# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| DEREK DIXON, | ) |
| | ) |
| | ) CIVIL ACTION |
| Plaintiff, | ) FILE NO. 1:25-CV-07102-SEG-CCB |
| | ) |
| v. | ) **JURY TRIAL DEMANDED** |
| | ) |
| TYLER PERRY; | ) |
| TPS PRODUCTION SERVICES, LLC; | ) |
| and AND ACTION, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## FIRST AMENDED AND VERIFIED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Plaintiff Derek Dixon ("Plaintiff" or "Mr. Dixon") submits the following

First Amended Verified Complaint for Damages and Equitable Relief against

Defendants Tyler Perry ("Perry"), TPS Production Services, LLC ("TPS"), and

And Action, LLC ("AA"), collectively referred to as "Defendants."

## INTRODUCTION

1.      This is egregious case of sex trafficking which reveals how the

world's richest actor, Tyler Perry, uses his unparalleled power in the

entertainment industry to target and recruit attractive young men for abuse.

Through his sprawling media empire, Defendant Perry preys on aspiring actors

sexually using invitations to participate in his lavish lifestyle, illusory promises

of "big breaks" and other career opportunities, and veiled threats of killing off their characters on his television shows. Defendant Perry uses every weapon in his arsenal to dominate these vulnerable young men, which included Mr. Dixon, and to secure their compliance with his insatiable sexual urges. Mr. Dixon brings this case for just compensation as well as the hope of holding one of the world's most powerful sex abusers to account.

2. Mr. Dixon asserts claims for wrongful discharge in violation of public policy under California law; a severe and pervasive sex-based hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); intentional infliction of emotional distress under California and Georgia law in the alternative; Sex Trafficking by Force, Fraud, or Coercion in violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1591 ("TVPA"); and a pattern of racketeering activity in violation of the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-16-4 ("Georgia RICO"). Mr. Dixon seeks lost wages and economic benefits of his employment; compensatory damages for emotional distress; punitive damages; reasonable attorney's fees and costs of litigation; divestiture, dissolution, or other reasonable restrictions upon the future activities of Defendants under O.C.G.A. § 16-16-6(a); and such other declaratory and equitable relief as this Court may deem just.

## JURISDICTION AND VENUE

3.   Plaintiff's claims present federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a), as well as Title VII, 42 U.S.C. § 2000e-5(f)(3).

4.   The Court has supplemental jurisdiction of Plaintiff's state law claims under 28 U.S.C. § 1267.

5.   Venue is proper under 28 U.S.C. § 1391(b)(1), (b)(3), and (d), as well as 28 U.S.C. § 1404(a) (*see* Doc. 67), and Title VII, 42 U.S.C. § 2000e-5(f)(3).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.   On January 13, 2025, Plaintiff filed charges of discrimination against Defendant TPS and Tyler Perry Studios with the U.S. Equal Employment Opportunity Commission ("E.E.O.C.") and alleging sex discrimination and sexual harassment,  which are attached as Exhibit 1.

7.   Previously, on October 14, 2024, Mr. Dixon entered into a tolling agreement with Defendants, which is attached as Exhibit 2.

8.   The October 14, 2024 tolling agreement had tolled "all periods of limitations, repose, and laches" applicable to any claims that Mr. Dixon or Defendants could assert "in any legal or administrative action" during the tolling period, which was from October 8, 2024 through December 8, 2024. *Id.* at pp. 1-2.

3

9. On December 9, 2024, Mr. Dixon and Defendants extended the October 14, 2024 tolling agreement through January 12, *2025, id.* at p. 5.

10. The total tolling period was thus 96 days.

11. On June 13, 2025, Plaintiff filed a second charge of discrimination against Defendants Perry, TPS, and AA with the California Civil Rights Division and alleging sexual harassment and retaliation, which is attached as Exhibit 3 at pages 6 to 8.

12. Prior to filing this case in the California Superior Court on June 13, 2025, Plaintiff received earlier that day a Notice of Right to Sue on his second charge of discrimination from the California Civil Rights Division. *Id.* at pp. 4-5.

13. The California Civil Rights Division is a deferral agency within the meaning of Title VII, such that a charge filed with that agency within a 300-day limitations period constitutes administrative exhaustion of Title VII. *See E.E.O.C. v. Dinuba Med. Clinic*, 222 F.3d 580, 585 (9th Cir. 2000).[1]

14. This action was first filed in the Superior Court of California for the County of Los Angeles on June 13, 2025. (Doc. 1-1.)

15. There is no need for the E.E.O.C. to issue the Notice of Right to Sue on Plaintiff's first charge of discrimination because his administrative remedies

---

[1] The Civil Rights Division was previously known as the Department of Fair Employment and Housing. *See Wilson v. City of Fresno*, 763 F. Supp. 3d 1073, 1090 (E.D. Ca. 2025).

as to his Title VII claim were exhausted as to the alleged conduct underlying that claim by the second charge he filed with the California Civil Rights Division, but if the Court holds otherwise, Plaintiff will promptly seek leave to amend the complaint further upon receipt of another Notice of Right to Sue from E.E.O.C.

## PARTIES

16.     Plaintiff Derek Dixon is an actor and screenwriter and resident of the State of New York.

17.     Mr. Dixon lived in Atlanta, Georgia from before 2019 until January of 2023 when he moved to California.

18.     Mr. Dixon lived in Santa Monica, California from January 2023 through February 8, 2025.

19.     Beginning in February 2025, Mr. Dixon lived in North Carolina until November of that year, when he moved to New York City.

20.     To the extent that California's borrowing statute could apply to any of Mr. Dixon's claims, he is entitled to the citizenship exception by reason of the fact that he was a citizen of California from January 2023 through February 8, 2025. *See* Cal. Code Civ. Pro. § 361.

21.     Defendant Tyler Perry is an individual who resides and conducts substantial business in the State of Georgia.

22. Defendant TPS is a limited liability company which creates and sells film and television projects.

23. Defendant TPS is the entity with which Mr. Dixon was employed when he performed for Defendant Perry in the pilot episode of *Losing It* in 2022 and 2023, when he performed for Defendant Perry in the film "Joy Ridge" in 2024, and from early 2024 onward with respect to the television show *The Oval* after Defendant AA assigned to Defendant TPS its rights and liabilities with respect to the employment of Mr. Dixon.

24. Defendant TPS is organized under the laws of the State of Georgia with its principal place of business located at 541 10th Street NW, #172, in Atlanta, Georgia 30318.

25. Defendant TPS is wholly owned by TPS Holdings Group, LLC, a Delaware LLC which is headquartered in Georgia and owned in part by Defendant Perry.

26. Defendant AA was a limited liability company organized under the laws of the State of Georgia with its principal place of business located at 541 10th Street NW, #172, in Atlanta, Georgia 30318.

27. Defendant Perry was a Managing Member for Defendant AA.

28. AA was purportedly dissolved on December 18, 2023.

29.     Defendant AA assigned its rights and liabilities with respect to the employment of Mr. Dixon to Defendant TPS before August 6, 2024.

30.     As an owner of TPS Holdings Group, LLC, which owns Defendants TPS and AA, and as the Manager of AA, Defendant Perry qualifies as the alter ego of Defendants TPS and AA, as well as their proxy for purposes of the tort and statutory liability alleged below.

31.     Mr. Dixon was at all relevant times an "employee" of Defendants TPS and AA as that term is defined by Title VII, 42 U.S.C. § 2000e(f).

32.     Mr. Dixon was at all relevant times an "employee" of Defendants TPS and AA as that term is defined by California law.

33.     Defendants TPS and AA were at all relevant times an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b).

34.     Defendants Perry, TPS, and AA were at all relevant times an "employer" within the meaning of the California Fair Employment and Housing Act, Cal. Gov't. Code § 12926(d).

35.     Defendants TPS and AA received revenue from the sale and distribution of the film and television projects that Mr. Dixon appeared in while employed with Defendants.

36.     Because Defendant Perry is an owner of Defendant TPS and was an owner of Defendant AA and he exercised creative control over the film and

television projects created, sold, and distributed by them, Defendants Perry, TPS, and AA were associated in fact with respect to the creation, sale, and distribution of the film and television projects in which Mr. Dixon appeared as an actor as well as the tortious trafficking conduct against him alleged below.

37.    At all relevant times, Defendants TPS and AA had actual or constructive knowledge that Defendant Perry was sexually assaulting and harassing Mr. Dixon and others and attempting to coerce participation in sexual activity in exchange for commercial benefit in violation of 18 U.S.C. § 1591.

## FACTUAL ALLEGATIONS CONCERNING EMPLOYEE STATUS

38.    During his employment with Defendants Perry through Defendants TPS and AA, Mr. Dixon was required to perform his services when and where Defendant TPS or Defendant AA decided.

39.    Defendants TPS and AA also had the right to approve of anything with respect to the film and television projects in which Mr. Dixon performed, including anything about his performance, and their decisions were final.

