**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DEREK DIXON,

       *Plaintiff*,

   v.

TYLER PERRY;
TPS PRODUCTION SERVICES, LLC;
and AND ACTION, LLC,

       *Defendants*.

Case No. 1:25-CV-07102-SEG-CCB

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO DISMISS PLAINTIFF'S FIRST AMENDED AND
<u>VERIFIED COMPLAINT</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

ALLEGATIONS AND PROCEDURAL BACKGROUND ...................................2

    A.    The Parties...............................................................................3

    B.    Dixon Meets Perry, Recognizes An Opportunity, And Seeks To Befriend Him ..........................................................................3

    C.    Perry Offers Dixon Another Acting Gig.................................5

    D.    Dixon Continues To Socialize With Perry..............................6

    E.    Dixon Vacations With Perry And Also Turns Down Offers To Vacation With Perry.................................................................6

    F.    Dixon And Perry Discuss Dixon's Struggles With His Sexuality........7

    G.    The Alleged June 2021 Visit To Perry's Georgia Home ......7

    H.    Dixon Develops And Then Over Time Loses Hope That Perry Will Secure A Lucrative Deal For Dixon's New Television Series .....................................................................................8

    I.    Dixon's Stint In California....................................................9

    J.    Procedural History...............................................................11

ARGUMENT ...........................................................................................................14

I.    Dixon's California Employment Claims Should Be Dismissed Because California Law Is Inapplicable.........................................14

    A.    Dixon's FEHA Claim (Count II) Fails Because California Was Not The Situs Of His Work Or The Alleged Harassment....................15

    B.    Dixon's Wrongful Termination Claim (Count I) Fails For The Same Reasons.....................................................................19

II.    Dixon's Title VII Claim Should Be Dismissed Because It Is Untimely And Because Dixon Failed To Exhaust Administrative Remedies..............20

    A.    Dixon Did Not File An EEOC Charge Within 180 Days ....20

        1.    The 2020-2021 Allegations Reflect A Separate Course Of Conduct From Alleged Calls And Texts Years Later .........21

        2.    The 2023-2024 Calls And Texts Are Not Harassment............23

    B.    Dixon Never Obtained A Right To Sue Under Title VII...................24

III.   Dixon's Emotional Distress Claim Should Be Dismissed Because It Is Untimely Under Applicable Georgia Law .......................................................25

    A.   Dixon's IIED Claim Does Not Arise Under California Law..............25

    B.   Dixon's IIED Claim Is Time-Barred Under Georgia Law .................27

IV.   Dixon's Sex Trafficking And Georgia RICO Claims Should Be Dismissed..............................................................................................28

    A.   Dixon Does Not Allege Any Sex Trafficking....................................28

    B.   Dixon Does Not Allege Any Georgia RICO Violations....................32

CONCLUSION ...............................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Allen v. Ambu-Stat, LLC*,
   799 F. App'x 703 (11th Cir. 2020) ......................................................23

*Anderson v. CRST Int'l*,
   685 F. App'x 584 (9th Cir. 2017) ........................................................14

*Buchanan v. Lossing*,
   2025 WL 2014324 (N.D. Ga. July 16, 2025) .......................................27

*Burnett v. City of Jacksonville, Fla.*,
   376 F. App'x 905 (11th Cir. 2010) ......................................................24

*Campbell v. Arco Marine, Inc.*,
   42 Cal. App. 4th 1850 (Cal. Ct. App. 1996)........................................14

*Carr v. Kupfer*,
   250 Ga. 106 (1982) ..............................................................................26

*Carter v. Paschall Truck Lines, Inc.*,
   2023 WL 359559 (W.D. Ky. Jan. 23, 2023) ........................................31

*Cooper v. Meridian Yachts, Ltd.*,
   575 F.3d 1151 (11th Cir. 2009) ...........................................................26

*Dowis v. Mud Slingers, Inc.*,
   279 Ga. 808 (2005) ..............................................................................25

*English v. General Dynamics Missions Systems. Inc.*,
   2019 WL 2619658 (C.D. Cal. May 8, 2019)...........................16, 18, 19

*Fanning v. Bos. Mkt. Corp.*,
   2007 WL 9735676 (N.D. Ga. Feb. 26, 2007)...............20, 21, 22, 23

*Five Star Athlete Management, Inc. v. Davis*,
   355 Ga. App. 774 (2020) ......................................................................35

*Forehand v. Fla. State Hosp. at Chattahoochee*,
   89 F.3d 1562 (11th Cir. 1996) .............................................................24

*Glock v. Glock*,
    247 F. Supp. 3d 1307 (N.D. Ga. 2017)...............................................................34

*Gonsalves v. Infosys Techs., LTD.*,
    2010 WL 1854146 (N.D. Cal. May 6, 2010)........................................15, 16, 19

*Gowan v. Stryker Corp.*,
    2021 WL 3403150 (N.D. Cal. Aug. 4, 2021) .....................................................17

*Gupta v. Fla. Bd. of Regents*,
    212 F.3d 571 (11th Cir. 2000) ..........................................................................23

*Hill v. Workday, Inc.*,
    2024 WL 3012802 (N.D. Cal. June 14, 2024)......................................15, 17, 18

*Horne v. Potter*,
    392 F. App'x 800 (11th Cir. 2010) .....................................................................4

*Kane v. Matson Navigation Co.*,
    2024 WL 1988838 (9th Cir. May 6, 2024)........................................................16

*Loza v. Intel Americas, Inc.*,
    2020 WL 7625480 (N.D. Cal. Dec. 22, 2020)....................................................14

*McGinnis v. American Home Mtge. Servicing, Inc.*,
    817 F.3d 1241 (11th Cir. 2016) ........................................................................32

*Motamedi v. Radioshack Corp.*,
    2008 WL 11338432 (C.D. Cal. Dec. 4, 2008)....................................................19

*Motorsports of Conyers, LLC v. Burbach*,
    317 Ga. 206 (2023) ..........................................................................................26

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017) ............................................................................29

*Neibert v. Computer Sciences Corp.*,
    621 F. App'x 585 (11th Cir. 2015).....................................................................26

*O'Shea v. OMi Holdings Inc.*,
    2023 WL 4703300 (11th Cir. July 24, 2023) ......................................................4

iv

*Osiris Therapeutics, Inc., v. MiMedx Grp., Inc.*,
  2020 WL 11192769 (N.D. Ga. Feb. 24, 2020) .................................................26

*Roman v. Tyco Simplex Grinnell*,
  2017 WL 3394295 (M.D. Fla. Aug. 8, 2017) ...................................................30

*Russo v. APL Marine Servs., Ltd.*,
  135 F. Supp. 3d 1089 (C.D. Cal. 2015) ...........................................14, 16, 17, 19

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
  473 U.S. 479 (1985) ..........................................................................................33

*Sexton v. Spirit Airlines, Inc.*,
  2023 WL 1823487 (E.D. Cal. Feb. 8, 2023) .......................................14, 15, 17

*Smith v. Gen. Scanning, Inc.*,
  832 F.2d 96 (7th Cir. 1987) ........................................................................24, 25

*State v. Davis*,
  246 Ga. 761 (1980) ...........................................................................................34

*Stewart Ausband Enterprises, Inc. v. Holden*,
  349 Ga. App. 295 (2019) ..............................................................................33, 34

*Sullivan v. Oracle Corporation*,
  51 Cal. 4th 1191 (Cal. 2011) ............................................................................14

*United States v. Walker*,
  73 F.4th 915 (11th Cir. 2023) ......................................................................29, 30

*Ward v. United Airlines*,
  9 Cal. 5th 732 (Cal. 2020) ................................................................................15