40.    During his employment with Defendants, Mr. Dixon was compensated at an agreed-upon rate for the projects in which he performed, and he was not able to earn more or less depending on his skill.

41.    Mr. Dixon did not invest any money in any equipment or materials required for his performance in the film and television projects produced by

8

Defendants; camera equipment, wardrobe, accommodations, and other expenses were paid for by Defendants.

42.   Mr. Dixon worked for Defendant Perry, through TPS and AA, from 2019 through 2024.

43.   And Mr. Dixon had the opportunity to continue working on the television project called *The Oval* for an additional three years after 2024.

44.   Defendant TPS and Defendant AA are media production companies which exist for the sole business purpose of creating television and film productions starring actors like Mr. Dixon.

45.   Defendants TPS and AA also had the right to withhold payment and to remit those payments to government entities as payroll and other taxes for Mr. Dixon, and they did so.

46.   Defendants could also prevent Mr. Dixon from working in other television and film productions during pre-production or production periods for the projects with Defendants, among other restrictions.

47.   And Mr. Dixon has continued to receive W-2 earnings statements for his work on *The Oval* since 2023 and as recently as January 2026.

48.   When Mr. Dixon's mental health deteriorated to the point that he gave them notice he could not return to work on October 1, 2024, Defendants suggested that he take medical leave rather than terminate his employment.

9

## FACTUAL ALLEGATIONS CONCERNING CONDUCT IN OR AFFECTING INTERSTATE COMMERCE

49.     Through Defendants TPS and AA, Defendant Perry paid Mr. Dixon for his work between 2019 and 2024 through GEP Talent Services, LLC, a company headquartered in Burbank, California which provides payroll and related services to actors and other employees in the entertainment industry.

50.     Defendants thus routed money through banks to California with knowledge that they were paying Mr. Dixon in that State for his work.

51.     During Mr. Dixon's employment on *The Oval*, Defendant Perry, through Defendant AA, provided Mr. Dixon with roundtrip airfare between Los Angeles, California and Atlanta, Georgia in 2023.

52.     During Mr. Dixon's employment in Joy Ridge, Defendant Perry, through Defendant TPS, provided Mr. Dixon with roundtrip airfare between Los Angeles, California and Atlanta, Georgia in 2024.

53.     When Mr. Dixon lived in California from January 2023 through the end of his employment with Defendants on October 1, 2024, Defendants TPS and AA sent Mr. Dixon scripts, contracts, and other materials necessary for his employment through email and through interstate mail services from Atlanta.

54.     During the time Mr. Dixon lived in California from January 2023 through the end of his employment with Defendants on October 1, 2024, Defendants knew that Mr. Dixon lived in California and was performing his

10

work for Defendants, including but not limited to reading and writing scripts and preparing performances as an actor on the show *Losing It.*

55. When Mr. Dixon lived in California from January 2023 through the end of his employment with Defendants on October 1, 2024, Defendant Perry, individually and on behalf of Defendants TPS and AA, contacted Mr. Dixon by telephone from Defendant Perry's location in Georgia.

56. Defendants knew that Mr. Dixon resided in California from January 2023 through the end of his employment with Defendants on October 1, 2024 when Defendant Perry intentionally directed harassing communications to him in the State of California.

## FACTS

### *Defendant Perry's Pattern of Recruiting Aspiring Actors and Using their Employment to Sexually Coerce and Harass Them*

57. Defendant Perry has recruited several young men to work for his media production companies and then sexually assaulted and harassed them and used implied threats of ending their careers or promises of career opportunities to buy their silence and gain their acquiescence.

58. For example, when actor Bill Barrett interviewed for a television show produced by Defendant Perry and his companies, the casting team did not want to cast Mr. Barrett but then Defendant Perry directed that he be cast.

11

59.    After Mr. Barrett was cast, his character on the television show was shot at the end of the season in which he appeared.

60.    After this, Defendant Perry began inviting Mr. Barrett on trips alone with him and took Mr. Barrett shopping and bought him clothing.

61.    As another example, according to another lawsuit filed against Defendant Perry in the Los Angeles County Superior Court, No. 25STCV37750, Defendant Perry approached actor and model Mario Rodriguez through a gym trainer and told him he wanted to offer him an acting role in 2015.

62.    Defendant Perry began to contact Mr. Rodriguez and ask him personal questions about his upbringing and living situation and offered to send him the script for a small part in the film "Madea's Halloween."

63.    Defendant Perry then invited Mr. Rodriguez to his home, suggested that he drink alcohol, told him he had trauma and should let Defendant Perry hug him, and then started rubbing him and trying to have sex with him.

64.    When Mr. Rodriguez stopped the encounter and tried to leave, Defendant Perry said, "I promise I'm a good guy to know and have in your corner," and "I would take care of you for the rest of your life and you wouldn't have to worry about anything."

12

65.     Defendant Perry sexually assaulted Mr. Rodriguez again at the end of 2018 or early 2019 when he grabbed Mr. Rodriguez's hand and placed it on his penis and then stuffed $5,000 in Mr. Rodriguez's pocket before he left.

66.     In December 2023, an actor named Christian Keyes who had worked for Defendant Perry in the movie "Diary of a Mad Black Woman" and other projects alleged in a social media posting that he had endured sexual harassment by a Black billionaire who offered him money, among other things.

67.     Upon information and belief, Defendants sexually harassed and coerced or attempted to coerce Mr. Keyes into sex acts as well.

### Defendant Perry Targets Mr. Dixon for Recruitment

68.     In or around September 2019, Mr. Dixon worked for a catering and event company called Legendary Events that was hired to organize a studio opening party for Defendants Perry and TPS.

69.     At the party, Defendant Perry picked Plaintiff out of a crowd of employees and began asking him questions about his employment status and whether he was an actor.

70.     Mr. Dixon said he had tried acting before but was not an actor.

71.     On the last day of the party, Defendant Perry insisted that he and Mr. Dixon exchange telephone numbers, and Defendant Perry then began texting Mr. Dixon and asking him about his dreams and aspirations.

72.    Mr. Dixon told Defendant Perry that he was interested in acting and writing for television and film productions.

73.    In October 2019, Defendant Perry asked Mr. Dixon to do an audition over the telephone and send it to him.

74.    Mr. Dixon responded that he was a Halloween party, and then Defendant Perry asked to see pictures of Mr. Dixon in his costume. When Mr. Dixon complied, Defendant Perry texted Mr. Dixon in response, "I was gonna say. Your cowboy needs a sugar daddy."

75.    Defendant Perry continued with another text saying, "You look great. You're just lacking costume parts. Sorry don't want to offend."

76.    Mr. Dixon responded, "Not at all. It's so true. Half-assed costume." To which Perry replied, "What's true? Cowboy needs a sugar daddy?" implying that Perry wanted to be Dixon's sugar daddy.

77.    Soon thereafter, Mr. Dixon's boss at Legendary Events called him and said that Defendant Perry was having another event in Los Angeles and that Defendant Perry specifically wanted Mr. Dixon to fly from Atlanta to Los Angeles to work on the event.

78.    Mr. Dixon was flattered by the attention from Defendant Perry and excited for the opportunity to fly to Los Angeles and possibly obtain work in the entertainment industry, so he eagerly accepted the job.

14

79.    After working the event in Los Angeles, on November 3, 2019, Defendant Perry sent Mr. Dixon several text messages saying that he "would love to find [Mr. Dixon] a job," and "change [Mr. Dixon's] life," insisting that they should "make it happen."

80.    Defendant Perry sent Dixon another text message warning, "Be careful hanging around me!! I cause dreamers to dream bigger!! I cause them to not only believe but do!! Then let's make it happen. You're an artist. You have to be fulfilled. Nothing else will suffice."

### Defendant Perry Begins his Campaign of Sexual Harassment and Coercion of Mr. Dixon

81.    On November 4, 2019, Defendant Perry sent an email to Mr. Dixon which contained an offer for him to play the role of "Dale" in a few episodes of Defendant Perry's television series *Ruthless*.

82.    *Ruthless* was produced by Defendants Perry and AA, and filmed at Defendant TPS's studio in Georgia.

83.    Defendant Perry told Mr. Dixon that the role of Dale was a small role that could get a lot bigger.

84.    Mr. Dixon filmed his roles in *Ruthless* in mid-November 2019 and went back to his job as an event staff for Legendary Events.

85.    Approximately one month later, Defendant Perry bought and gave to Mr. Dixon a new Kia Telluride sport utility vehicle, telling Mr. Dixon that his jeep "wouldn't do."

86.    Mr. Dixon was elated and felt that Defendant Perry believed he had talent and could be a star.

87.    In December 2019, Defendant Perry again requested Mr. Dixon to work at an event at Defendant Perry's home in Jackson Hole, Wyoming.

88.    After the event at his home in Jackson Hole, Defendant Perry began calling Mr. Dixon frequently and sending him frequent text messages, insisting that Mr. Dixon "give [Defendant Perry] some attention."