*Watson v. Blue Circle, Inc.*,
  324 F.3d 1252 (11th Cir. 2003) ................................................................20, 21, 22

## Rules / Statutes

10 U.S.C. § 920 ......................................................................................................33

18 U.S.C. § 1591 ..............................................................................28, 29, 31, 32, 33

42 U.S.C. § 2000e-5 ...............................................................................................20

Cal. Labor Code Section 925(a)..............................................................13

O.C.G.A § 9-3-33..............................................................................27

O.C.G.A. § 16-14-3............................................................................32

O.C.G.A. § 16-14-4....................................................................32, 34, 35

O.C.G.A. § 16-6-9..............................................................................33

## PRELIMINARY STATEMENT

For years, Plaintiff Derek Dixon exploited a friendship with Tyler Perry for personal and professional gain. He accepted roles on Perry's TV and film projects, gifts, and vacations with mutual friends and cast members—all on Perry's dime. But in 2024, after Perry was unable to sell a Dixon-created TV show to a major streaming network, Dixon grew frustrated and sought to profit another way. He sent Perry a "demand letter" predicated on false claims of sexual harassment. *See* ECF No. 102-2 (Ex. 2 to Amended Complaint), at 1. When that did not work, Dixon filed a lawsuit in California in which he lied to the court about, among other things, being a California resident. The case was promptly transferred to this District pursuant to Dixon's numerous agreements to litigate disputes here.

Dixon does not have a case. That is evident because he is still trying to pursue California claims in this Court for conduct that is alleged to have taken place in Georgia or the Bahamas; is alleged to have been committed by Georgia defendants; and is alleged to have been committed against a plaintiff who lived and worked primarily in Georgia (Counts I, II, and IV). California laws do not reach across the country to regulate such extraterritorial alleged conduct.

Dixon's lack of a case is also evident from his failure to timely pursue and exhaust administrative remedies with the EEOC, which bars his Title VII claim for a hostile work environment (Count III). Dixon complains of supposed verbal and

physical harassment in 2020 and 2021, yet he failed to file a complaint with the EEOC until nearly four years later, in January 2025. Dixon cannot resuscitate his stale grievances by alleging Perry made a handful of purported comments about sex in 2024. Those alleged comments—innocuous under 11th Circuit law when viewed through the necessary lens of Dixon's friendship with Perry—do not form a single chain of conduct with the alleged 2020 and 2021 events. Dixon's common law claim for intentional infliction of emotional distress (Count IV) fares no better under Georgia's two-year statute of limitations.

Finally, Dixon's inability to state a claim is evidenced by his latest gambit to sensationalize this case and exert settlement pressure: accusing Defendants of being sex traffickers and racketeers (Counts V and VI). Dixon comes nowhere close to pleading such claims. The relevant statutes are designed to protect vulnerable individuals from forced sex work and stop organized crime, respectively. They are not meant to be trivialized and exploited as a means to generate publicity for a deficient workplace harassment lawsuit.

The Court should dismiss Dixon's Amended Complaint in its entirety.

## ALLEGATIONS AND PROCEDURAL BACKGROUND

Defendants deny most of the allegations in the Amended Complaint and deny any liability. Even accepting the facts as alleged, however, Dixon has no claim.

### A.    The Parties

Plaintiff Derek Dixon is an aspiring actor/screenwriter and currently a New York resident.  AC ¶ 16.  Before moving to New York, Dixon lived in North Carolina from February to November 2025, *id.* ¶ 19; in California from January 2023 to February 2025, *id.* ¶ 18; and in Georgia from 2019 to January 2023, *id.* ¶ 17. The 2020-2021 time period, when Dixon was a Georgia resident, is when he alleges every instance of unwanted physical contact with Defendant Tyler Perry occurred, *id.* ¶¶ 98, 134, 143, and nearly every instance of alleged inappropriate messages or comments, *see id.* ¶¶ 88-89, 107-114, 130, 137.

Defendant Tyler Perry is a renowned director, producer, screenwriter, and actor.  He grew up poor in New Orleans and experienced periods of homelessness before moving to Atlanta and finding success as a multi-talented entertainer.  Perry still lives and works in Georgia.  He owns a Georgia production studio, which is where Defendant TPS produces television shows and movies.  *Id.* ¶¶ 21-25. Defendant And Action is a now-dissolved production company that was also based in Georgia.  *Id.* ¶¶ 26-28.

### B.    Dixon Meets Perry, Recognizes An Opportunity, And Seeks To Befriend Him

In 2019, when Dixon was 31 years old, he met Perry while working as an event caterer.  *Id.* ¶¶ 68-70.  Dixon told Perry he wanted to be an actor and a writer for television and film, and the two exchanged numbers.  *Id.* ¶¶ 71-72.

3

In November 2019, Perry offered Dixon a small role in a television series, *Ruthless*. *Id.* ¶ 81.[1]  Dixon signed a performer agreement providing that any dispute "arising out of or related to" the agreement would be decided under Georgia law. Ex. 1 § P(2)[2].  Dixon filmed the role in Georgia in November 2019 and then returned to his catering job.  AC ¶¶ 81-84.

Dixon alleges that Perry began calling and texting him frequently in December 2019, and the communications included Perry asking for "attention" and discussing his sex life.  *Id.* ¶¶ 88-89.  Dixon does not allege that he was doing any work for Defendants at that time.

In January 2020 Perry invited Dixon to his Georgia home.  *Id.* ¶ 91.  Dixon accepted with the goal to "befriend Defendant Perry and show him that Mr. Dixon

---

[1]  Dixon's claim that Defendants "employed" him is inaccurate because Dixon was always an independent contractor.  While that bars both his Title VII claim (Count III) and his wrongful discharge in violation of California public policy claim (Count I), it is a more fact-intensive issue that Defendants do not address in this posture.

[2]  "Ex." citations refer to exhibits attached to the April 27, 2026 Declaration of Matthew A. Boyd, filed herewith.  Dixon's AC asserts employment-related claims and contains allegations about Defendants' rights with respect to Dixon's alleged employment.  The AC thus incorporates Dixon's performer agreements (Exhibits 1-4).  *See O'Shea v. OMi Holdings Inc.*, 2023 WL 4703300, at *1 n.1 (11th Cir. July 24, 2023) ("employment offer, employment letter, and employment agreement" were "incorporated into" complaint where "they were referred to in the complaint, central to [the] claims, and of undisputed authenticity").  The agreements are also subject to judicial notice, as they previously were filed on the docket, and there is no authenticity dispute.  *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010) (district court could take judicial notice of pleadings and court orders for purposes of motion to dismiss).

had talent and potential as an actor." *Id.* ¶ 92.  At Perry's home, Dixon and Perry drank alcohol and socialized. *Id.* ¶ 93.  Dixon does not allege he was doing any work for Defendants at this time, nor does he allege that he and Perry discussed Dixon's career or potential work opportunities.  After Dixon became inebriated and opted to stay the night, Perry allegedly climbed into bed with him and rubbed his thighs, an advance that Dixon allegedly rebuffed.  *Id.* ¶¶ 95-103.

According to Dixon, following his January 2020 visit to Perry's home, Perry continued "to proposition Mr. Dixon for sex in regular text messages and telephone calls." *Id.* ¶ 105.  Dixon also continued to socialize with Perry in early 2020, visiting his Georgia home on multiple occasions.  *Id.* ¶ 111.  The two allegedly discussed sex during these social visits.  *Id.* ¶¶ 108-114.  Dixon does not allege he was working for Defendants at this time; in fact, he still worked for a catering company.  *Id.* ¶ 115.