89.    On New Year's Eve in 2019, Defendant Perry texted Dixon "I can't tell you the last time I pumped gas. Or went to the supermarket. Or fly commercial. Or packed a bag. **Or had good sex**. It was before I was rich."

90.    Mr. Dixon found the sexual messages from Defendant Perry to be strange and inappropriate, but being new to the entertainment industry, he felt he needed to avoid upsetting Defendant Perry and so he responded by trying to downplay the sexual comments and move on to other topics.

91.    In January 2020, just a few months after Mr. Dixon's first acting job for Defendants Perry, TPS, and AA on television series called *Ruthless,* Mr. Dixon was invited to Defendant Perry's home in Douglas County, Georgia.

92. Mr. Dixon showed up to Defendant Perry's home hoping that he would be able to befriend Defendant Perry and show him that Mr. Dixon had talent and potential as an actor.

93. At his home in Douglas County, Defendant Perry served Mr. Dixon several alcoholic drinks.

94. At one point, Defendant Perry told Mr. Dixon to give him a hug, which Mr. Dixon did because he did not want to offend Defendant Perry.

95. Later in the evening, Defendant Perry told Mr. Dixon that he should not drive home because he was too inebriated.

96. Mr. Dixon agreed and was escorted to a guest room.

97. Mr. Dixon went to bed wearing only his underwear because he did not have any pajamas.

98. Before he knew it, Mr. Dixon felt someone get into the bed with him and start rubbing his body around his inner thighs in a sexual manner.

99. Mr. Dixon turned around and saw that it was Defendant Perry who was molesting him.

100. Feeling violated and sickened, Mr. Dixon jumped out of the bed and told Defendant Perry he "wasn't that sexual."

17

101. But Defendant Perry ignored Mr. Dixon's remark, told him to turn around so that Defendant Perry could see Mr. Dixon in his underwear, and commented on how beautiful Mr. Dixon's body was.

102. Mr. Dixon again told Defendant Perry he was not interested in sex.

103. Defendant Perry eventually left the room.

104. The next day, after Mr. Dixon had left, Defendant Perry sent him a text message claiming that Mr. Dixon was an "affectionate drunk."

105. Defendant Perry continued thereafter to proposition Mr. Dixon for sex in regular text messages and telephone calls.

106. Mr. Dixon did not want to insult Defendant Perry because he held the keys to Mr. Dixon's continued employment as an actor, and so he attempted to deflect by saying that he was not into sex.

107. Defendant Perry responded by prying into Mr. Dixon's personal life and trying to persuade him to be willing to have sex with Defendant Perry.

108. After this, Defendant Perry began to text Mr. Dixon or call him almost every day.

109. When Mr. Dixon didn't respond or answer Defendant Perry's telephone calls, Defendant Perry harassed him with text messages like the one he sent in January 2020 saying, "Derek. Why don't you text me more?"

18

110.    Mr. Dixon felt very uncomfortable about the sexual harassment by Defendant Perry, but he felt that if he did not allow it, Defendant Perry would terminate his employment and stop offering him acting opportunities.

111.    Defendant Perry invited Mr. Dixon to his house on other occasions during early 2020, and when Mr. Dixon went, Defendant Perry asked him sexually explicit questions, such as whether Mr. Dixon was a "top" or "bottom," or in other words, whether he gave or received during sexual intercourse.

112.    Defendant Perry also elaborated on his sexual prowess with men, saying that he was a "top," and "when you have a big dick and when hit the G spot right on these bottoms, they go crazy."

113.    Defendant Perry also complained to Mr. Dixon that he gave and gave and no one does anything for him in return or gives him what he needs.

114.    Defendant Perry told Mr. Dixon he wanted a man who is in a relationship with someone else and emotionally involved with him so that Defendant Perry can have sex with the man and then the man can go back to his significant other.

115.    On February 11, 2020, Defendant Perry told Mr. Dixon that he should quit his job working for Legendary Events and work for Defendant Perry full-time.

116. In March 2020, after Mr. Dixon had refused Defendant Perry's attempts to have sex with him, Defendant Perry offered Mr. Dixon a recurring role on a new television show he was producing called *The Oval*.

117. Mr. Dixon was intrigued and hoped that this would be the big break he was looking for and a chance to demonstrate his acting talent.

118. As he read the scripts, Mr. Dixon realized that the character was a gay, homeless man who had to sleep with one of the other characters in order to have a place to live.

119. Mr. Dixon also saw that his character was shot four times at the end of the season.

120. Mr. Dixon asked Defendant Perry about his character's death, and Defendant Perry responded that the character was not shot in the head, so that if Mr. Dixon "did a good job," then maybe Mr. Dixon's character would come back in the next season.

121. Mr. Dixon began to feel that he needed to please Defendant Perry or he would not be able to continue in his employment as an actor for Perry.

122. Defendant Perry also continued to sexually harass Mr. Dixon during this time, inviting Mr. Dixon to his home and when he came to visit, forcing him to discuss his sex life.

123.   On one occasion, Defendant Perry asked Mr. Dixon if he liked it "rough" in bed, to which Mr. Dixon said he did with one partner he had.

124.   Defendant Perry reached his hand out and pretended that he would choke Mr. Dixon and said, "wow! Look how you excited you just got! You do like that!"

125.   Defendant Perry told Mr. Dixon that he should move out of his apartment because Mr. Dixon's roommate might give him COVID-19, and had Mr. Dixon move into one of the studio houses owned by Defendant TPS.

126.   During the COVID-19 pandemic throughout the rest of 2020, Defendant Perry texted or called Mr. Dixon nearly every day.

127.   Defendant Perry got mad if Mr. Dixon did not respond, sending text messages saying things like, "DEREK!!!!!" or "GRRRRR!!!!!!" or "What are you doing!!" if Mr. Dixon did not respond quickly.

128.   Defendant Perry also continued to make inappropriate sexual remarks and requests for sex to Mr. Dixon through the remainder of 2020, such as telling Mr. Dixon that he had a dream about Mr. Dixon dressed as a cowboy and it was so inappropriate and sexual that Defendant Perry couldn't even say what Mr. Dixon was doing in the dream.

129.   In 2020 when Mr. Dixon lived in one of the TPS studio houses, Defendant Perry frequently had someone drop off alcohol for Mr. Dixon and then called Mr. Dixon to try to talk about sex with him.

130.   Defendant Perry also constantly sent inappropriate sexual remarks and requests for sex to Mr. Dixon by text messages, including but not limited to:

      a.   Sending Mr. Dixon a text message on April 9, 2020 asking him to keep their "new friendship" secret from others because Defendant Perry doesn't have "friends" who work for him and suggesting that this was necessary for Mr. Dixon's success in acting;



b.   Sending him a text message on June 27, 2020, in which he said "Biscuits and BJs. That's what I tell people I want for my birthday every year. But all I get are biscuits."

c.   Sending him text messages saying that he was cute;

d.   Sending him a text message referring to a scene in *The Oval* in which a character grabbed Mr. Dixon by the neck saying, "And when lodrric grabbed you by the neck and you quickly said yes!!!"

e.   Sending him a text message saying, "why do you twist your hips when you work?"

f.   Sending him text messages with comments about his body, such as talking about whether he was "thick" or "skinny";

g.   Sending to Mr. Dixon pictures of his buttocks that Defendant Perry took and saying that he "lost his butt" and asking him "when will you be thick again?"

h.   Sending to Mr. Dixon a text message on August 12, 2020 saying that he hadn't "been touched in months":

23



i.    Sending Mr. Dixon a text message on August 16, 2020 saying

that the testosterone he was taking made him horny and he

"felt sorry for the first person that flirts with [him]":



j.    Sending to Mr. Dixon a picture of himself on his Bahamian

island and insisting that Mr. Dixon refer to him as a "stud":



131.    Defendant Perry's text messages were also often demanding, such as the September 23, 2020 text message he sent saying "Are you awake? Stop ignoring me. You are awake. Derek. WAKE UP. I KNOW YOU'RE NOT SLEEPING BECAUSE YOU'RE…"

132.    In October 2020, Mr. Dixon reluctantly accepted an invitation to go with Defendant Perry to his Bahamian island because another actor was supposed to go with them.

133.    However, the other actor ended up not going.

25

134. While on Defendant Perry's island, Defendant Perry again pressured Mr. Dixon to drink alcohol and groped his buttocks and told him that he wanted to have a relationship with someone who could be sexually available to Defendant Perry but also have their own relationship with someone else.

135. Defendant Perry said he could see having that with Mr. Dixon, and told Mr. Dixon that he needed to be with someone rich because Mr. Dixon likes nice things.

136. In October 2020, after they returned from the Bahamas, Defendant Perry told Mr. Dixon again that he was jealous of Mr. Dixon giving too much attention to other men, told him that he was being too much of a "social butterfly," and that he would need Mr. Dixon to "sit still this week."