## C.    Perry Offers Dixon Another Acting Gig

In March 2020, Perry offered Dixon a recurring role on *The Oval*, a television show also filmed in Georgia. *Id.* ¶ 116.  Dixon signed another performer agreement with a Georgia choice-of-law provision.  Ex. 2 § 24(b).  The script referenced Dixon's character being shot at the end of the season, and Dixon inquired about the character's future. *Id.* ¶¶ 118-20.  Perry told him that if he "did a good job," then the character might return. *Id.* ¶ 120.  Dixon does not allege that Perry mentioned anything about sex—or any other topic not related to Dixon's acting performance.

### D.    Dixon Continues To Socialize With Perry

Throughout 2020, Dixon and Perry continued to communicate and socialize regularly in person and by phone. *Id.* ¶¶ 122, 126-28. According to Dixon, they would sometimes discuss their sex lives or the topic of sex, generally. *See id.* ¶ 123; *id.* ¶¶ 128-29, 130b-j. Dixon does not allege that he ever told Perry he did not want to discuss sex or other personal topics. To the contrary, he alleges he was cultivating a friendship with Perry. *Id.* ¶ 92.

Dixon and Perry discussed keeping their friendship out of the workplace while filming *The Oval* in Georgia. *Id.* ¶ 130a. Neither wanted other cast members to doubt that Dixon secured the role through merit. *Id.* (Perry: "You earned your spot like everyone else. Don't give people an opportunity to play you small or they will" …. Dixon: "Don't want to give anyone that opportunity. Bc work is work.").

### E.    Dixon Vacations With Perry And Also Turns Down Offers To Vacation With Perry

In October 2020, Dixon vacationed with Perry in the Bahamas.[3] Dixon alleges that Perry discussed wanting a sexual relationship with Dixon during the trip and "groped his buttocks" at one point. *Id.* ¶¶ 132-35. That was not the last vacation

---

[3] Dixon claims he "reluctantly" agreed to go "because another actor was supposed to go with them" but then did not. *Id.* ¶¶ 132-33. Dixon does not allege he was tricked or lied to. Dixon's story is also misleading because the cast of *The Oval* went on the vacation, as Dixon has previously alleged. ECF No. 1-1 ¶¶ 123-35 (describing October 2020 Bahamas trip and cast partying together).

Dixon took with Perry. He traveled to the Bahamas again with Perry and members of *The Oval* cast, *id.* ¶ 172, and also traveled with Perry and mutual friends to Italy. On another occasion, Perry invited Dixon on a trip and Dixon declined to go. *Id.* ¶ 155. Dixon does not allege that Perry retaliated in any way after Dixon turned him down. Dixon also does not allege that he and Perry ever traveled to California.

**F.        Dixon And Perry Discuss Dixon's Struggles With His Sexuality**

Dixon alleges he and Perry would often return to the discussion of Dixon's struggle with his sexuality, which Dixon attributed to his "religious guilt." *Id.* ¶ 137b. Perry encouraged Dixon to embrace his sexuality and not miss the best years of his life, to which Dixon responded "I want that too" and "I'm workin on it." *Id.* ¶ 137f. Dixon also talked with Perry about potential romantic partners. *Id.*¶ 137h.

**G.    The Alleged June 2021 Visit To Perry's Georgia Home**

Dixon alleges that he again went to Perry's Georgia home for a social visit on June 4, 2021. *Id.* ¶ 138. He and Perry consumed alcohol, and sex was a conversation topic. *Id.* ¶ 140. Dixon does not allege that current or future work was discussed. As Dixon was preparing to spend the night in Perry's guest house, Perry allegedly encouraged Dixon to weigh himself on a health-monitoring scale in his underwear. *Id.* ¶¶ 141-42. Dixon alleges that Perry then asked for a hug before pulling Dixon's underwear down and groping his buttocks. *Id.* ¶¶ 143-44. Dixon allegedly rebuffed

Perry's advance. *Id.* ¶¶ 144-46. He and Perry then went back to the main house to eat food, after which Dixon spent the night alone in the guest house. *Id.* ¶¶ 146-47. June 4, 2021 is the last instance Dixon alleges of any physical contact with Perry.

Dixon alleges he expressed displeasure to Perry about what happened at Perry's Georgia home, and Perry apologized. *Id.* ¶¶ 148, 153-54. After that, Dixon does not allege any purported harassment or sexual misconduct of any kind until sometime in 2023—at least a year and a half later. *See id.* ¶ 178.

### H.    Dixon Develops And Then Over Time Loses Hope That Perry Will Secure A Lucrative Deal For Dixon's New Television Series

During this time, Dixon was trying to create a new TV series called *Losing It*, and he had written the script for a first "pilot" episode. *Id.* ¶ 151. Dixon provided the script to Perry for feedback in 2020, and Perry responded that he was interested in helping Dixon film the pilot. *Id.* Dixon was understandably excited. *Id.* He signed a performer agreement to play the lead role in the *Losing It* pilot, which was filmed in Georgia, and the agreement again contained a Georgia choice-of-law provision. Ex. 3 at Addendum § P(2).

While Perry thought highly of *Losing It*, he informed Dixon that it was not a show that would be successful with his (Perry's) audience. *Id.* ¶ 151c. Perry nonetheless wanted to shop it to streamers like Netflix and Amazon. *Id.* ¶¶ 151, 180, 281. Perry allegedly thought the show could be a success and generate profits of $2-

3 million per episode over multiple seasons. *Id.* ¶ 151. Dixon alleges that Perry made "promises that he could sell *Losing It* from 2021 through 2024." *Id.* ¶ 281.

According to Dixon, part of the inability to sell *Losing It* was Perry's contract with ViacomCBS, which prevented him from selling a new tv show for some period of time. *Id.* ¶¶ 165, 174. Dixon alleges Perry informed him of this obstacle in October 2022, and that it would take about two years for the contract to expire (about two years later, in September 2024, Dixon would send Perry his "demand letter" making accusations of harassment for the first time, ECF No. 102-2, at 1).[4] *Id.* ¶ 174.

## I.    Dixon's Stint In California

Shortly after Perry told Dixon that he would not be able to shop *Losing It* for a couple of years, Dixon decided to move to California. *Id.* ¶ 175. Dixon does not allege that Defendants objected to or tried to prevent him from moving to another state. Dixon never filmed any projects for Defendants in California.

Dixon claims that, after his move, "Perry continued to sexually harass [him] by regularly calling him and sending him text messages, including sexual remarks and discussion about sex." *Id.* ¶ 177. Dixon alleges only the following purportedly harassing communications from Perry in 2023: in January 2023, asking Dixon if his

---

[4]   In his original complaint, Dixon admitted that Perry's failure to sell *Losing It* to Netflix is what caused Dixon to accuse Perry of harassment in the first place. ECF No. 1-1 ¶¶ 186-89.

"no" was "stronger"[5]; in May 2023, asking Dixon if he was "still cheating on [Perry]"; and in November 2023, asking Dixon who he was having sex with and other sex-related questions. *Id.* ¶ 178. Dixon does not allege he was located in California when he received these communications.

Dixon alleges Perry communicated with him about sex "more often" in 2024, but he alleges only three such communications: asking Dixon in March or April 2024 why he is single and doesn't have sex more; warning Dixon in May 2024 not to let "the alone time win" or else he would end up alone; and telling Dixon on a June 2024 call that he was a "sexy man" and should be having more sex. *Id.* ¶¶ 179-80. According to Dixon's screenshots, he responded to Perry's May 2024 message in a joking manner, with a "crying laughing" emoji. *Id.* ¶ 180. Dixon does not allege he was in California when he received these communications either.