137. Defendant Perry's sexual harassment of Mr. Dixon continued with inappropriate telephone calls and text messages multiple times per month from January 2021 through June 2021, including, but not limited to:

      a.    Sending a text message in February 2021 saying, "what's your waist? I'm so glad think (sic) Derek us (sic) back."

      b.    Sending Mr. Dixon a text message on February 20, 2021 trying to pressure him into having sex, saying, ""What's it going to take for you to have guiltless sex?"



c.      Sending Mr. Dixon a text message on March 27, 2021 saying,

"You home? I don't want you out with your 'friends'.

Drinking."

d.      Sending Mr. Dixon a text message on April 5, 2021 saying,

"You are the rose. But you are so blocked that you refuse to be

smelt or opened."

27



e.  Sending Mr. Dixon a text message on April 26, 2021 saying,
"you're so beautiful, when you finally are able to unlock your
mind you're going to make that person crazy"

28

f.   Sending Mr. Dixon another text message on April 26, 2021 saying, "I would hope that you would let some one hold you and make love to you. You are missing the best years of your life my friend. Trust me. I hope you get past that block in your mind soon."



g.   Sending Mr. Dixon a text message on April 29, 2021 telling him that a picture he saw of Mr. Dixon with another man made him jealous and remarking that his body looked "thick";



h.    Sending Mr. Dixon a text message on May 9, 2021 asking him

what he was doing and when he said hanging out with a

girlfriend, Defendant Perry said "She wants you too. …

Everybody wants to fuck Jacob" referring to the name of the

character Mr. Dixon played on *Losing It.*

138.    On June 4, 2021, Defendant Perry again invited Mr. Dixon to visit at

his home in Douglas County, Georgia.

139. Mr. Dixon again felt obligated to accept because of Defendant Perry's position and ability to control his employment as an actor, and so he accepted the invitation.

140. After having a few drinks, Defendant Perry against resorted to asking several inappropriate and probing questions about Mr. Dixon's sex life, Defendant Perry said he was getting too drunk and it was time to go to bed.

141. Defendant Perry led Mr. Dixon to a guest house, near which there was a specialized health monitoring scale.

142. Defendant Perry suggested that Mr. Dixon step onto the scale, but said Mr. Dixon had to get into his underwear for it work, which Mr. Dixon did because he was getting ready to go to bed.

143. As Mr. Dixon was heading to the guest room, Defendant Perry told him to give Defendant Perry a hug, which he did, and Defendant Perry then pulled Mr. Dixon's underwear down and started groping his buttocks.

144. Mr. Dixon protested, saying, "No, I don't want to be naked," and "I don't want this," and tried to pull his underwear back up, but Defendant Perry grabbed Mr. Dixon's wrists to keep him from pulling his underwear back up and said, "Relax, just let it happen," "I'm not going to hurt you," and "I'm not even hard right now," and then groped his buttocks again.

31

145. Mr. Dixon was terribly frightened and believed that he was going to be raped by Defendant Perry, who is six feet and five inches tall and must larger than Mr. Dixon.

146. Mr. Dixon was able to get free of Defendant Perry's grasp and after this claimed that he was hungry and needed food in order to end the encounter.

147. After eating back in the main house, Mr. Dixon went to the bathroom, locked the door to keep Defendant Perry from assaulting him again, and slept on the bathroom floor.

148. In the morning, as he was trying to find his keys to leave, Defendant Perry saw him and said, "See this is why we shouldn't drink together. That shouldn't have happened last night."

149. When Mr. Dixon said, "so that was my fault?" Defendant Perry said, "no," and that he drank too much.

150. Mr. Dixon was distraught by the incident, suffering such overwhelming feelings of anxiety, guilt, shame, and revulsion that it affected him physically and caused him to suffer tremors.

151. Defendant Perry's sexual harassment of Mr. Dixon was also coercive in that, along with the sexual remarks and requests for sex, Defendant Perry regularly mentioned career opportunities he could offer or secure for Mr. Dixon, including, but not limited to:

32

a.    In July 2020, Defendant Perry told Mr. Dixon that he loved a television pilot program written by Mr. Dixon called *Losing It* and that he was interested in filming it;

b.    During the months after the June 4, 2021 sexual assault at Defendant Perry's Douglasville home, Defendant Perry called Mr. Dixon to claim that he was "looking for a director" for the pilot and

c.    On January 21, 2023, Defendant Perry puffed Mr. Dixon up about the pilot Mr. Dixon wrote called *Losing It*, saying that he liked it and claiming that he would help Mr. Dixon get the pilot produced and sold to Amazon or Netflix;



d.    After the pilot for *Losing It* was shot in 2023, telling Mr. Dixon

that the show would net two to three million dollars per

episode and run for two seasons "guaranteed"; and

e.    Promising Mr. Dixon he would send the pilot of *Losing It* to

Peter Friedlander at Netflix.

34

152.    Defendant Perry also made it clear to Mr. Dixon that he enjoyed and would use the power to write actors who did not please him off his show by killing those characters in the story, including but not limited to:

      a.      In a verbal conversation in Defendant Perry's trailer in 2020, Defendant Perry explained to Mr. Dixon frankly that he kills off the characters of actors who "piss [him] off";

      b.      Pressuring Mr. Dixon to respond and engage with him with constant text messages like the one on June 20, 2020, in which he insisted on knowing what Mr. Dixon was doing, followed up with "DERRRREEKK" when Mr. Dixon did not respond, and expressed frustration about not getting attention:



c.  On August 2, 2020, Defendant Perry mentioned two actors who had upset him and said he knew "HOW TO FIX THIS SHIT" by writing them off the show and that he "love[s] killing a mother fucker in a show that no one expects";



d.  After Mr. Dixon resisted Defendant Perry's attempts to coerce sex with him, asking Mr. Dixon in April 2021 if he needed to "punch [Mr. Dixon] in the stomach" to act the way Defendant Perry wanted him to act;

e.  In 2021 and 2022, Defendant Perry lashed out at Mr. Dixon on set frequently in of other cast members, which stunned them to the point that some of them mentioned it to Mr. Dixon.

### Defendant Perry Uses Mr. Dixon's Employment to Buy his Silence About the Sexual Batteries

153.  On June 6, 2021, Defendant Perry sent Mr. Dixon a text message saying, "I really need to talk to you please call as soon as you can."

154.  After several calls went unanswered, Mr. Dixon finally picked up, and Defendant Perry apologized for the assault, claiming that it was caused by testosterone that he was taking or perhaps he was "self-sabotaging."

155.  Defendant Perry then attempted to invite Mr. Dixon on a yacht trip but Mr. Dixon declined.

156.  Defendant Perry then told Mr. Dixon, "we're going to make your show, so don't worry about that."

157.  Mr. Dixon was conflicted because he wanted to be successful as an actor and have his pilot produced, but he knew Defendant Perry was promising to make it happen in exchange for Mr. Dixon to accept the sexual assault and how Defendant Perry wanted to treat him.

*Defendant Perry Continues to Use Employment Opportunities for Mr. Dixon to to Pave the Way for Ongoing Sexual Harassment*

158.   In July 2021, Mr. Dixon received a telephone call from staff at TPS, who said that Mr. Dixon's pilot would be filmed in the Fall or Winter.

159.   Days later, Mr. Dixon received a telephone call from one of Defendant Perry's lawyers, who said, "Christmas came early" because Defendant Perry decided that Mr. Dixon's character on *The Oval* would be returning that year when filming resumed in November 2021.

160.   Defendant Perry's lawyer also told Mr. Dixon that he was "getting a raise" from $10,000 per episode of *The Oval* to $16,000 per episode in 2021, increasing up to $19,000 per episode in upcoming seasons, but told him to keep it a secret from his castmates because none of them were getting raises.

161.   During this time, Mr. Dixon began seeking treatment from a counselor for anxiety and depression.

162.   When Mr. Dixon returned to Atlanta in November 2021 to begin shooting another season of *The Oval*, he had a panic attack in his dressing room after seeing Defendant Perry for the first time again.

163.   Defendant Perry then began calling and sending more text messages to Mr. Dixon, saying that he wanted to purchase *Losing It* from Mr. Dixon.

164.   On or around March 4, 2022, Mr. Dixon signed the literary purchase agreement for the Pilot, giving the rights for the series to Defendant TPS.

165. However, Defendant TPS's pre-existing television contracts with ViacomCBS, now known as Paramount Global, prevented the sale of Mr. Dixon's show for at least two more years.

166. Yet, Defendant Perry had purchased the rights to *Losing It* knowing that he would not and could not try to sell it to any network because he was under contract with ViacomCBS which prevented him from doing so.

167. On or around April 9, 2022, Mr. Dixon received the script for another season of *The Oval*, in which Mr. Dixon's character, originally written as a grocery store clerk, would play a male prostitute being pursued by a pimp.

168. The new situations involving Mr. Dixon's character shared eerie similarities to Defendant Perry's sexual pursuit of Mr. Dixon.

169. Also in April 2022, Defendant Perry called Mr. Dixon and said they need to talk about what happened at Defendant Perry's Douglasville home, and said that Mr. Dixon was overreacting and just needed to "say no stronger."