In February 2024, Dixon was offered a role in a Perry film called *Joy Ridge*, which was filmed in Georgia. *See Id.* ¶¶ 23, 52; Ex. 4. Dixon again signed a performer agreement with a Georgia choice-of-law provision. Ex. 4 at

---

[5]    Dixon also alleges vaguely that Perry referred to "trading sex for career opportunities." *Id.* ¶ 178. In his prior complaint, Dixon screenshotted the messages. It was in fact Dixon who joked about trading sex for opportunities, remarking that he would "say yes" to sex with someone "if it gets me an Oscar," before adding "Jkjkjkjk!" ECF No. 1-1 at 7. Dixon does not allege Perry ever conditioned a professional opportunity on sex.

Addendum § P(2).  Dixon does not allege any harassment, whether physical or verbal, during his work on *Joy Ridge*.

Ultimately, Dixon's TV series *Losing It* was never sold to a streaming network, and Dixon never received the resulting windfall.  In September 2024, after he sent his demand letter, Dixon informed Defendants that he would not travel to Georgia to film season 7 of *The Oval*.  AC ¶ 194.  Dixon claims that he refused to show up because his mental health had deteriorated due to Perry's harassment, and his refusal to work amounted to a constructive discharge.  *Id.* ¶¶ 48, 199.

### J.    Procedural History

Dixon previously alleged that, by 2024, he "was getting frustrated about his show [*Losing It*] not getting off ground."  ECF 1-1 ¶ 187.  He also previously alleged that, around June 2024, he "woke up and realized that Perry was never going to be serious about helping [him]" sell the show.  *Id.* ¶ 188.

Dixon sent a "demand letter" in September 2024, ECF 102-2 (Ex. 2 to AC) at 1, and, in Dixon's words, took "the heroic step of reporting the sexual harassment to the EEOC," ECF No. 1-1 ¶ 189.  Dixon filed his EEOC charge with the Atlanta, Georgia EEOC office on January 13, 2025.  ECF No. 102-1 (Ex. 1 to AC).

Dixon filed a lawsuit in California Superior Court on June 13, 2025—more than four years after the June 4, 2021 visit to Perry's home during which Dixon alleges he was groped.  June 13, 2025 was also the same day he filed a charge with

11

the California Civil Rights Division and received an immediate, *pro forma*, right-to-sue letter. ECF No. 102-3 (Ex. 3 to AC). That CRD letter told Dixon he would still need to obtain a right-to-sue notice from the EEOC to pursue any federal claim. *Id.* at 5. Dixon has never obtained an EEOC right-to-sue notice. AC ¶ 15.

In his California complaint, Dixon claimed to be "an individual who resides in the State of California." ECF 1-1 ¶ 27. As Dixon recently revealed in his verified Amended Complaint, he was not, in fact, a California resident when he filed suit in June 2025. He had moved to North Carolina months prior. AC ¶¶ 19, 196. Dixon never returned to California and instead moved to New York. *Id.* ¶ 19.

From September through November 2025, the parties litigated Defendants' removal to federal court, and Dixon's alleged California residence was a core aspect of Defendants' argument that federal diversity jurisdiction existed. Defendants also raised jurisdictional and substantive challenges to Dixon's pleadings under Rules 12(b)(2) and (6) on the basis that his purported California residence was not enough to justify litigation in California courts under California law. Dixon opposed Defendants' arguments yet never corrected the record as to his real residence.

Defendants alternatively sought a transfer to this District. That request was granted, with the court declining to reach the jurisdictional and substantive arguments for dismissal. ECF No. 67. The court's transfer reasoning relied primarily on Dixon's agreements to litigate disputes in Georgia. *See generally id.*

12

Dixon attempted to avoid the contractual forum provisions under California Labor Code Section 925(a), but the California court ruled that Dixon did not satisfy the requirement that he "primarily reside and work in California" before he could invoke the California statute. *Id.* at 5-6. The Court held that, even after Dixon's move to California in 2023, "[Dixon] did not primarily work in California, but rather primarily worked in Georgia, where filming took place." *Id.* at 6. Consequently, the Court found that any work Dixon did in California was "incidental" to his Georgia work. *Id.*

On April 1, 2026, Dixon filed an Amended Complaint. ECF No. 102. It asserts six claims: wrongful discharge and retaliation in violation of the public policies embodied in California's Fair Employment and Housing Act (FEHA) and the California constitution (Count I); sex harassment in violation of FEHA (Count II); hostile work environment under Title VII (Count III); intentional infliction of emotional distress under California law or Georgia law (Count IV); sex trafficking under the Trafficking Victims Protection Reauthorization Act (TVPRA) (Count V); and racketeering in violation of the Georgia RICO statute (Count VI).

## **ARGUMENT**

**I.    DIXON'S CALIFORNIA EMPLOYMENT CLAIMS SHOULD BE DISMISSED BECAUSE CALIFORNIA LAW IS INAPPLICABLE**

Dixon cannot assert any claim under FEHA or the California constitution—either directly (Count II) or indirectly by invoking California "public policy" (Count I)—because his allegations do not establish a sufficient connection to California.

The long-settled presumption is that California statutes do not apply extraterritorially. *Sullivan v. Oracle Corporation*, 51 Cal. 4th 1191, 1207 (Cal. 2011). That commonsense rule arises from constitutional restrictions on states imposing their regulatory regimes on out-of-state conduct. *Id.* at 1205; *Campbell v. Arco Marine, Inc.*, 42 Cal. App. 4th 1850, 1852, 1858 (Cal. Ct. App. 1996).

"FEHA, a California statute, does not apply extraterritorially." *Loza v. Intel Americas, Inc.*, 2020 WL 7625480, at *4 (N.D. Cal. Dec. 22, 2020); *Anderson v. CRST Int'l*, 685 F. App'x 584, 525-26 (9th Cir. 2017). A plaintiff asserting a FEHA claim must therefore plead "a substantial connection to California" through "the situs of both [(1)] employment and [(2)] the material elements of the cause of action." *Russo v. APL Marine Servs., Ltd.*, 135 F. Supp. 3d 1089, 1094 (C.D. Cal. 2015), *aff'd*, 694 F. App'x 585 (9th Cir. 2017); *Sexton v. Spirit Airlines, Inc.*, 2023 WL 1823487, at *3 (E.D. Cal. Feb. 8, 2023). That is true regardless of the "residence of the employee or the employer." *Russo*, 135 F. Supp. 3d at 1094.

14

Here, Dixon has not pled facts establishing California was the situs of either his employment or the material elements of his causes of action.  His California law claims should therefore be dismissed.

**A.    Dixon's FEHA Claim (Count II) Fails Because California Was Not The Situs Of His Work Or The Alleged Harassment**

To start, Dixon's FEHA claim fails because his employment was based in Georgia, not California.  The "situs of employment" is the employee's "principal place of work." *Sexton*, 2023 WL 1823487, at *3; *Hill v. Workday, Inc.*, 2024 WL 3012802, at *9 (N.D. Cal. June 14, 2024).  And "principal place of work" unsurprisingly means the location where an employee "perform[s] a majority of their work" or has their "definite base of operations." *Ward v. United Airlines*, 9 Cal. 5th 732, 740, 755-56, 760-61 (Cal. 2020) (California employment law did not apply to California residents who did not "perform the majority of their work" in California and were not "based for work purposes" in the state).  Indeed, interpreting FEHA— or any California employment law—to cover "all employees who perform some job duties or manage some clients in California, even when no connection exists between the California activities and the [misconduct] at issue, would clearly implicate [] federal constitutional concerns." *Gonsalves v. Infosys Techs., LTD.*, 2010 WL 1854146, at *5 (N.D. Cal. May 6, 2010).