170. When Mr. Dixon reminded Defendant Perry that he had said "no," Defendant Perry said "yeah, but you need to say it stronger."

171. Mr. Dixon felt violated again by Defendant Perry's attempt to minimize what the sexual assault.

39

172.   On April 17, 2022, Mr. Dixon went on a trip with the other cast members from *The Oval*, during which Defendant Perry said to Mr. Dixon that he was "glad" that he and Mr. Dixon were "past our 'confusion.'"

173.   So as not to jeopardize his employment with Defendants Perry and TPS, Dixon dismissed the conversation, especially due to the allegedly impending sale of his show to a major broadcasting company.

174.   However, on or around October 28, 2022, after filming a full season of *The Oval*, Perry told Dixon that despite shooting the Pilot, it could "take a while to place," and that Perry couldn't do any other television series until "[his] deal was up with Viacom" which would take about two years.

175.   In January 2023, Mr. Dixon moved to Santa Monica, California, partly in order to get away from Defendant Perry.

176.   Defendants knew that Mr. Dixon moved to Santa Monica in January 2023 because he told Defendant Perry at the time.

177.   But even after he moved, Defendant Perry continued to sexually harass Mr. Dixon by regularly calling him and sending him text messages, including sexual remarks and discussion about sex.

178.   During 2023, Defendant Perry called Mr. Dixon on the telephone and sent text messages to him approximately once a week, including but not limited to:

40

    a.    On January 24, 2023, asking him about whether his "no" is "stronger" and apparently referring to Harvey Weinstein with regard to trading sex for career opportunities;

    b.    Texting him on May 5, 2023 saying "still cheating on me?"

    c.    Calling Mr. Dixon in November 2023 to tell him that he would be able to sell *Losing It* in 2024, and then asking Mr. Dixon who he was having sex with, whether he was the "top" or "bottom," and whether he was using the medication called "Prep" to prevent contracting of the HIV virus;

179. During 2024, Defendant Perry began to call Mr. Dixon on the telephone and send him text messages more often, calling him three or four times per month to ask about his sex life and dangle work in front of him.

180. At this time, between January 2024 and June 2024, Defendant Perry's sexual remarks, attempts to get Mr. Dixon to talk about sex with him or others, and false promises of opportunities continued, including but not limited to:

    a.    Offering Mr. Dixon a role in the film called *Finding* Joy;

    b.    Calling Mr. Dixon in March or April of 2024 and asking him why he doesn't have more sex and why he's single, and telling Mr. Dixon that he loved him and asking if he should the pilot for *Losing It* to Netflix;

c.  Continuing to pressure Mr. Dixon with remarks about him making a mistake by not having more sex, presumably with Defendant Perry, such as the one on May 14, 2024 that he sent with a link to a video of a man dancing alone and telling Mr. Dixon it would be him in 30 years:



d.  Calling Mr. Dixon on the telephone in June 2024 and telling him that he was a "sexy man," that he "should be having sex more," and that he was wasting his life by not doing so;

e.  Texting Mr. Dixon in June 2024 about opportunities to write and direct for Defendant Perry's shows, indicating that he needed a replacement to continue writing.

181.  In early 2024, Mr. Dixon saw reports of the allegations by Christian Keyes and realized that Defendant Perry's behavior was a pattern.

182. This realization, combined with Defendant Perry's continued sexual harassment and making of false promises to coerce Mr. Dixon to accept the harassment and be sexual with him, Mr. Dixon to realize that Defendant Perry would never stop trying to abuse him sexually.

183. As a result, Mr. Dixon's mental health began to deteriorate even further and was exacerbated to the point where he could not return to working for Defendants on October 1, 2024.

### Mr. Dixon's Mental Health Suffers to the Point he Can no Longer Work for Defendants Perry, TPS, and AA

184. After Defendants began to subject Mr. Dixon to sexual harassment and the first sexual assault in March 2020, Mr. Dixon began seeing a counselor for anxiety and depression caused by the event.

185. After the June 2021 sexual assault pled above, Mr. Dixon's mental health condition worsened, and his counselor suggested he get intensive psychiatric therapy, but Mr. Dixon could not afford to do so.

186. When Mr. Dixon moved to California in January 2023, his goal was to put distance between himself and Defendant Perry.

187. Yet, when the distance did not prevent Defendant Perry from continuing to contact Mr. Dixon as pled above, Mr. Dixon's mental health condition worsened, leading to various symptoms consistent with anxiety, depression, and trauma.

43

188. In particular, after Defendant Perry began to contact Mr. Dixon more often in 2024, Mr. Dixon suffered an acute episode of depression in July of 2024.

189. Mr. Dixon also began to suffer sleep disturbances, including waking three times a night and suffering frequent nightmares beginning in July 2024.

190. Mr. Dixon also began to suffer from flashbacks of the physical assaults nearly every day, as well as decreased appetite, difficulty concentrating on scripts, and anhedonia, or the loss of the ability to experience pleasure.

191. Mr. Dixon saw a psychiatrist in 2024, Dr. Trevor Haas, who diagnosed Mr. Dixon with major depressive disorder for the first time and prescribed duloxetine, an anti-depressant medication more familiarly known under the brand name Cymbalta.

192. Dr. Haas also recommended Mr. Dixon consider taking the medication called prazosin, known more familiarly by the brand name Minipress, for nightmares related to post-traumatic stress disorder.

193. Dr. Haas observed that Mr. Dixon's major depressive disorder was chronic and worsening in October 2024.

194. Mr. Dixon gave notice to Defendants in September 2024 that he could not return to work, on set, on October 1, 2024.

195. Mr. Dixon was a California resident and in California when he gave notice to Defendants in September 2024 that he could not return to work.

44

196.    Eventually, on February 8, 2025, without the steady income needed to pay rent and provide for himself in California, Mr. Dixon moved back to North Carolina to live with his parents again.

## COUNT I

### WRONGFUL DISCHARGE AND RETALIATION IN VIOLATION OF PUBLIC POLICY UNDER CALIFORNIA LAW
#### *Against all Defendants*

197.    Plaintiff incorporates by reference the foregoing paragraphs 1 through 196 pled above.

198.    Plaintiff was employed by Defendants Perry, TPS, and AA.

199.    Plaintiff suffered adverse employment actions at the hands of Defendants Perry, TPS, and AA, including but not limited to a sexually hostile work environment and constructive discharge while living and working in California and while in Georgia.

200.    Plaintiff was subjected to harassment by Defendant Perry, including but not limited to the above-pled sexual assaults, unwanted physical touching, propositions for sex, and sexual remarks and comments, some of which happened in California and some of which happened in Georgia.

201.    The harassment also included constant implied threats to end the employment of Plaintiff as an actor with Defendants, and to refuse to grant and

provide opportunities for continued and additional employment as an actor on film and televisions projects.

202.   The harassment also included constant offers of opportunities for continued and additional employment as an actor on film and television projects in exchange for acquiescing to sexual activity with Defendant Perry and/or remaining silent about sexual harassment and sexual assault and battery perpetrated by Defendant Perry.

203.   The harassment was unwelcome.

204.   The harassment was based on Plaintiff's sex.

205.   The harassment was severe or pervasive.

206.   In addition, Plaintiff was required by Defendants Perry, TPS, and AA to submit to sexual conduct by Defendant Perry as a condition of receiving concrete employment benefits, including but not limited to new acting roles on new film and television projects; the purchase, creation, and promotion of a pilot television project authored by Plaintiff; and continued employment as an actor and writer.

207.   Because Plaintiff did not acquiesce to sexual activity with Defendant Perry, Defendant Perry refused to ensure the distribution and sale of Plaintiff's pilot television program.

46

208. The acts of sexual harassment, quid pro quo propositions, and constructive discharge alleged above constituted a continuing pattern of wrongful conduct and a continuing violation of California public policy.

209. The last acts of sexual harassment alleged by Plaintiff to constitute part of the sex-based harassment occurred on May 14, 2024, when Defendant Perry sent Plaintiff a text message making light of him being alone if he would have sex with people (*see supra*, ¶ 181.d); in the June 2024 telephone call in which he asked Plaintiff about his sex life and whether he was having sex with anyone (*see supra*, ¶ 181.f); and at the constructive termination of his employment on October 1, 2024 while Plaintiff was living in California. (*see supra*, ¶ 183).

210. The sexually hostile work environment and sex-based harassment by Defendants—including the sexual text messages, sexual comments on the telephone, and quid pro quo propositions directed at Plaintiff while he resided in California from January 2023 through the end of his employment on October 1, 2024—was so intolerable that Plaintiff was unable to return to working for Defendants on October 1, 2024.

211. Mr. Dixon was a California resident and in California when he became unable to return to work for Defendants on October 1, 2024.

212. Under California law, including but not limited to the <u>California Constitution, art. I, § 8</u>, and the California Fair Employment and Housing Act

47

(FEHA), Cal. Gov't. Code § 12940, there is a strong public policy forbidding harassment of an employee on the basis of sex.