In this case, the California federal court previously considered the same substantive allegations, performer agreements, and a sworn declaration by Dixon

15

and decided that Dixon's situs of employment was Georgia.  ECF No. 67.  Judge Walter transferred the case to this District after finding that Dixon's "primary work location" was Georgia, and that any work he did from California after his move in 2023 (*e.g.*, "script study, memorization, practice, and preparation") was merely "incidental."  *Id.* at 6.  Courts routinely dismiss FEHA cases with analogous facts. *See Gonsalves*, 2010 WL 1854146, *5-7 (dismissing FEHA claims by plaintiff who alleged some job duties were performed in California); *English v. General Dynamics Missions Systems. Inc.*, 2019 WL 2619658, at *5-8 (C.D. Cal. May 8, 2019) (similar, at summary judgment), *aff'd*, 808 F. App'x 529 (9th Cir. 2020).

In his Amended Complaint, Dixon has not alleged any new California work or other facts that could shift the obvious, and already-determined, situs of his employment across the country.  *See* AC ¶ 54 (alleging work in California consisted of "reading and writing scripts and preparing performances"); *compared with* ECF No. 53-1 (Nov. 17, 2025 Dixon Declaration) ¶¶ 3-5.  To the contrary, his allegations and work agreements evidence the undisputed fact that he performed all acting roles in Georgia.  *See* AC ¶ 24-26, 51-52, 82; Exs. 1-4.  Dixon's stint living in California—a personal choice—cannot justify application of California law to this Georgia-centered work relationship.  *Kane v. Matson Navigation Co.*, 2024 WL 1988838, at *1 (9th Cir. May 6, 2024) (unpublished) ("California residency does not establish a substantial work connection to California."); *Russo*, 135 F. Supp. 3d at

16

1095 (dismissing FEHA claims by California-resident plaintiff where "the majority of [her] occupational duties" were performed outside California).

Dixon similarly fails to plead that the "material elements" of his claims have substantial connection to California.  That inquiry turns on "the location of where the core of the alleged wrongful conduct occurred."  *Sexton*, 2023 WL 1823487, at *4.  The focus is thus on the defendant's conduct, rather than the plaintiff's location.  *Id.*  "[A] significant *aggregation* of alleged events must occur within California," *Hill*, 2024 WL 3012802, at *9 (emphasis in original), including events comprising a "crucial element" of the claim, *Gowan v. Stryker Corp.*, 2021 WL 3403150, at *1 (N.D. Cal. Aug. 4, 2021).  Where, as here, a plaintiff alleges harassment and wrongful discharge under FEHA, the court must look to where the alleged harassment occurred and the termination decision was made.  *Hill*, 2024 WL 3012802, at *9.

Dixon's allegations make clear that *none* of the alleged conduct occurred in California.  He alleges that all physical harassment occurred in Georgia or the Bahamas.  AC ¶¶ 91, 98, 132, 134, 138, 142-44.  Prior to his 2023 move to California, any alleged verbal or text-message harassment indisputably had no connection to California.  But even with respect to the 2023-2024 time period, Dixon alleges that Perry's calls and texts came from Georgia.  AC ¶ 55 ("When Mr. Dixon lived in California … Defendant Perry … contacted Mr. Dixon by telephone *from*

17

***Defendant Perry's location in Georgia***.") (emphasis added). Dixon does not even allege he was in California when he received those communications. There similarly are no allegations that Defendants made employment decisions anywhere other than Georgia, where they all lived, worked, or were headquartered. AC ¶¶ 21, 24-26, 55, 82. Nothing happened in California, and certainly nothing important to Dixon's claims. *Hill*, 2024 WL 3012802, at *9-10 (dismissing FEHA claim where supervisor responsible for alleged constructive discharge worked in New York, and plaintiff alleged no involvement by California-based superiors).

*English v. General Dynamics Mission Systems* is instructive, and while that case was decided on summary judgment, the same bases for dismissal are apparent on the face of Dixon's complaint. In *English*, the Georgia plaintiff was hired to work on Georgia military bases. 2019 WL 2619658, at *2. Later, she moved to California, after which she experienced discrimination working in other states, reported the discrimination, and was terminated. *Id.* at *2-3. Even though the plaintiff (a) was a California resident during all alleged misconduct, (b) received her pay and paid taxes in California, (c) performed a "substantial amount" of work in California, and (d) was located in California when terminated, the court dismissed her FEHA claims. *Id.* at *6-8, *aff'd*, 808 F. App'x 529 (9th Cir. 2020). Dismissal was required because the alleged discrimination occurred in other states, and the employers made the termination decision in Georgia and North Carolina. 2019 WL 2619658, at *6-8.

18

So too here:  the alleged misconduct occurred in Georgia (where Dixon contracted to work) or the Bahamas.  There are no alleged employment decisions or actions in California, and Dixon did not even live in California for most alleged misconduct.

Because California was not the situs of Dixon's employment or the alleged wrongful conduct, Dixon's FEHA claim in Count II must be dismissed.

## B.    Dixon's Wrongful Termination Claim (Count I) Fails For The Same Reasons

Because Dixon cannot bring a direct claim under FEHA, he also cannot pursue his claim that Defendants wrongfully terminated him in violation of the public policies embodied in the same statute.  Where courts dismiss FEHA claims on extraterritoriality grounds, they will dismiss "public policy" claims premised on FEHA or the California constitution for the same reasons.  *See Motamedi v. Radioshack Corp.*, 2008 WL 11338432, at *3 (C.D. Cal. Dec. 4, 2008) (dismissing wrongful termination in violation of public policy claim based on FEHA violations where plaintiff failed to show that the alleged misconduct occurred in California); *Gonsalves*, 2010 WL 1854146, at *7 (dismissing California "public policy" claims for "same reasons" as FEHA claims); *English*, 2019 WL 2619658, at *8 n.21 (same); *Russo*, 135 F. Supp. 3d at 1096 (dismissing sex discrimination claim premised on California constitution, along with FEHA claim, because "all alleged acts of harassment took place [outside California]," as did "the vast majority of Plaintiff's employment duties").  The Count I "public policy" claim is premised on alleged

19

violations of FEHA and/or the California constitution.  *See* AC ¶ 212.  It thus fails for the same reason as Dixon's direct FEHA claim:  there is no basis to apply California employment law to this Georgia case.

## II.    DIXON'S TITLE VII CLAIM SHOULD BE DISMISSED BECAUSE IT IS UNTIMELY AND BECAUSE DIXON FAILED TO EXHAUST ADMINISTRATIVE REMEDIES

Dixon did not file a timely EEOC charge, nor did he obtain the required right-to-sue notice from the EEOC.  Both failings require dismissal of Count III.

### A.    Dixon Did Not File An EEOC Charge Within 180 Days

A plaintiff must file an EEOC charge within 180 days of the unlawful employment action.  *See* 42 U.S.C. § 2000e-5(e)(1); *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003).  "Title VII is not intended to allow employees to dredge up old grievances; they must promptly report and take action on [unlawful] acts when the[y] occur," and "[u]nlitigated bygones are bygones."  *Fanning v. Bos. Mkt. Corp.*, 2007 WL 9735676, at *11 (N.D. Ga. Feb. 26, 2007), *report and recommendation adopted*, 2007 WL 9735720 (N.D. Ga. Mar. 26, 2007), *aff'd*, 262 F. App'x 999 (11th Cir. 2008).  Here, Dixon seeks to recover for alleged harassment in 2020-2021, yet he did not file an EEOC charge until 2025—four years later.  AC ¶ 6.  Dixon cannot recover for such un-litigated bygones, nor can he bootstrap the years-old alleged conduct to the only timely alleged conduct—two communications from Perry in May and June 2024.  And because those alleged 2024

20

communications do not meet the standard for a hostile work environment, Dixon's Title VII claim must be dismissed in its entirety.