213.   The sexual harassment of Plaintiff by Defendants, including the quid pro quo harassment and constructive discharge, was substantially motivated by a violation of public policy in that Defendants intentionally created and/or knowingly permitted working conditions that were so intolerable or aggravated that Plaintiff's resignation was compelled.

214.   Plaintiff's constructive discharge was also in retaliation for his attempt to exercise a fundamental right—the right to be free from sexual assault and harassment.

215.   Plaintiff's working conditions were in fact so intolerable or aggravated at the time of his resignation that any reasonable employer would realize that a reasonable person in his position would be compelled to resign.

216.   Plaintiff is entitled and seeks to recover compensatory damages for lost wages and economic benefits of his employment and severe emotional distress, in amounts to be proven at trial.

217.   Plaintiff is entitled to and seeks to recover punitive damages in an amount sufficient to punish and deter Defendants TPS and AA from in the future engaging in the same wrongful conduct as alleged above.

218.    Plaintiff is entitled to and seeks an order of reinstatement, or in the event reinstatement is impracticable, to front pay in lieu of reinstatement.

219.    Plaintiff is entitled to and seeks to recover his reasonable attorney's fees and costs of litigation.

## COUNT II

### SEX HARASSMENT
### IN VIOLATION OF THE
### CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT (FEHA)
### *Against all Defendants*

220.    Plaintiff incorporates by reference the foregoing paragraphs 1 through 196 pled above.

221.    Plaintiff was employed by Defendants Perry, TPS, and AA while he was living in Georgia and in California.

222.    Plaintiff did work for Defendants Perry, TPS, and AA in California during the relevant time period.

223.    Defendants Perry, TPS, and AA each employed five or more persons.

224.    Alternatively, Plaintiff was a person providing services to Defendants TPS and AA pursuant to a contract, and Defendant TPS and AA knew or should have known of the sexual harassment of Plaintiff by Defendant Perry but failed to take immediate and appropriate corrective action.

225.    Defendant Perry acted as the agent of Defendants TPS and AA.

49

226. Defendant Perry is personally liable for the harassment by virtue of Cal. Gov't Code § 12940(j)(3).

227. Plaintiff was subjected to harassment by Defendant Perry, including but not limited to the above-pled sexual assaults, unwanted physical touching, propositions for sex, and sexual remarks and comments.

228. The harassment also included constant implied threats to end the employment of Plaintiff as an actor with Defendants, and to refuse to grant and provide opportunities for continued and additional employment as an actor on film and televisions projects.

229. The harassment also included constant offers of opportunities for continued and additional employment as an actor on film and television projects in exchange for acquiescing to sexual activity with Defendant Perry and/or remaining silent about sexual harassment and sexual assault and battery perpetrated by Defendant Perry.

230. The harassment was unwelcome.

231. The harassment was based on Plaintiff's sex.

232. The harassment was severe or pervasive.

233. The acts of sexual harassment alleged above constitute a continuing pattern of wrongful conduct which constituted a sex-based hostile work environment and a continuing violation of the FEHA.

234.    The last acts of sexual harassment alleged by Plaintiff to constitute part of the sex-based harassment occurred on May 14, 2024, when Defendant Perry sent Plaintiff a text message making light of him being alone if he would have sex with people (*see supra*, ¶ 181.d); in the June 2024 telephone call in which he asked Plaintiff about his sex life and whether he was having sex with anyone (*see supra*, ¶ 181.f); and at the constructive termination of his employment on October 1, 2024 while Plaintiff was living in California. (*see supra*, ¶ 183).

235.    Because Plaintiff did not acquiesce to sexual activity with Defendant Perry, Defendant Perry refused to ensure the distribution and sale of Plaintiff's pilot television program.

236.    Eventually, the continued harassment, including the quid pro quo offerings which indicated the desire to continue sexually abusing Plaintiff, caused Plaintiff to suffer the exacerbation of his mental health to such a degree that he could no longer continue working for Defendants in September 2024.

237.    The sexually hostile work environment and sex-based harassment by Defendants and suffered by Plaintiff was so intolerable, including specifically when Plaintiff was to return to working for Defendants on October 1, 2024.

238.    As a direct and proximate result of Defendants' aforementioned conduct, Plaintiff suffered lost wages and economic benefits of his employment when he could not return to work on October 1, 2024.

51

239.    Excluding the tolling period set forth above, the last acts of sexual harassment alleged by Plaintiff occurred within 300 days before the filing of Plaintiff's second EEOC charge.

240.    As a further direct and proximate result of Defendants' aforementioned conduct, Plaintiff suffered physical sickness, physical injuries, body pains, anxiety, worry, embarrassment, humiliation, injury to his professional reputation, mental anguish, and emotional distress, all in amounts to be proven at trial.

241.    Defendants committed the acts pled above maliciously and fraudulently, with the wrongful intention of injuring Plaintiff and with an improper and evil motive rising to the level of malice, in conscious disregard of Plaintiff's rights, such that Plaintiff is entitled to recover punitive damages.

242.    Plaintiff is also entitled to and seeks recovery of his reasonable attorney's fees and costs, along with pre-judgment interest.

## COUNT III

**SEXUALLY HOSTILE WORK ENVIRONMENT
IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
*Against Defendants TPS and AA*

243.    Plaintiff incorporates by reference the foregoing paragraphs 1 through 196 pled above.

244. Plaintiff was subjected to a hostile work environment on the basis of his sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a).

245. Specifically, Plaintiff was subjected to harassment by Defendant Perry, including but not limited to the above-pled sexual assaults, unwanted physical touching, propositions for sex, and sexual remarks and comments.

246. The harassment was unwelcome.

247. The harassment was based on Plaintiff's sex.

248. The harassment was severe or pervasive.

249. The acts of sexual harassment alleged above constitute a continuing pattern of wrongful conduct which constituted a sex-based hostile work environment within the meaning of Title VII.

250. The last acts of sexual harassment alleged by Plaintiff to constitute part of the sex-based harassment occurred on May 14, 2024, when Defendant Perry sent Plaintiff a text message making light of him being alone if he would have sex with people (*see supra*, ¶ 181.d); in the June 2024 telephone call in which he asked Plaintiff about his sex life and whether he was having sex with anyone (*see supra*, ¶ 181.f); and at the constructive termination of his employment on October 1, 2024 (*see supra*, ¶ 183).

251. Excluding the tolling period set forth above, the last acts of sexual harassment alleged by Plaintiff occurred within 180 days before the filing of Plaintiff's first EEOC charge.

252. Because Defendant Perry is and was at all relevant times an owner of Defendants TPS and AA, his acts of sexual harassment are directly imputed to these Defendants, making them directly liable under Title VII.

253. Additionally, prior to subjecting Mr. Dixon to a sexually hostile work environment, Defendants TPS and AA were on notice of Defendant Perry's propensity to engage the sexual harassment of young male employees.

254. Yet, Defendants TPS and AA did nothing to correct or remediate the sexually hostile work environment.

255. Defendants TPS and AA thus failed to exercise reasonable care to prevent and promptly correct the sexually hostile work environment suffered by Mr. Dixon, and are therefore also vicariously liable for the sexually hostile work environment suffered by Mr. Dixon.

256. The sexually hostile work environment suffered by Plaintiff also culminated in the constructive termination of his employment.

257. Defendants TPS and AA willfully and wantonly disregarded Plaintiff's rights and their discrimination against him was in bad faith.

258.   As a result of Defendants' unlawful actions, Plaintiff has suffered physical harm, emotional distress, humiliation, mental and emotion suffering, loss of income and other economic benefits of employment, and other damages.

259.   Plaintiff is entitled and seeks to recover compensatory damages for lost wages and economic benefits of his employment and severe emotional distress, in amounts to be proven at trial.

260.   Plaintiff is entitled to and seeks to recover punitive damages in an amount sufficient to punish and deter Defendants TPS and AA from in the future engaging in the same wrongful conduct as alleged above.

261.   Plaintiff is entitled to and seeks an order of reinstatement, or in the event reinstatement is impracticable, to front pay in lieu of reinstatement.

262.   Plaintiff is entitled to and seeks to recover his reasonable attorney's fees and costs of litigation.

## <u>COUNT IV</u>

### **INTENTIONAL INFLICTION OF EMTIONAL DISTRESS IN VIOLATION OF CALIFORNIA AND GEORGIA LAW IN THE ALTERNATIVE**
***Against All Defendants***

263.   Plaintiff incorporates by reference the foregoing paragraphs 1 through 196 pled above.

264.   Defendants intentionally, maliciously, wantonly, and in gross and reckless disregard for Plaintiff's health and safety, engaged in extreme and

outrageous conduct when they subjected Plaintiff to a pattern of unwanted sexual conduct as a condition of his employment, including but not limited to sexual harassment, sexual assault and battery, and sexual remarks and requests and demands for sexual activity, among other things.