1.    The 2020-2021 Allegations Reflect A Separate Course Of Conduct From Alleged Calls And Texts Years Later

Because Dixon filed his EEOC charge on January 13, 2025, and taking into account the parties' tolling agreement as alleged, only conduct occurring on or after April 12, 2024 is timely "filing-period" conduct.  AC ¶¶ 8-11, 179-83.  That leaves the alleged May 2024 message cautioning Dixon not to end up alone and the alleged June 2024 call where Perry purportedly told Dixon he was sexy and should have more sex.  *Id.* ¶¶ 250-51.

Courts assessing whether pre-filing-period conduct may be the basis for a hostile work claim "examine[] the acts within the filing period and determine[] what acts outside the filing period were related by type, frequency, and perpetrator[.]" *Fanning*, 2007 WL 9735676, at *12.  In addition, where "intervening acts" separate periods of alleged harassment, the misconduct is no longer a single act for purposes of the limitations period.  *Id.*; *Watson*, 324 F.3d at 1258-59.  In this case, any chain of events is broken.  Dixon alleges physical and verbal harassment in 2020-2021, followed by an apology from Perry, nearly two years of no alleged harassment, and Dixon's relocation to another state.  After all of that, Dixon alleges Perry made a handful of comments about sex by phone in 2023 and 2024.  These allegations reflect separate episodes of supposed conduct.

21

*Fanning* illustrates the point. The plaintiff there alleged 2001 harassment that included a supervisor brushing his erect penis on her, rubbing himself, licking his lips, making sexual comments, calling plaintiff "baby," staring at her buttocks, and repeatedly attempting to kiss her. 2007 WL 9735676, at *10. Plaintiff later transferred to a new store, separating her from the supervisor. *Id*. She thereafter had phone interactions with the supervisor where he again called her "baby" and, in 2003, an in-person interaction where the supervisor again tried to kiss her. *Id*. The court found the plaintiff could not connect the 2001 and 2003 conduct because plaintiff's "transfer and resulting two-year separation from contact with [the supervisor]" were "intervening acts." *Id*. at *13. And while the 2001 and 2003 conduct were of the same general nature, the prior conduct was "significantly more severe." *Id*. There accordingly was no single course of unlawful conduct. The magistrate's findings were adopted by the district court and affirmed by the Eleventh Circuit. 2007 WL 9735720, *aff'd*, 262 F. App'x 999.

The same is true here. According to Dixon, after the June 4, 2021 incident, Dixon complained, and Perry apologized. AC ¶¶ 148-49, 154. There was then no alleged harassment of any kind in 2021 or 2022. *See also Watson*, 324 F.3d at 1258-59 (pre-filing-period harassment could not be part of claim where plaintiff complained to supervisor, resulting in remedial action). Dixon also relocated to California, separating himself from Perry. AC ¶¶ 175, 186. While the alleged filing-

22

period communications from May and June 2024 plausibly could be grouped with the similar alleged communications from 2023, none of that represents a single, continuing course of conduct with alleged physical and other in-person harassment from years prior, in 2020 and 2021.  Dixon therefore cannot base a claim on such "old [alleged] grievances." *Fanning*, 2007 WL 9735676, at *11, *13.

### 2. The 2023-2024 Calls And Texts Are Not Harassment

Dixon does have an actionable Title VII claim based on the alleged communications from Perry in 2023-2024 either.  Dixon admittedly befriended Perry outside of work, AC ¶ 92, and their communications must be read "in the overarching context of [Dixon] being friendly with [Mr. Perry]." *Allen v. Ambu-Stat, LLC*, 799 F. App'x 703, 709 (11th Cir. 2020).  Viewed in any light—but especially in that light—the alleged 2023 and 2024 comments do not constitute "severe or pervasive" harassment necessary for a hostile work environment. *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 584 (11th Cir. 2000) (supervisor "may compliment [a subordinate's] looks … on one or several occasions … without fear of being found guilty of sexual harassment"), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Allen*, 799 F. App'x at 705, 709 (comments that employee was "really pretty," "fine as hell," and "had a body like [boss'] ex-girlfriend … with wider hips" was not actionable given context of friendship).  The Court should dismiss Dixon's Title VII claim in its entirety.

23

**B.      Dixon Never Obtained A Right To Sue Under Title VII**

Dixon's Title VII claim should also be dismissed because he failed to exhaust administrative remedies.    "Before instituting a Title VII action … plaintiff must … receive statutory notice from the EEOC of his or her right to sue." *Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1567 (11th Cir. 1996).  Dixon admits he never obtained a right to sue from the EEOC.  AC ¶ 15.  His Title VII claim should thus be dismissed.  *Burnett v. City of Jacksonville, Fla.*, 376 F. App'x 905, 907 (11th Cir. 2010) (affirming dismissal for failure to exhaust remedies).

Dixon wrongly argues that, because he received a right-to-sue letter from the California Civil Rights Division, "[t]here is no need for the E.E.O.C. to issue the Notice of Right to Sue."  AC ¶ 15.  Not so.  To start, Dixon ignores that the CRD letter expressly directed him to contact the EEOC "[t]o obtain a federal Right to Sue notice," which he never obtained.  ECF No. 102-3 at 6.  Moreover, filing a charge with the CRD and obtaining an immediate, *pro forma* right-to-sue letter does not satisfy Dixon's administrative-exhaustion burden under Title VII.  "[A]n aggrieved employee must assert his claim in the ***appropriate*** State agency and the EEOC before he can file [a Title VII] claim in federal district court." *Smith v. Gen. Scanning, Inc.*, 832 F.2d 96, 100 (7th Cir. 1987) (emphasis added).  Here, the CRD was never an "appropriate State agency" because Dixon was never employed in California and the alleged conduct took place elsewhere.  Nor did Dixon even live in California when

24

he filed with the CRD.  *See Smith*, 832 F.2d at 97, 100 (dismissing Title VII action where plaintiff obtained right-to-sue letter from Wisconsin agency based on work performed in Illinois).  Dixon's Title VII claim is again dead on arrival.

## III.    DIXON'S EMOTIONAL DISTRESS CLAIM SHOULD BE DISMISSED BECAUSE IT IS UNTIMELY UNDER APPLICABLE GEORGIA LAW

Dixon attempts to assert his IIED claim under California common law, but a tort claim for conduct outside California does not arise under California law. Dixon's performer agreements compel the same conclusion; each contained an enforceable choice of Georgia law, under which Dixon's claim is time-barred.

### A.    Dixon's IIED Claim Does Not Arise Under California Law

Conflicts of laws principles require application of Georgia law to Count IV. "[A] tort action is governed by the substantive law of the state where the tort was committed." *Dowis v. Mud Slingers, Inc.*, 279 Ga. 808, 809-10, 816 (2005).  Dixon alleges that his emotional distress was caused by Perry's "sexual acts, groping, and coercive sexual propositioning," AC ¶ 265, all of which Dixon alleges occurred in Georgia (with the exception of one Bahamas incident), while Dixon lived in Georgia. Even if the few calls and texts Dixon claims he received from Perry in 2023-2024 could fairly be characterized as part of his IIED claim (they cannot, *see infra* III.B), Dixon alleges those communications also emanated from Georgia, and he does not even allege he was in California when he received them.  Georgia law accordingly

25

governs. *See Osiris Therapeutics, Inc. v. MiMedx Grp., Inc.*, 2020 WL 11192769, at \*3-4 (N.D. Ga. Feb. 24, 2020) (holding on motion to dismiss that Georgia law governed tort claims based on Georgia conduct by Georgia defendants).