265. These sexual acts, groping, and coercive sexual propositioning by Defendant Perry exceeded the risks inherent in the employment relationship and had a questionable relationship to Mr. Dixon's employment.

266. The above-pled extreme and outrageous sexual conduct was objectively malicious, wanton, wholly incompatible with the standards of a civilized society, and did exceed all possible bounds of decency.

267. The above-pled extreme and outrageous sexual conduct did in fact cause severe emotional distress to Plaintiff, manifesting in mental disease and disorder which reached the degree and extent in September 2024 that he was not able to return to work for Defendants on October 1, 2024.

268. The above-pled extreme and outrageous sexual conduct was thus of such substantial quality or enduring quality that no reasonable person in a civilized society should be expected to endure it.

269. As a result, Plaintiff notified Defendants in September 2024 that he could not return to working on set in Atlanta on October 1, 2024.

270. Mr. Dixon's cause of action for intentional infliction of emotional distress thus accrued on October 1, 2024.

271. At all relevant times, Defendant Perry was acting in the course and scope of his employment with Defendants TPS and AA, making them vicariously liable for his actions under a theory of respondeat superior.

272. Based on the actual and constructive knowledge of Defendants TPS and AA regarding Defendant Perry's similar misconduct with prior victims, and his similar misconduct with Plaintiff specifically, coupled with the failure of Defendants TPS and AA to intercede and to discipline or remove Defendant Perry, Defendants TPS and AA condoned, adopted, and ratified Defendant Perry's conduct, making them liable for his actions.

273. As a result of Defendants' unlawful actions, Plaintiff has suffered lost wages and economic benefits of employment, emotional distress, inconvenience, humiliation, and other indignities.

274. Defendants' unlawful actions were also intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights, such that Plaintiff is entitled to and seeks recovery of punitive damages against all Defendants.

275. Plaintiff is also entitled to and seeks recovery of reasonable attorney's fees and costs of litigation, plus prejudgment interest.

## COUNT V

## SEX TRAFFICKING BY FORCE, FRAUD, OR COERCION
## IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT
### *Against all Defendants*

276.    Plaintiff incorporates by reference the foregoing paragraphs 1 through 196 pled above.

277.    Plaintiff was subjected to sex trafficking by coercion in violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1591.

278.    Defendants Perry, TPS, and AA, directly or through their agents, recruited, enticed, transported, obtained, maintained, patronized, and solicited Plaintiff within the meaning of 18 U.S.C. § 1591(a)(1).

279.    Defendants Perry, TPS, and AA, directly or through their agents, recruited, enticed, transported, obtained, maintained, patronized, and solicited Plaintiff with knowledge that threats of serious harm and coercion would be used to cause the person to engage in a "commercial sex act."

280.    Defendant Perry subjected and attempted to subject Plaintiff to a "commercial sex act" within the meaning of 18 U.S.C. § 1591(e)(3) in that Defendant Perry put Plaintiff in a position where a sex act could occur; offered Plaintiff continued employment and career opportunities in the attempt to gain Plaintiff's acquiescence to engaging in sex acts with Defendant Perry; threatened Plaintiff with the loss of continued employment and career opportunities in

58

Defendant Perry's productions if he did not engage in sex acts with Defendant Perry, and offered cash, continued employment, and career opportunities to Plaintiff to secure his silence about the sexual assaults and sexual harassment to which Defendant Perry previously subjected him.

281.    The instances upon which Defendant Perry coerced or attempted to coerce Plaintiff to allow, accept, or remain silent about sex acts committed against him or attempted or to be attempted against him, or in exchange for Plaintiff allowing, accepting, or remaining silent about the same, include but are not limited to:

> a.    the purchase of a new car for Mr. Dixon in December 2019; offering Mr. Dixon a role on *The Oval* in January 2020;
>
> b.    the effort to separate Mr. Dixon from his other income from Legendary Events in order to make him dependent on Defendants;
>
> c.    the promise to produce Mr. Dixon's pilot, *Losing It*, in July 2020; inviting Mr. Dixon on a yacht trip in June 2021;
>
> d.    providing a pay raise and greenlighting *Losing It* in the Summer of 2021;

e.  making continued promises to Mr. Dixon to sell *Losing It* to networks like Netflix and Amazon from the summer of 2021 through May 2024; and

f.  offering Mr. Dixon a position as a writer on Defendant Perry's shows in June 2024.

282.  Other instances upon which Defendant Perry coerced or attempted to coerce Plaintiff to allow, accept, or remain silent about sex acts committed against him or attempted against him or to be attempted against him included but were not limited to:

a.  Defendant Perry telling Mr. Dixon he loved "killing a mother fucker in a show that no one expects" in 2020;

b.  Writing into the end of a season of *The Oval* the development that Mr. Dixon's character was shot four times and telling Mr. Dixon that if he did a "good job," the character would survive (and thus he would remain employed);

c.  Inviting Mr. Dixon to his trailer the day after filming the scene in which Mr. Dixon was shot in August 2020 and offering Mr. Dixon drinks and subjecting him to sexual touching and attempting to make him engage in sex acts;

d.   Killing off the characters of other actors who displeased him and confirming to Mr. Dixon that he did so because those actors made him unhappy, such as a particular actor in *Ruthless*.

283.   The conduct of Defendant Perry in recruiting, enticing, transporting, obtaining, maintaining, patronizing, and soliciting Plaintiff, and the conduct of Defendants TPS and AA in knowingly benefiting financially or by receiving something of value from a venture with Defendant Perry that engaged in acts in violation of 18 U.S.C. § 1591(a)(1), was conduct in or affecting interstate or foreign commerce within the meaning of 18 U.S.C. § 1591(a)(1).

284.   At all relevant times, Defendant Perry acted with knowledge or reckless disregard for the fact that he recruited, enticed, transported, obtained, maintained, patronized, and solicited Plaintiff for sex, and that it was unlawful.

285.   At all relevant times, Defendant Perry acted with knowledge or reckless disregard that he was coercing and/or attempting to coerce Plaintiff to allow, accept, or remain silent about sexual assaults committed against Plaintiff by Perry, or attempted to be committed against Plaintiff by Perry, with benefits of employment.

286.   The sexual touching and sexual comments to which Plaintiff was subjected by Defendant Perry were for Defendant Perry's sexual gratification.

287. Defendant Perry coerced and/or attempted to coerce Plaintiff to allow and accept the commercial sex acts and sexual harassment perpetrated against him by Defendant Perry, and to remain silent about them, with threats of serious financial and reputational harm in violation of 18 U.S.C. § 1591(e)(2)(A), and/or a scheme, plan, or pattern intended to cause Plaintiff to believe that he would suffer such harm in violation of 18 U.S.C. § 1591(e)(2)(B).

288. When Defendants subjected Plaintiff to the coercion and attempted coercion alleged above, Defendants had knowledge that Mr. Dixon would be caused by those promises and threats to allow, accept, or remain silent about the sex acts perpetrated against him.

289. Plaintiff reasonably believed he would suffer lost employment and career opportunities, financial harm, and reputational harm if he did continue working for Defendants, allowing Defendant Perry to sexually assault and sexually harass him, and staying quiet about all of this.

290. At all relevant times, including the production of film and television projects including Plaintiff and employing Plaintiff and others in these projects, Defendants Perry, TPS, and AA constituted a "venture" within the meaning of 18 U.S.C. § 1591(e)(6).

291. Defendants Perry, TPS, and AA "participated in a venture" within the meaning of 18 U.S.C. § 1591(e)(4) by assisting, supporting, or facilitating

62

Defendant Perry's authority and decision making concerning the continued employment of Plaintiff, bonuses or remuneration he received, and opportunities he would or would not have for future employment as an actor with Defendants and whether his pilot television program would be purchased or distributed, which were the principal means through which violations of 18 U.S.C. § 1591(a)(1) were accomplished as pled above.

292. Defendants knowingly benefitted by receiving the value of Plaintiff's labor as an actor in the television programs produced and sold by Defendants.

293. Additionally, in violation of 18 U.S.C. § 1591(a)(2), Defendants TPS and AA benefited, financially or by receiving something of value, from participation in a venture with Defendant Perry which engaged in acts in violation of 18 U.S.C. § 1591(a)(1).

294. Specifically, Defendants TPS and AA derived substantial financial benefit from the coercion and attempted coercion of Mr. Dixon in that, at all relevant times, Defendants were the contracting entities that produced, sold, licensed, and distributed the television and film productions in which Mr. Dixon performed, including the *The Oval*, *Ruthless*, *Losing It*, and the film *Joy Ridge*, also known as *Finding Joy*.

295.    Defendants TPS and AA licensed *The Oval* to Black Entertainment Television ("BET"), a network owned by ViacomCBS, now known as Paramount Global, and received licensing and distribution revenue from that arrangement.

296.    Mr. Dixon's labor as a recurring cast member on *The Oval* for five consecutive seasons from 2020 through 2023 was an essential component of the commercial value of that production, as Mr. Dixon was a series regular and Defendants would have lost the commercial value of his character and the storylines built around it if he were not so employed.