Were that not enough, in each of his work contracts, Dixon agreed that "[a]ny Dispute … may be heard only in a court of competent jurisdiction in Fulton County applying Georgia law." *See* Ex. 1 at Addendum § P(2) (*Ruthless*, 2019); Ex. 2 § 24(b) (*The Oval*, 2020); Ex. 3 at Addendum § P(2) (*Losing It*, 2022); Ex. 4 at Addendum § P(2) (*Joy Ridge*, 2024). "Dispute" is defined broadly as "[a]ny and all controversies, claims or disputes arising out of or related to this Agreement." *See id.* Dixon's claim that he suffered distress through a "pattern of unwanted sexual conduct as a condition of his employment," AC ¶ 264, falls within that broad bucket of contemplated claims. *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009) (holding similar choice-of-law language encompassed tort claims).

Georgia courts enforce choice-of-law agreements absent a contrary Georgia public policy. *Neibert v. Computer Sciences Corp.*, 621 F. App'x 585, 589 (11th Cir. 2015); *Carr v. Kupfer*, 250 Ga. 106, 107 (1982). A contrary policy typically arises when the agreed foreign law contravenes Georgia's own laws on the same issue. *See, e.g.*, *Motorsports of Conyers, LLC v. Burbach*, 317 Ga. 206, 210, 216 (2023) (choice of foreign law would result in enforcement of restrictive covenant that violated Georgia law). Here, there is no Georgia policy against applying

26

Georgia law in a case where all but one challenged act is alleged to have occurred in Georgia. The California court rejected Dixon's previous invocation of public policy to avoid the same forum and choice-of-law provisions, *see* ECF No. 67 at 5-7, and the same result follows here.

**B.    Dixon's IIED Claim Is Time-Barred Under Georgia Law**

Georgia has a two-year statute of limitations for intentional infliction of emotional distress. O.C.G.A § 9-3-33; *Buchanan v. Lossing*, 2025 WL 2014324, at *1 (N.D. Ga. July 16, 2025). The limitations period begins to run when the "injury is sustained." *Id.*, at *2.

Dixon alleges his distress was caused by "sexual acts, groping, and coercive sexual propositioning," AC ¶ 265, but according to Dixon, all of that conduct occurred by June 4, 2021—the date Dixon claims Perry groped him at Perry's home. After that, Dixon does not allege Perry committed any "sexual act," groped him, or made any "coercive sexual proposition." The closest Dixon comes is the alleged June 2024 phone call where Perry purportedly said Dixon was "a sexy man" and "should be having sex more," *id.* ¶ 180d, but that cannot be characterized as "coercive sexual propositioning"—the alleged cause of Dixon's distress. In any event, Dixon alleges his injury arose years earlier following the alleged June 2021 incident. AC ¶ 175 ("After the June 2021 sexual assault pled above, Mr. Dixon's mental health condition worsened, and his counselor suggested he get intensive

psychiatric therapy, but Mr. Dixon could not afford to do so."). Yet Dixon did not file an IIED claim until June 2025—well over two years after the alleged conduct and injury. Count IV should be dismissed.

## IV.    DIXON'S SEX TRAFFICKING AND GEORGIA RICO CLAIMS SHOULD BE DISMISSED

### A.    Dixon Does Not Allege Any Sex Trafficking

Dixon asserts a "sex trafficking by coercion" claim, with Perry as the purported perpetrator, AC ¶¶ 277-89, and the entity Defendants as purported "beneficiaries," *id.* ¶¶ 290-301. The Trafficking Victims Protection Reauthorization Act ("TVPRA") penalizes anyone who "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person … knowing … that … coercion … will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a).

"Coercion" is defined by statute. It means "threats of serious harm [] or physical restraint" or "[a] scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm [] or physical restraint." 18 U.S.C. § 1591(e)(2).[6] And "'serious harm' means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a

---

[6] Another form of "coercion" that Dixon does not attempt to allege is "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2).

reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm."  18 U.S.C. § 1591(e)(5).

The TVPRA helps implement the Thirteenth Amendment's protections against slavery, *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017), *as amended* (Mar. 3, 2017), and the archetypal case is one in which a vulnerable individual is forced into prostitution through threats or violence.  *See, e.g.*, *United States v. Walker*, 73 F.4th 915, 928 (11th Cir. 2023) (pimp coerced impoverished women, including 15-year-old runaway, into multi-state sex work).

This is not a sex trafficking case.  Dixon's allegations of Perry's supposed "coercion" are found in paragraphs 281 and 282 of the Amended Complaint.  They include Perry buying Dixon a car, offering him a recurring TV role, inviting him on vacation, giving him a pay raise, and promising to support his TV series.  Those are not threats of "serious harm."  If anything, they seek to establish the inverse—that if Dixon had sex with Perry, more good things would accrue.  "Coercion," by contrast, is the threat that *failure* to perform a sex act will result in *harm* so significant that a reasonable person would go through with the act to avoid it.  18 U.S.C § 1591(e)(5).

Nor are Dixon's allegations that Perry suggested he may fire Dixon, including by "killing off" Dixon's character, allegations of "coercion."  An alleged threat of termination, without more, is not a threat of "serious harm" under the TVPRA.

29

*Roman v. Tyco Simplex Grinnell*, 2017 WL 3394295, at \*5-6 (M.D. Fla. Aug. 8, 2017) (termination would not be "serious harm" where plaintiff did not allege he would be subject to deportation or was otherwise in "especially precarious financial position"), *aff'd*, 732 F. App'x 813, 817 (11th Cir. 2018) (affirming dismissal where plaintiff "d[id] not explain how the potential financial harm … would be any more serious than the financial harm any employee encounters when faced with termination"). Dixon does not allege any precarious personal circumstances that would have made it uniquely untenable for him to lose his job. Dixon also does not allege Perry's remarks about "killing off" characters was ever coupled with a mention of sex, nor that Perry ever directed such comments at Dixon. *See* AC ¶ 152c (Dixon joking with and encouraging Perry to kill off *other actors'* characters).

*Walker* illustrates what actually amounts to "coercion" under the statute. There, Walker recruited an impoverished woman for prostitution and made her believe "serious harm" would befall her if she refused. He did so by rationing her food, suggesting she would lose her shelter, and transporting her to a faraway city where she was penniless and had no means of getting home. 73 F.4th at 930-31. Here, by stark contrast, Dixon had a legitimate job; access to his own money, car, and apartment; and even the ability to pick up and move to Santa Monica, California when *he* wanted to. When Dixon chose to quit working for TPS—another fact undermining any notion he was threatened with "serious harm"—he had a fallback

30

place to live (North Carolina) and shortly thereafter moved to another expensive city (New York City). *See Carter v. Paschall Truck Lines, Inc.*, 2023 WL 359559, at *10 (W.D. Ky. Jan. 23, 2023) ("[F]acts showing that employment was voluntary—like [plaintiff's] early departure—undermine any argument that a plaintiff faced serious economic harm sufficient to trigger the TVPA."). Indeed, Dixon does not allege Defendants did anything to prevent him from doing what he wanted, going where he wanted, or associating with whomever he wanted. *See id.* (hallmarks of trafficking are where "extreme isolation, threats and violence, and denial of access to education, [are] used to … keep [victims] bound to their captors").

Notably, Dixon repeatedly ***rejected*** Perry's alleged sexual advances, further undermining any notion that he was coerced to the point where "a reasonable person" in his shoes would have engaged in sex acts. 18 U.S.C. § 1591(e)(2) & (5). Not only that, but Dixon continued to receive professional opportunities and earn increased compensation. Dixon claims Perry was buying his silence, AC at 37, ¶ 280, but that proves the point: giving someone perks after they have rejected sex acts is the opposite of threatening serious harm for such refusals. Similarly undermining any coercion claim is (1) Perry's alleged apology in June 2021, because an apology communicates that Dixon was within his rights to reject Perry; and (2) Dixon's concession that he felt free to decline Perry's invitation on a yacht. Dixon's

31

TVPRA claim must be dismissed as to all Defendants for these reasons. *See* 18 U.S.C. § 1591(a)(2) ("beneficiary" claim requires underlying (a)(1) violation).