297.    Thus, by securing Mr. Dixon's continued labor through the coercive scheme pled above, Defendants received the financial benefit of his performances in seasons 4, 5, and 6 of *The Oval*, the pilot episode of *Losing It*, and the film *Joy Ridge*, all of which generated licensing, distribution, and other revenue for Defendants.

298.    Moreover, Defendants' offer to Mr. Dixon to take medical leave rather than terminate his employment on October 1, 2024 shows that they valued his continued availability and services as a performer and sought to preserve the financial benefit of his labor, even after being made aware that the conditions of his employment were causing him severe psychological harm.

299.    Defendants also had a substantial financial interest in the keeping Mr. Dixon silent about the sexual assault and harassment to which Defendants

subjected him, since public disclosure of Defendant Perry's sexual misconduct would have jeopardized Defendants' business relationships with ViacomCBS and/or Paramount Global and other distribution partners, threatening the commercial viability of their projects.

300.    The financial benefits received by Defendants TPS and AA were inextricably linked with their participation in a "venture" with Defendant Perry in that Defendant Perry was the sole creative authority over the media productions and Defendants TPS and AA provided the corporate infrastructure, contracting, payroll, and production facilities through which the productions were made and Mr. Dixon was employed.

301.    The profits from the sale and distribution of the film and television products Mr. Dixon performed for flowed to Defendants TPS and AA, and through TPS Holding Group, LLC, to Defendant Perry.

302.    Under 18 U.S.C. § 1595, Plaintiff is entitled to recover compensatory and punitive damages in an amount to be proven at trial, including but not limited to:

        a.      Plaintiff's actual economic losses, including the value of his compensation that he lost when he was compelled to resign and his medical expenses;

        b.      Other compensatory damages, including compensation for

physical, mental, and emotional injuries; and

c.    Punitive damages; and

d.    Reasonable attorney's fees and expert's fees and costs.

## COUNT VI

### RACKETEERING ACTIVITY
### IN VIOLATION OF THE GEORGIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
*Against all Defendants*

303.    Plaintiff incorporates by reference the foregoing paragraphs 1 through 196 pled above.

304.    This Count sets forth Plaintiff's claim for damages against Defendants caused by their violations of Georgia RICO, which are brought under the first subsection of that statute, O.C.G.A. § 16-14-4(a).

305.    Plaintiff is an aggrieved person with standing to sue within the meaning of Georgia RICO, O.C.G.A. § 16-14-6(b).

306.    Plaintiff is a person who was injured by reason of violations of O.C.G.A. § 16-14-4(a), and therefore, he has standing to sue pursuant to Georgia RICO, O.C.G.A. § 16-14-6(c).

307.    Defendants each individually, through a pattern of racketeering activity conducted from Georgia as described above and below, or proceeds derived therefrom, acquired or maintained an interest in or control of an

enterprise, real property, or personal property, including money, in violation of O.C.G.A. § 16-14-4(a).

308.    Specifically, the predicate acts of racketeering activity by which the Defendants committed the Georgia RICO violations set forth in the preceding paragraphs in violation of § 16-14-4(a) are the following:

a.    Violation of the TVPA, which constitutes a "racketeering activity" under the federal Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(1), which is incorporated into the definition of the same contained in the Georgia RICO at O.C.G.A. § 16-14-3(5)(C); and

b.    Pandering in violation of O.C.G.A. § 16-6-12, incorporated into the definition of "racketeering activity" in the Georgia RICO at O.C.G.A. § 16-14-3(5)(A)(vii).

309.    Defendants engaged in the racketeering activity described in this lawsuit repeatedly, on at least two occasions, as pled above with respect to Plaintiff and at paragraphs 57 through 67 above with respect to three other victims, starting before January 2021 and continuing through at least 2024.

310.    Each Defendant personally committed at least two acts of racketeering activity, including but not limited to violations of the TVPA alleged

above at paragraphs 276-302 and pandering in violation of Georgia law as alleged above at paragraphs 280-81.

311.   Each Defendant acquired an interest in personal property, including money, through the above-pled pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a).

312.   As a direct and proximate result of the Defendants' willful, knowing, and intentional acts in violation of Georgia RICO set forth in this First Amended and Verified Complaint for Damages and Equitable Relief, Plaintiff has suffered injuries, including but not limited to, lost wages and economic benefits of the contract he had for continued employment on *The Oval*, lost employment opportunities, incidental relocation expenses, other actual damages, including personal injuries arising from severe emotional and psychological suffering.

313.   Plaintiff specifically prays not only for compensation for his actual damages, but also statutory trebling of the same, and for punitive damages as appropriate in accordance with the Georgia RICO and Georgia law, O.C.G.A. § 51-12-5.1.

314.   Plaintiff also specifically prays for reasonable attorney's fees, expert fees, and costs associated with this action as authorized by the Georgia RICO, O.C.G.A. § 16-14-6(c).

315.    Plaintiff is also entitled to injunctive relief pursuant to O.C.G.A. § 16-14-4(a), including an order and judgment:

a.    Ordering Defendant Perry to divest himself of interests in an enterprise, real property, or personal property wrongfully obtained or used in violation of the Georgia RICO;

b.    Imposing reasonable restrictions on Defendants' future activities or investments to prevent violations of the law like those alleged in this First Amended and Verified Complaint for Damages and Equitable Relief;

c.    Dissolving Defendants TPS and/or AA and/or ordering the suspension or revocation of their licenses to do business in the State of Georgia; and/or

d.    Ordering the forfeiture of the corporate charters or revocation of or any certificates authorizing Defendants TPS and AA to do business in the State of Georgia.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands a **TRIAL BY JURY**, and that the following relief be granted:

A.    That the Court take and maintain jurisdiction of this matter;

B.    That process be served;

C.   That the Court award Plaintiff back pay and lost economic benefits of employment, including interest and lost social security benefits, in an amount to be determined at the trial of this case;

D.   That the Court award Plaintiff reinstatement, or front pay in lieu of reinstatement;

E.   That the Court award compensatory damages for pain and suffering and emotional distress in an amount to be determined by the trier of fact;

F.   That the Court award Plaintiff punitive damages against Defendants in an amount to be determined by the trier of fact;

G.   That the Court award Plaintiff his reasonable attorney's fees and costs of litigation in this action;

H.   That the Court grant Plaintiff a trial by jury on all issues triable to a jury; and

I.   That the Court grant such other additional relief as the Court deems proper and just.

Respectfully submitted this 26th day of March 2026.

BEAL, SUTHERLAND,
BERLIN & BROWN, LLC

/s/ Brian J. Sutherland
Brian J. Sutherland
Georgia Bar No. 105408

70

brian@beal.law
Andrew M. Beal
Georgia Bar No. 043842
drew@beal.law

Resurgens Plaza
945 East Paces Ferry Rd NE
Suite 2275
Atlanta, GA 30326

**LAW OFFICES OF
JONATHAN J. DELSHAD**

*/s/ Jonathan J. Delshad*
Jonathan J. Delshad
California Bar No. 246176*
jdelshad@delshadlegal.com
Daniel Kohanbash
dk@delshadlegal.com
California Bar No. 358553*
*admitted *pro hac vice*

1663 Sawtelle Blvd, Suite 220
Los Angeles, California 90025
Tel: (424) 255-8376

*Counsel for Plaintiff*

71

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| DEREK DIXON,<br><br>Plaintiff,<br><br>v.<br><br>TYLER PERRY;<br>TPS PRODUCTION SERVICES, LLC;<br>and AND ACTION, LLC,<br><br>Defendants. | )<br>)<br>)  CIVIL ACTION<br>)  FILE NO. 1:25-CV-07102-SEG-CCB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Derek Dixon, declare, certify, verify, and state under penalty of perjury that the information contained in the foregoing Plaintiff's First Amended and Verified Complaint for Damages and Equitable Relief is true and correct to the best my knowledge, information, and belief.

Executed this date of _3/26/26_

Derek Dixon

72

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |
|---|---|
| DEREK DIXON,<br><br>    Plaintiff,<br><br> v.<br><br>TYLER PERRY;<br>TPS PRODUCTION SERVICES, LLC;<br>and AND ACTION, LLC,<br><br>    Defendants. | ) <br> ) <br> )   CIVIL ACTION <br> )   FILE NO. 1:25-CV-07102-SEG-CCB <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 26, 2026, the foregoing **First Amended and Verified Complaint for Damages and Equitable Relief** was filed with the Court's CM/ECF system, which will automatically serve these attorneys of record:

Matthew Alexander Bergjans
Matthew A. Boyd
Jonathan J. Delshad
Ndubisi A. Ezeolu
Erin Freeman
Mari F. Henderson
Daniel Kohanbash
Michael T. Lifrak
Alex B. Spiro

*/s/ Brian J. Sutherland*
Brian J. Sutherland
Georgia Bar No. 105408

73