### B.    Dixon Does Not Allege Any Georgia RICO Violations

Dixon brings a claim under subsection (a) of Georgia's RICO statute, which prohibits "any person, through a pattern of racketeering activity … to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." O.C.G.A § 16-14-4(a). A "pattern of racketeering activity" requires "at least two acts" of "interrelated" "racketeering activity," *McGinnis v. American Home Mtge. Servicing, Inc.*, 817 F.3d 1241, 1252-53 (11th Cir. 2016), which is the commission or attempted commission of enumerated crimes (or the solicitation, coercion, or intimidation of another to commit such crimes), O.C.G.A § 16-14-3(4)-(5).

Dixon's Georgia RICO claim fails at the outset because he has not alleged any predicate racketeering acts. Even if Dixon had alleged predicate acts, he has not alleged that Defendants acquired or maintained property through such acts. In fact, Dixon alleges that Perry's sexual advances—the foundation of all claimed racketeering acts—resulted in financial value flowing to Dixon, not Defendants.

***No Predicate Racketeering Acts.*** Dixon relies first on a claimed violation of TVPRA, but as explained above, *supra* III.A, Dixon fails to allege that Defendants trafficked him. Nor does he allege sex trafficking of anyone else because there are

32

no allegations that any of the other individuals briefly referenced in the AC were subjected to "force, fraud, or coercion" to procure commercial sex acts. 18 U.S.C. § 1591(a). Dixon alleges Perry cast one individual on a show, traveled with him, and provided gifts—without any sex-related allegations at all. AC ¶¶ 58-60. Two others allegedly were offered roles, harassed, and then offered or given money, *id.* ¶¶ 61-67, yet there are no allegations of force, fraud, or coercion.[7] In any event, Dixon does not allege that this conduct injured ***him***, and thus he cannot ground his RICO claim on those purported predicates. *Stewart Ausband Enterprises, Inc. v. Holden*, 349 Ga. App. 295, 299-300 (2019) (racketeering acts must be the cause of plaintiff's injury); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496-97 (1985) (same, under federal RICO).

Dixon also fails to allege "pandering"—his second claimed racketeering predicate. AC ¶ 308b. "A person commits the offense of pandering when he or she solicits a person to perform an act of prostitution …." *Id.* "Prostitution" occurs when a person "performs or offers or consents to perform a sexual act … for money or other terms of value." O.C.G.A. § 16-6-9. Dixon does not allege Perry's

---

[7] "Force" is not defined in the TVPRA but is defined in another statute addressing sex crimes. It means "use of a weapon," "use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person," or "inflicting physical harm sufficient to coerce or compel submission by the victim." *See* 10 U.S.C. § 920(g)(4). Dixon's allegation that Perry "grabbed [an individual's] hand and placed it on his penis," AC ¶ 65, for instance, does not come close to that definition.

advances amounted to pandering because Dixon rejected them yet continued to benefit through work opportunities, pay raises, and paid vacations. The alleged fact that Perry bestowed value on Dixon after Dixon *rejected* sex is antithetical to the idea that Perry was seeking to trade things of value for *acquiescence* to sex. Dixon does not allege pandering with respect to other individuals for the same reason and because he does not allege any such interactions occurred in Georgia. Like California statutes, Georgia laws do not regulate extraterritorial conduct. *Glock v. Glock*, 247 F. Supp. 3d 1307, 1318 (N.D. Ga. 2017). And again, Dixon does not claim any injury from purported third-party pandering and thus cannot bring a RICO claim on that basis. *Ausband*, 349 Ga. App. at 299-300.

Dixon also does not plead any instances of "solicitation" of prostitution, as required by the Georgia pandering statute. "[O]nly a relatively overt statement or request intended to bring about action on the part of another person" will satisfy the requirements of the solicitation statute. *State v. Davis*, 246 Ga. 761, 762 (1980). Dixon's Amended Complaint does not contain any allegations that Perry made overt statements tying Dixon's professional advancement to sex. Because he has failed to allege racketeering acts, Dixon's RICO claim must be dismissed.

*No Value Acquired Or Maintained By Defendants.* Another crux of a RICO claim is that the defendant used a pattern of racketeering acts to acquire or maintain control over personal or real property. O.C.G.A § 16-14-4(a). Dixon does not allege

34

that happened here. Even assuming he had properly pled predicate racketeering acts, he alleges all financial benefits flowed to him, not Defendants. All Defendants purportedly obtained were Dixon's services as an actor on Defendants' shows and movies, but services do not amount to "personal property" under Georgia's RICO statute. *Five Star Athlete Management, Inc. v. Davis*, 355 Ga. App. 774, 778-81 (2020). Dixon tries to blur the line by alleging Defendants received money when they licensed *The Oval* to a network, AC ¶ 295, but obtaining money through a legitimate licensing—as opposed to through felonious racketeering conduct—does not violate RICO. O.C.G.A § 16-14-4(a) (personal property must be obtained "through a pattern of racketeering activity").

At bottom, the numerous pleading deficiencies in Counts V and VI illustrate that these were never serious claims but rather attempts to generate negative publicity and settlement pressure. Those efforts fail along with the claims themselves.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's First Amended and Verified Complaint in its entirety, with prejudice.

[*Signatures on following page*]

35

Dated:  April 27, 2026

TUCKER ELLIS LLP

By:  */s/ Matthew A. Boyd*
Matthew A. Boyd
Georgia Bar No. 027645
matthew.boyd@tuckerellis.com
3344 Peachtree St. NE – Suite 1050
Atlanta, GA 30326
Telephone:  (404) 678-6365

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Alex Spiro (*admitted pro hac vice*)
alexspiro@quinnemanuel.com
295 5th Avenue
New York, New York 10016
Telephone:  (212) 849-7000

Michael T. Lifrak (*admitted pro hac vice*)
michaellifrak@quinnemanuel.com
Mari F. Henderson (*admitted pro hac vice*)
marihenderson@quinnemanuel.com
Alex Bergjans (*admitted pro hac vice*)
alexbergjans@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000

*Attorneys for Defendants Tyler Perry, TPS Production Services, LLC and And Action, LLC*

36

## LOCAL RULE 7.1(D) CERTIFICATION

Counsel certifies that this memorandum of law has been prepared with Times New Roman size 14-point font, which is one of the font and point selections approved by the Court in Local Rule 5.1.  This memorandum does not contain more than 10 characters per inch of type.

TUCKER ELLIS LLP

By:  */s/ Matthew A. Boyd*
Matthew A. Boyd
Georgia Bar No. 027645
Matthew.boyd@tuckerellis.com
3344 Peachtree St. NE – Suite 1050
Atlanta, GA 30326
Telephone:  (404) 678-6365

*Attorneys for Defendants Tyler Perry, TPS Production Services, LLC and And Action, LLC*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

DEREK DIXON,

     *Plaintiff*,

   v.

TYLER PERRY;
TPS PRODUCTION SERVICES, LLC;
and AND ACTION, LLC,

     *Defendants*.

Case No. 1:25-cv-07102-SEG-CCB

## CERTIFICATE OF SERVICE

This is to certify that, on this 27th day of April, 2026, I have electronically filed **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED AND VERIFIED COMPLAINT** with the Clerk of Court using CM/ECF and thereby served the Plaintiff through his counsel of record.

 

*/s/ Matthew A. Boyd*
Matthew A. Boyd
Georgia Bar No. 027645

38