**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| DEREK DIXON, | ) | |
| | ) | |
| | ) | CIVIL ACTION |
| Plaintiff, | ) | FILE NO. 1:25-CV-07102-SEG-CCB |
| | ) | |
| v. | ) | |
| | ) | |
| TYLER PERRY; | ) | |
| TPS PRODUCTION SERVICES, LLC; | ) | |
| and AND ACTION, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................... 1

II.   FACTUAL ALLEGATIONS ......................................................................... 3

     A.   Perry's Pattern of Targeting Aspiring Actors for Sex Abuse .............. 4

     B.   Perry Targets Mr. Dixon and Begins Grooming Him ......................... 4

     C.   Perry Begins to Sexually Harass and Coerce Mr. Dixon .................... 5

     D.   Perry Uses Mr. Dixon's Employment to Buy his Silence About
          the Sex Abuse and Continued Sex Harassment .................................. 8

     E.   Mr. Dixon's Mental Health Suffers to the Point Where he
          Cannot Work for Defendants Any Longer ......................................... 11

III.  ARGUMENT AND CITATION TO AUTHORITIES ................................. 12

     A.   California Law Applies to Mr. Dixon's Wrongful Discharge
          and Retaliation and California FEHA Claims .................................... 13

          1.   Georgia Law is Clear that California Law Applies .......................... 13

          2.   A California Court Would Apply California Law to
               Mr. Dixon's Wrongful Discharge and Retaliation Claim .............. 16

          3.   A California Court Would Also Apply California Law to
               Mr. Dixon's California FEHA Claim .............................................. 18

     B.   Mr. Dixon's Title VII Claim is Timely, Adequately Pled,
          and Properly Before the Court .......................................................... 22

          1.   Mr. Dixon's Charges were Timely Filed Because the
               Tolling Agreement Extended the Limitations Periods ................... 22

          2.   Mr. Dixon Adequately Pleads his Title VII .................................... 25

i

3.      *Mr. Dixon's Second Charge with the California CRD
        Exhausted his Administrative Remedies* ........................................... 27

4.      *The Proper Remedy if the California CRD did not
        Exhaust Title VII Administrative Remedies is
        Amendment of the Complaint* ............................................................ 28

C.      Mr. Dixon's Intentional Infliction of Emotional Distress
        Claim is Timely Because it Accrued when he Could not
        Return to Work ...................................................................................... 28

D.      Mr. Dixon Adequately Alleges a TVPA Claim .................................... 31

E.      Mr. Dixon Adequately Alleges his Georgia RICO Claim..................... 36

1.      *Defendants Violated the Georgia RICO* ............................................. 37

2.      *Defendants Acquired Money Through Their Violations*.................... 38

3.      *Mr. Dixon Suffered Injury* .................................................................. 39

4.      *Mr. Dixon Adequately Alleges Proximate Cause*.............................. 40

IV.   CONCLUSION .......................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ................................................... 40

*Ardolf v. Weber*, 332 F.R.D. 467 (S.D.N.Y. 2019) .................................32 n .14, 33, 34

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................... 2, 12, 13

*Auld v. Forbes*, 309 Ga. 893 (2020)................................................................13-15, 18

*Austin v. Mac-Lean Fogg Co.*, 999 F. Supp. 2d 1254 (N.D. Ala. 2014)....................... 26

*Bailey v. Wheeler*, 843 F.3d 473 (11th Cir. 2016) ......................................................1, 12

*Bishop's Property & Investments, LLC v. Protective Life Ins. Co.*,
597 F. Supp. 2d 1365 (M.D. Ga. 2009)..................................................................... 13

*Bistline v. Parker*, 918 F.3d 849 (10th Cir. 2019) ........................................................ 35

*Borden v. Johnson*, 196 Ga. App. 288 (1990)............................................................... 18

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ....................................... 40

*Bridges v. Poe*, 487 F. Supp. 3d 1250 (N.D. Ala. 2020) .............................................. 34

*Butts v. Georgia State Patrol Div.*, No. 4:11-CV-60 CDL,
2011 WL 5597258 (M.D. Ga. Nov. 17, 2011)........................................................... 26

*Campbell v. Arco Marine, Inc.*, 42 Cal. App. 4th 1850 (1996)................................. 19, 20

*Cobb Cnty. v. Jones Group P.L.C.*, 218 Ga. App. 149 (1995)...................................... 39

*Comerinsky v. August Coating & Mfg., LLC*,
418 F. Supp. 3d 1252 (S.D. Ga. 2019) ...................................................................... 26

*Commercial Credit Plan, Inc. v. Parker*, 152 Ga. App. 409 (1979) ................................16 n.4

*Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151 (2009) .................................................29 n.11

*United States v. Corley*, 679 Fed. App'x. 1 (2d Cir. 2017)...................................................... 37

*CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc.*,
283 Ga. 426 (2008)........................................................................................ 15

*Dague v. Riverdale Athletic Ass'n*, 99 F.R.D. 325 (N.D. Ga. 1983) ..................................... 28

*Dinkins v. Charoen Pokphand USA, Inc.*,
133 F. Supp. 2d 1254 (M.D. Ala. 2001) ................................................................ 28

*Doe v. Maxim, Inc.*, No. 2:22-CV-05289-MEMF(ASX),
2023 WL 11979557 (C.D. Cal. May 19, 2023)........................................................ 19

*Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204 (11th Cir. 2011) ........................14, 29 n.11

*Does 3 v. Indyke*, 801 F. Supp. 3d 200 (S.D.N.Y. 2025)............................................. 19

*E.E.O.C. v. Dinuba Med. Clinic*, 222 F.3d 580 (9th Cir. 2000) .......................................22-23

*Eckhard v. Fox News Network, LLC*, No. 20-CV-5593 (RA),
2021 WL 4124616 (S.D.N.Y. Sept. 9, 2021)............................................................ 33

*English v. Gen. Dynamics Missions Sys., Inc.*, No. EDCV 18-908 JGB,
2019 WL 2619658 (C.D. Cal. 2019) .................................................................... 21

*Evans v. McClain*, 131 F.3d 957, 964 n.2 (11th Cir. 1997) ...........................................34 n.16

*Fanning v. Boston Mrkt. Corp.*, No. 1:05-CV-1121-TCB,
2007 WL 9735676 (N.D. Ga. 2007).....................................................................24-25

*Fredette v. BVP Mgmt. Assocs.*, 112 F.3d 1503 (11th Cir. 1997) ....................................25-26

*Fusco v. Amer. Airlines*, No. C 00-1439 PJH, 2003 WL 25730512
(N.D. Cal. Apr. 10, 2003), *aff'd in part, rev'd in part sub. nom. on other grounds,*
*Leonel v. Am. Airlines, Inc.*, 400 F.3d 702 (9th Cir. 2005) .......................................20, 21-22

*Gamble v. New England Auto Finance, Inc.*, 281 F. Supp. 3d 1354
(N.D. Ga. 2017) .......................................................................................29 n.11

*Garland v. Advanced Med. Fund, L.P. II*, 86 F. Supp. 2d 1195 (N.D. Ga. 2000) .............. 14

iv

*Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156 (S.D.N.Y. 2019).......................33

*Gonsalves v. Infosys Techns, Ltd.*, No. C 09-04112 MHP, 2010 1854146
(N.D. Cal. May 6, 2010) ..................................................................................... 21

*Hill v. Workday, Inc.*, 773 F. Supp. 3d 779 (N.D. Cal. 2025)...................................19-20, 21

*Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992)................................................. 40

*Intern. Bus. Machines Corp. v. Kemp*, 244 Ga. App. 638 (2000)...................................13-14

*James v. Comm'ns Workers of Amer.*, 534 F. Supp. 566 (N.D. Ga. 1982)....................28 n.10

*Jandak v. Village of Brookfield*, 520 F. Supp. 815 (N.D. Ill. 1981) ........................................... 1

*Johnson v. American Standard, Inc.*, 43 Cal. 4th 56 (2008) ...............................................19 n.6

*Johnson v. Lucent Technologies Inc.*, 653 F.3d 1000 (9th Cir. 2011) ..................................... 30

*Kea v. State,* 344 Ga. App. 251, 254 (2018) ................................................................ 38

*Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95 (2006) ............................ 16-17, 21, 22

*Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279 (N.D. Ga. 2021)............................................. 37

*Lidow v. Superior Court*, 206 Cal. App. 4th 351 (2012)....................................................17-18

*Livingston v. Marion Bank and Trust Co.*, 30 F. Supp. 3d 1285 (N.D. Ala. 2014) ............. 25

*Malloy v. Superior Court*, 83 Cal. App. 5th 543 (2022) ....................................................21-22

*McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68 (2010)............................................... 17

*Mears v. Gulfstream Aerospace Corp.*, 225 Ga. App. 636 (1997) ......................................... 31

*Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) ................................................. 26

*Morrow v. Green Tree Servicing, L.L.C.*, 360 F. Supp. 2d 1246 (M.D. Ala. 2005) .....34 n.16

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)...........................................23-25

*Noble v. Harvey Weinstein, at al.*, 335 F. Supp. 3d 504 (S.D.N.Y. 2018) .........30-33, n.13-14

*O'Neal v. Garrison*, 263 F.3d 1317 (11th Cir. 2001) ................................................ 40

*Osborne v. State*, 92 Ga. App. 518 (1955).............................................................. 38

*Poague v. Huntsville Wholesale Furniture*, 369 F. Supp. 3d 1180 (N.D. Ala. 2019) .......... 26

*Reaugh v. Inner Harbour Hosp., Ltd.*, 214 Ga. App. 259 (1994) ........................................ 39

*Richardson v. Nw. Univ.*, No. 1:21-CV-00522, 2023 WL 6197447
(N.D. Ill. Sept. 21, 2023)........................................................................ 35-36, n.17

*Robinson v. Parrish*, 720 F.2d 1548 (11th Cir. 1983)......................................................20 n.7

*Rojo v. Kliger*, 52 Cal. 3d 65 (1990) ...................................................................... 18

*Roman v. Tyco Simplex Grinnell*, 732 Fed. App'x. 813 (11th Cir. 2018) ............................ 35

*Rulenz v. Ford Motor Co.*, No. 10CV1791-GPC-MDD, 2014 WL 50807
(S.D. Cal. 2014)........................................................................................... 20, 22

*Russo v. APL Marine Servs., Ltd.*, 135 F. Supp. 3d 1089 (C.D. Cal. 2015),
*aff'd*, 694 Fed. App'x. 585 (9th Cir. 2017)....................................................... 19, 28

*SCI Liquidation Corp. v. Hartford Ins. Co.*, 272 Ga. 293 (2000).....................................15 n.3

*Scott v. Dismas Charities, Inc.*, No. CIVA 105CV-3267-TWT, 2007 WL 2746697
(N.D. Ga. 2007) .........................................................................................30-31

*Short v. Immokalee Water & Sewer Dist.*, 165 F. Supp. 3d 1129 (M.D. Fla. 2016) ............. 23

*Smith v. Pefanis*, 652 F. Supp. 1308 (N.D. Ga. 2009) ............................................... 26

*State v. Stillman*, 372 Ga. App. 330 (2024) ........................................................... 38

*Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011) .................................................16-17, 18

*Surrell v. California Water Srvc. Co.*, 518 F.3d 1097 (9th Cir. 2008) ............................27 n.8

*Tomczyk v. Jocks & Jills Rests., LLC.*, 198 Fed. App'x. 804 (11th Cir. 2006) .................30-31

*Treminio v. Crowley Maritime Corp.*,
707 F. Supp. 3d 1234 (M.D. Fla. 2023) ................................................. 32 n.14, 33 n.15, 35-36

*United States v. Mickey*, 897 F.3d 1173 (9th Cir. 2018) ......................................................... 33

*United States v. Smith*, 895 F.3d 410 (5th Cir. 2018) ..........................................................31-32

*United States v. Taylor,* 44 F. 4th 779 (8th Cir. 2022) .....................................................32 n.14

*United States v. Walker*, 73 F.4th 915 (11th Cir. 2023) .....................................................34-35

*Usai v. Club Mgmt. Miami II, LLC,* 801 F. Supp. 3d 1295 (S.D. Fla. 2025)........................ 26

*Ward v. United Airlines, Inc.*, 9 Cal. 5th 732 (2020)....................................................18, 19 n.5

*Wassman v. South Orange Cnty. Comm. Coll. Dist.*, 24 Cal. App. 5th 825 (2018) ............ 30

*Watson v. Blue Circle, Inc.*, 324 F.3d 1252 (11th Cir. 2003) ............................................ 23, 24

*White v. City of Sylvester*, No. 1:14-CV-00076 (LJA), 2016 WL 1270236
(M.D. Ga. Mar. 31, 2016) ...................................................................................................... 28

*United States v. Williams*, 714 Fed. App'x. 917 (11th Cir. 2017)................................36 n.19

*Wilson v. City of Fresno*, 763 F. Supp. 3d 1073 (E.D. Cal. 2025) ...................................27 n.8

*Wommack v. G. S. Construction, Inc.*, 377 Ga. App. 582 (2025)......................................... 40

*Wylie v. Denton*, 323 Ga. App. 161 (2013)........................................................................36-37

## Rules and Statutes

Fed. R. Civ. P. 8...................................................................................................................34 n.16

18 U.S.C. § 1589 ..................................................................................................................35 n.17

18 U.S.C. § 1591 ..................................................................................................................31-36

18 U.S.C. § 1591(a) ............................................................................ 31, 33, 34 n.16

18 U.S.C. § 1591(a)(2)(A) .......................................................................34, 36 n.20

18 U.S.C. § 1591(a)(3) ....................................................................................32 n.14

18 U.S.C. § 1591(e)(5) ......................................................................................34-35

18 U.S.C. § 1961(1) ................................................................................................ 37

46 U.S.C. § 30104 .........................................................................................14 n.2

Cal. Labor Code § 925 ...................................................................................20 n.7

O.C.G.A. § 16-6-9 ..........................................................................................37-38

O.C.G.A. § 16-6-12 ........................................................................................37-38

O.C.G.A. § 16-14-3 .............................................................................................. 37

O.C.G.A. § 16-14-4(a) .......................................................................................... 37

O.C.G.A. § 16-14-6(c) .......................................................................................... 39

O.C.G.A. § 17-2-1 ..........................................................................................38 n.21

## I.    INTRODUCTION

The Motion to Dismiss filed by Defendants Tyler Perry, TPS Production Services, LLC ("TPS") and And Action, LLC ("AA") (Doc. 104-1) is a transparent example of the "old, but not venerable, lawyer's adage to the effect that when the law is against you, argue the facts; when the facts are against you, argue the law; and when both are against you, attack your opponent." *Jandak v. Village of Brookfield*, 520 F. Supp. 815, 819 (N.D. Ill. 1981). Defendants try each of these strategies but predictably, they all come up short.

Defendants cannot argue the facts because "the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor," *Bailey v. Wheeler*, 843 F.3d 473, 478 n.3 (11th Cir. 2016). Yet, that does not stop them from trying. They make a straw person out of Mr. Dixon's allegations by pitching an alternative version and arguing that *it* is insufficient. As one example, they claim that "Dixon alleges that Perry then asked for a hug before pulling Dixon's underwear down and groping his buttocks[,]" and "Dixon allegedly rebuffed Perry's advance." (Doc. 104-1, pp. 7-8 (citing Doc. 102, ¶¶ 143-44, 144-46.) But the cited paragraphs in Plaintiff's complaint allege much more— including that Mr. Dixon tried to pull his underwear up, but Perry grabbed his wrists to restrain him and said "[r]elax, just let it happen … I'm not going to hurt you[,]" and Mr. Dixon was "terribly frightened and believed he was going to be

1

raped" by Perry, who is much larger than him. (Doc. 102, ¶¶ 144-46.) At other times, Defendants simply ignore the allegations, such as when they claim Mr. Dixon only alleges he received inappropriate text messages and calls from Perry in Georgia (Doc. 104-1, p. 3), when he actually alleges Perry knowingly texted him in California once a week in 2023 and three to four times a month in 2024 (Doc. 102, ¶¶ 175-80). That Defendants prefer to attack a different complaint than the one Mr. Dixon filed is understandable, but not acceptable.

Defendants also cannot argue the law because Mr. Dixon's First Amended Complaint contains "sufficient factual matter, accepted as true" to state claims for relief that are "plausible on [their] face" under the applicable law. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citations omitted). As explained below,

- California law applies to Mr. Dixon's claims for wrongful discharge and retaliation and sex harassment (Counts I and II) because the Georgia choice of law rule requires it and California courts would apply California law to sex harassment directed into California and suffered by a California employee;

- Mr. Dixon's Title VII claim is timely and properly before the Court because the parties entered into a tolling agreement shortly after the last acts of sexual harassment, and Mr. Dixon filed charges with the U.S. Equal Employment Opportunity Commission ("EEOC") and the California Civil Rights Division ("CRD") within the applicable limitations period thereafter;

- Mr. Dixon's intentional infliction of emotional distress claim (Count IV) is also timely, regardless of whether California or Georgia law applies, because the cases hold that the claim accrues when the plaintiff is unable to return to work as a result of the tortious conduct, which was less than two years ago;

2

- Mr. Dixon's claim for sex trafficking under the Trafficking Victims Protection Act ("TVPA") (Count V) is adequately pled with evidence that Perry recruited, enticed, and solicited Mr. Dixon with knowledge that he would use force, fraud, and threats of "serious harm" to try to coerce him to perform commercial sex acts with him; and

- Mr. Dixon adequately pleads a Georgia RICO claim (Count VI) with evidence of a pattern of racketeering activity that includes multiple TVPA violations and criminal pandering offenses.

Defendants thus have no recourse but to attack Mr. Dixon, impugning him as someone who "exploited a friendship … for personal and professional gain," (Doc. 104-1, p. 1), who "sought to profit another way" when Perry's promise to sell his TV show went unfulfilled (*id.*), and whose claims are merely attempts to use federal laws prohibiting sex abuse schemes in a "trivialized" way to "generate publicity" (*id.* at 2). These arguments are for a jury. Simply put, the Court cannot decide from the pleadings whether Mr. Dixon is an opportunistic hustler who seduced Perry only to later falsely accuse of him of sex abuse, or whether instead Perry is a "casting couch predator" in the mold of Harvey Weinstein and Jeffrey Epstein who used incomparable wealth and power to prey sexually on vulnerable victims like Mr. Dixon. The Motion must be denied.

## II.   FACTUAL ALLEGATIONS

Mr. Dixon alleges he was one of multiple victims in Perry's scheme of targeting aspiring young actors for sex abuse and then coercing them into sex acts with illusory promises and veiled threats of killing their careers. (*Id.*)

3

### A.   Perry's Pattern of Targeting Aspiring Actors for Sex Abuse

Perry has recruited several young men to work for him and then sexually assaulted and coerced them. (*Id.* ¶ 57.) In 2015, he approached Mario Rodriguez through a gym trainer and said he wanted to offer Mr. Rodriguez an acting role. (*Id.* ¶¶ 61-62.) Perry invited Rodriguez to his home for drinks, told him he had "trauma" and to let Perry hug him, and started rubbing him and trying to have sex with him. (*Id.* ¶ 63.) When Rodriguez tried to leave, Perry said, "I would take care of you for the rest of your life and you wouldn't have to worry about anything." (*Id.* ¶ 64.) In 2018 or early 2019, Perry grabbed Rodriguez's hand and placed it on his penis and then stuffed $5,000 in Rodriguez's pocket. (*Id.* ¶ 65.) He followed a similar pattern with Bill Barrett, whom he cast in a show over the objection of the casting team and then began taking on trips alone (*id.* ¶¶ 58-60), and actor Christian Keyes, who appeared in Perry's movie *Diary of a Mad Black Woman* (*id.* ¶ 66). Mr. Keyes said on social media in December 2023 that he was sexually suffered sex harassment by a "Black billionaire" who offered him money (*id.* ¶¶ 66-67), and the reasonable inference is that Perry coerced him into nonconsensual sex acts too.

### B.   Perry Targets Mr. Dixon and Begins Grooming Him

Perry followed the same *modus operandi* with Mr. Dixon, whom he first met in September 2019 when Mr. Dixon worked for a catering and event

company called Legendary Events. (Doc. 102, ¶ 68.) At a party organized for Defendant TPS, Perry picked him out of a crowd and asked him about his employment status and if he was an actor. (*Id.* ¶ 69.) Mr. Dixon said he tried acting but was not an actor. (*Id.* ¶ 70.) Perry insisted they exchange phone numbers and began texting him about his dreams and aspirations. (*Id.* ¶ 71.)

On November 4, 2019, Perry offered Mr. Dixon the chance to act on one of his TV shows called *Ruthless.* (*Id.* ¶ 81.) He said the role was small but could get a bigger. (*Id.* ¶ 83.) A month later, Perry bought and gave to Mr. Dixon a new sport utility vehicle, telling Mr. Dixon his jeep "wouldn't do." (*Id.* ¶ 85.) Mr. Dixon was elated and felt that Perry believed he could be a star. (*Id.*)

### C.    Perry Begins to Sexually Harass and Coerce Mr. Dixon

In December 2020, Perry lamented to Mr. Dixon that he couldn't remember when he last had "good sex," and invited Mr. Dixon to his home in January 2020. (*Id.* ¶¶ 88-91.) That night, after plying Mr. Dixon with alcohol, asking for a hug, and telling him to stay in the guest room rather than drive, Perry climbed into his bed and rubbed his inner thighs in a sexual manner. (*Id.* ¶¶ 92-98.) Mr. Dixon felt violated, jumped out of the bed, and told Perry he "wasn't that sexual." (*Id.* ¶ 100.) Perry ignored this, told Mr. Dixon to turn around so he could look at him, and said his body was beautiful. (*Id.* ¶ 101.)

5

Perry invited Mr. Dixon over on other occasions too, which Mr. Dixon accepted because he thought if he didn't that Perry would terminate his employment and stop offering him acting opportunities. (*Id.* ¶¶ 110-11.) Perry started asking him sexually explicit questions about whether he was a "top" or "bottom"—that is, the giver or receiver—when having sex, and bragged that he was a "top ," saying, "when you have a big dick and hit the G spot right on these bottoms, they go crazy." (*Id.* ¶¶ 111-12.) Perry also told Mr. Dixon to quit his job and work for him full-time. (*Id.* ¶ 115.) A few months later, he offered Mr. Dixon a recurring role on his TV show called *The Oval.* (*Id.* ¶ 116.)

Mr. Dixon was excited and hoped *The Oval* would be his "big break" and a chance to show his talent. (*Id.* ¶ 117.) However, as he read the scripts, he realized his character was a gay, homeless man who had to have sex with another character to have a place to live. (*Id.* ¶ 118.) He also saw that his character was shot at the end of the season, and Perry told him that, if he "did a good job," then his character would come back in the next season. (*Id.*) Perry continued to sexually harass Mr. Dixon during this time, forcing him to discuss his sex life, making sexual remarks and requests for sex, and engaging in other harassing behavior, like pretending to choke Mr. Dixon and claiming that Mr. Dixon was sexually excited by it. (*See, e.g.,* Doc. 102, ¶¶ 122-28.) Perry also convinced Mr. Dixon to move out of his apartment and into a studio

6

house owned by Defendant TPS, after which he frequently had alcohol delivered to Mr. Dixon and then called him to talk about sex. (*Id.* ¶¶ 125, 129.)

Throughout 2020, the sexual harassment and coercion of Mr. Dixon continued nearly every day (*id.* ¶¶ 126-36), including numerous text messages reproduced in the First Amended Complaint (*see, e.g., id.* ¶¶ 130-31). Perry also made it clear to Mr. Dixon that he enjoyed using his power to write actors who displeased him off a show by killing their characters. (*Id.* ¶ 152.) And he suggested he may need to "punch [Mr. Dixon] in the stomach" to get him to act the way Defendant Perry wanted him to act. (*Id.* ¶ 152.d.) Perry also offered opportunities to Mr. Dixon, like in July 2020 when he said he loved a TV show Mr. Dixon wrote called *Losing It* and wanted to film it. (*Id.* ¶ 151.a.) In August 2020, the day after filming the episode in which Mr. Dixon's character was shot, Defendant Perry brought him to a trailer, gave him drinks, groped him, and attempted to make him have sex again. (*Id.* ¶ 282.c.)

In October 2020, Perry invited Mr. Dixon to his private Bahamian island. (*Id.* ¶ 132.) Mr. Dixon reluctantly accepted because he thought another actor was going too. (*Id.* ¶¶ 133.) While there, Perry pressured him to drink alcohol and groped his buttocks. (*Id.* ¶ 134.) He also told Mr. Dixon that he wanted to have a relationship with someone who could be sexually available to him and this could be Mr. Dixon because Mr. Dixon likes "nice things." (*Id.* ¶¶ 134-35.)

7

After that, and throughout 2021, Perry continued to sexually harass and coerce Mr. Dixon, pressuring him with messages such as, "[w]hat's it going to take for you to have guiltless sex?", "[y]ou are the rose .. [b]ut you are so blocked that you refuse to be smelt or opened." (*Id.* ¶¶ 137.a.-h.) [1]

Perry invited Mr. Dixon to his home again on June 4, 2021, which Mr. Dixon felt obligated to accept because of his ability to control his career. When he got there, Perry fed him alcohol, hugged him, and pulled down his underwear and started groping his buttocks. (*Id.* ¶¶ 143-44.) Mr. Dixon tried to fight, saying "[n]o, I don't want to be naked … I don't want this" and pulling his underwear back up, but Perry restrained his wrists to keep him from doing so and said, "[r]elax, just let it happen … I'm not going to hurt you … I'm not even hard right now[,]" and groped him again. (*Id.* ¶ 144.) Mr. Dixon was "terribly frightened" and believed he was going to be raped. (*Id.* ¶¶ 145.) Later, Mr. Dixon locked himself in the bathroom to keep Perry from assaulting him again and spent the night sleeping on the bathroom floor. (*Id.* ¶¶ 146-47.)

### D.    Perry Uses Mr. Dixon's Employment to Buy his Silence about the Sex Abuse and Continued Sex Harassment

After sexually assaulting Mr. Dixon in June 2021, Perry offered him money and opportunities. He told Mr. Dixon days later that he was sorry and

---

[1] Perry also exhibited a controlling demeanor (Doc. 102, ¶ 131, 152.b.) and tried to isolate Mr. Dixon from others (*id.* ¶¶ 136, 137.c., 137.g.).

blamed it on testosterone (*id.* ¶¶ 153-54), and invited Mr. Dixon on a trip, which Mr. Dixon declined (*id.* ¶ 155). He then told Mr. Dixon, "we're going to make your show, so don't worry about that." (*Id.* ¶¶ 155-56.) Mr. Dixon felt conflicted because he wanted to be successful, but he knew Perry was only promising to produce *Losing It* in exchange for him accepting the sexual abuse. (*Id.* ¶ 157.)

The next month, in July 2021, Mr. Dixon got a call from staff at Defendant TPS who said his TV show would be filmed in the Fall or Winter. (*Id.* ¶ 158.) A few days later, Perry's lawyer called and told him that "Christmas came early" because Perry decided that Mr. Dixon's character on *The Oval* would be returning and Mr. Dixon was "getting a raise" of $6,000 more per episode but he should keep it a secret. (*Id.* ¶¶ 159-60.) When Mr. Dixon showed up on the set of *The Oval* in November 2021, he had a panic attack in his dressing room after seeing Perry again. (*Id.* ¶ 162.) After this, Perry began calling and sending him more text messages, saying he wanted to purchase *Losing It.* (*Id.* ¶ 163.)

Perry bought *Losing It* from Mr. Dixon on March 4, 2022, even though he knew that TPS's contracts with ViacomCBS, now known as Paramount Global, would prevent any sale of the show for years. (*Id.* ¶¶ 164-66.) In April, Mr. Dixon received the script for another season of *The Oval* in which his character had been rewritten as a male prostitute being pursued by a pimp in situations bearing eerie similarities to Perry's sexual pursuit of Mr. Dixon. (*Id.* ¶¶ 167-68.) Perry

kept calling Mr. Dixon and trying to minimize what happened in July 2021. (*Id.* ¶¶ 169-71.) Mr. Dixon tried to ignore these conversations for the same reason he accepted invitation to go on another trip with Perry in April 2022—because he did not want to jeopardize his employment or career. (*Id.* ¶¶ 172-73.)

In January 2023, Mr. Dixon moved to California and told Perry about it. (*Id.* ¶¶ 175-76.) But Perry's sexual harassment and coercive behavior didn't stop. (*Id.* ¶ 177.) In 2023, he called Mr. Dixon and sent text messages to him approximately once a week, including but not limited to on January 24, 2023 when he asked him about whether his ability to say "no" to sex is "stronger" and apparently referred to Harvey Weinstein with regard to trading sex for career opportunities; asking him on May 5, 2023 if he was "still cheating" on Perry; calling him in November 2023 to falsely promise he could sell *Losing It*; and asking him whether he was having sex as the "top" or "bottom" and whether he was taking medication to prevent contracting the HIV/AIDS virus. (*Id.* ¶ 178.)

In 2024, Perry began sending harassing text messages to Mr. Dixon more often and called him three or four times per month to ask about his sex life and dangle promises of work in front of him. (*Id.* ¶ 179.) For example, he called to ask Mr. Dixon why he doesn't have more sex, told Mr. Dixon he loved him, offered him a role in the movie *Finding Joy*, and claimed he could sell *Losing It* to Netflix or Amazon and Mr. Dixon could earn two to three million dollars per

10

episode, "guaranteed." (*Id.* ¶¶ 151.d., 179-80.) Another example of the pressure was a text on May 14, 2024 in which Perry provided a link to a video of a man dancing alone and saying it would be Mr. Dixon in 30 years. In June, he called Mr. Dixon and told him he was sexy and should be having more sex and was wasting his life. (*Id.* ¶¶ 180.c.-d.) As always, the pressure to acquiesce to sex with Perry was paired with *quid pro quo* promises of money or jobs, such as in June 2024 when Perry messaged him about a chance to write for one of Perry's TV shows. (*Id.* ¶ 180.e.) For Mr. Dixon, the harassment never stopped.

### E.   Mr. Dixon's Mental Health Suffers to the Point Where he Cannot Work for Defendants Any Longer

Mr. Dixon, who had anxiety and depression caused by Perry's first sexual assault in March 2020 (Doc. 102, ¶184), began to suffer a worsened mental health condition after the second assault in 2021 (*Id.* ¶¶ 183-84). When he moved to California in January 2023, his goal was to get away from Perry, but it didn't work because Perry continued to harass him there. (*See supra*, pp. 10-11) (citations omitted).) Also in 2024, he learned of Mr. Keyes's allegations, which led him to realize that Perry's sexual abuse and coercive behavior was his *modus operandi*. (*Id.* ¶ 181.) This was also when Perry was continuing to pressure him to justify his refusal to have sex with him and suggesting more opportunities for Mr. Dixon's professional advancement. (*Id.* ¶¶ 180-81.)

All of this brought Mr. Dixon's mental health to the breaking point in July 2024. (*Id.* ¶ 188.) He experienced an acute episode of depression and began suffering sleep disturbances, frequent nightmares, and flashbacks of the physical assaults nearly every day, as well as decreased appetite and difficulty concentrating on scripts. (*Id.* ¶¶ 189-90.) Psychiatrist Dr. Trevor Haas diagnosed him with major depressive disorder for the first time in 2024 and prescribed duloxetine, a medication known under the brand name Cymbalta. (*Id.* ¶¶ 191-92.) Dr. Haas also recommended prazosin for nightmares related to post-traumatic stress disorder. (*Id.* ¶ 192.) As a result, Mr. Dixon gave notice to Defendants in September that he could not return to work on October 1, 2024 (*id.* ¶ 194), at which time Dr. Haas also observed his major depressive disorder was chronic and worsening (*id.* ¶ 193). This caused Mr. Dixon to lose the contract he had for future seasons of *The Oval* and suffer personal injuries in the form of severe emotional and psychological suffering. (*Id.* ¶ 312.)

## III.   ARGUMENT AND CITATION TO LEGAL AUTHORITIES

Rule 12(b)(6) requires only that Mr. Dixon allege "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 663 (quotation omitted). The Court must "accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *Bailey*, 843 F.3d at 478 n.3. The question is not whether he will

ultimately prevail, but whether his allegations, taken as true, plausibly state claims for relief. *Ashcroft*, 556 U.S. at 678. They do.

### A. California Law Applies to Mr. Dixon's Wrongful Discharge and Retaliation and California FEHA Claims

Defendants misstate the law and the facts when they argue that California law does not apply to Mr. Dixon's claims for wrongful discharge and retaliation in violation of public policy (Count I) and sex harassment under the California Fair Employment and Housing Act ("FEHA") (Count II). (Doc. 104-1, pp. 14-20.) Georgia law requires this Court to apply to California law to sex harassment suffered in California by a California-based employee and resulting in his discharge there, and California courts would apply their law too.

### 1. *Georgia Law is Clear that California Law Applies*

"[F]or over 100 years, the state of Georgia has followed the doctrine of lex loci delicti in tort cases, pursuant to which 'a tort action is governed by the substantive law of the state where the tort was committed.'" *Auld v. Forbes*, 309 Ga. 893, 894 (2020) (quotation omitted). And in Georgia, the "place where the tort was committed … is the place where the injury sustained is suffered," *id.* (citation omitted), which is where the plaintiff is located, *Bishop's Property & Investments, LLC v. Protective Life Ins. Co.*, 597 F. Supp. 2d 1365, 1359-60 (M.D. Ga. 2009) ("the location of an economic injury is generally the injured party's place of residence"); *Intern. Bus. Machines Corp. v. Kemp*, 244 Ga. App. 638, 641 (2000)

13

(holding that a nationwide class of former employees who alleged wrongful suspension of employment benefits could not be certified because the law of the state where each employee lived furnished the controlling law); *Garland v. Advanced Med. Fund, L.P. II*, 86 F. Supp. 2d 1195, 1205 (N.D. Ga. 2000). Mr. Dixon lived and worked in California when he suffered sexual harassment and coercion, resulting in his constructive discharge (Doc. 102, ¶¶ 176-96), and he suffered the economic effects of that discharge there (*id.* ¶¶ 196, 312). As a result, California law applies, at the very least, to the sex harassment and resulting constructive discharge which occurred in California. *Auld*, 309 Ga. at 894.

Defendants will argue that Mr. Dixon's employment contracts contain a choice of law clause which requires this Court to apply "Georgia law without regard to its choice of laws principles." (*See* Doc. 104-6, p. 7.) This argument must fail for two reasons. First, the choice of law clause applies only to disputes "arising out of or related to" Mr. Dixon's contracts with Defendants TPS and AA. (*Id.* at p. 7, ¶ P(2) (incorporating ¶ P).) While that language is broad, it is "not all encompassing." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218-20 (11th Cir. 2011) (interpreting nearly identical language to conclude that tort claims against an employer did not "relate to" or "arise out of" the employment).[2] Counts I and

---

[2] The *Doe* Court did hold that claims under the Jones Act, 46 U.S.C. § 30104, arose out of or were related to the plaintiff's employment because they were only

II are not "arising out of or related to" Mr. Dixon's employment because the sex harassment and wrongful discharge were not "an immediate foreseeable result of the performance of contractual duties." *Id.* at 1218. [3] They are thus not within the choice of law clause and California law applies. *Auld*, 309 Ga. at 894.

Second, even if the choice of law clause did cover Mr. Dixon's tort claims, Georgia courts do not honor choice of law clauses if the result would contravene Georgia public policy. *CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc.*, 283 Ga. 426, 428 (2008). And it would here for the reason explained in *Auld.* There, the plaintiff was a mother who filed a wrongful death case for her child who died on a trip to Belize. 309 Ga. at 896. She argued that the Court should ignore *lex loci delicti* and apply Georgia law because to do otherwise would violate public policy. 309 Ga. at 896. The Court rejected this and found the opposite— that Belize law provided a remedy where Georgia law provided none because

---

available to her because she was a seaman. 657 F.3d at 1220-21. That result was required because the agreement covered not only disputes arising out of related to her "crew agreement," but also her "employment services." *Id.* at 1217-18. By contrast, the choice of law clause in Mr. Dixon's agreements does not cover claims depending on employment status, but only claims under state or federal statutory or common law "arising out of or related to this Agreement or the interpretation, performance or … breach thereof." (Doc. 104-6, p. 7, ¶ P(2).)

[3] The Georgia Supreme Court has also held that sex harassment claims do not "arise out of" employment because sexual harassment is not the kind of "risk of employment that a reasonable person could have foreseen due to the nature of the work." *SCI Liquidation Corp. v. Hartford Ins. Co.*, 272 Ga. 293, 294 (2000).

15

the Georgia Wrongful Death statute does not apply to deaths elsewhere, and Georgia thus had "no interest in adjudicating a claim that is extinguished under applicable law." *Id.* The same is true here, where departing from lex loci delicti would mean applying Georgia law to preclude a common law remedy for wrongful discharge which does not exist here.[4]

### 2. A California Court Would Apply California Law to Mr. Dixon's Wrongful Discharge and Retaliation Claim

Defendants misstate the law and the facts relevant to the question of extraterritorial application of California common law. First, the presumption against extraterritorial application does not apply where the wrongful conduct occurred in California. *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 119-20 (2006) (holding that application of California's wiretap statute to phone calls from Georgia to California "cannot accurately be characterized as an unauthorized extraterritorial application of the statute, but more reasonably is viewed as an instance of applying the statute to a multistate event in which a crucial element … occurred *in California*"). This is true even if an employee is not

---

[4] Moreover, to allow Georgia law to apply in this way would give Defendants and others the means to traffic sex abuse victims wherever—to private islands like Defendant Perry did if they want—and evade responsibility by claiming the protection of Georgia law that does not provide a remedy in a given case. Georgia courts will not countenance this result. *Commercial Credit Plan, Inc. v. Parker*, 152 Ga. App. 409, 414 (1979) (refusing to apply Georgia law because it would be "monstrous indeed" to allow the defendant to incur liability elsewhere and defend by arguing Georgia law provides no remedy).

a California resident or "worked mainly" in other states. *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1194-95 (2011) (holding that the California overtime law applied to work performed there by an out-of-state employee who only worked there for 20 days over three years). Because the sex harassment and resulting wrongful discharge in Counts I and II were suffered by Mr. Dixon in California, applying California law to these claims is not extraterritorial application at all.

But even where there is a real question as to whether California law is operating as to matters occurring outside the state, California courts do not apply the extraterritoriality analysis for statutes, but rather a simple and flexible analysis comparing the governmental interests at stake. *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 86-88 (2010); *Kearney*, 206 Cal. App. 4th at 107-08, 115-28 (concluding that California law would be impaired more if the less protective Georgia law were chosen); *Lidow v. Superior Court*, 206 Cal. App. 4th 351 (2012).

*Lidow* is instructive. In that case, the plaintiff was a California resident employed by a company incorporated in Delaware with a subsidiary in Japan where accounting improprieties were uncovered. 206 Cal. App. at 354, 357-58. The plaintiff traveled to Japan to investigate and was constructively discharged by Delaware officers when he complained about fraud. *Id.* at 358. The company argued that Delaware law should apply, but the California Court rejected this and held that California law applied because it touched upon "broader public

17

interest concerns that California has a vital interest in protecting." *Id.* at 362. Namely, California has "long recognized that claims for wrongful termination in violation of public policy serve vital interests insofar as they impose liability on employers who coerce … or retaliate against their employees." *Id.* at 363-64.

Here, the governmental interest analysis requires California law. There is a true conflict because California provides a common law claim for wrongful discharge and retaliation resulting from *quid pro quo* sex harassment, *Rojo v. Kliger*, 52 Cal. 3d 65 (1990), and Georgia does not, *Borden v. Johnson*, 196 Ga. App. 288, 289-90 (1990). And this claim serves "vital interests" in California, *Lidow*, 206 Cal. App. at 362, while Georgia has "no interest" in adjudicating a claim that does not exist, *Auld*, 309 Ga. at 896; *see also Sullivan*, 51 Cal. 4th at 1205 ("[t]o permit nonresidents to work in California without the protection of our overtime law would completely sacrifice ... the state's important public policy goals…").

### 3. *A California Court Would Also Apply California Law to Mr. Dixon's California FEHA Claim*

The FEHA is different because California courts apply a presumption against extraterritorial application of statutes. *Ward v. United Airlines, Inc.*, 9 Cal. 5th 732, 752 (2020). There is also a "mirror-image" presumption that California statutes apply to anything occurring in California, *id.* at 750, and so in cases with a multistate aspect, "the question is what kinds of California connections will suffice to trigger the relevant provisions of California law," *id.* at 752.

18

The only reported California case to address the extraterritoriality of the FEHA held that it does not apply to "non-residents employed outside the state." *Campbell v. Arco Marine, Inc.*, 42 Cal. App. 4th 1850, 1859 (1996).[5] The court noted that the plaintiff lived elsewhere, her job was performed "wholly" in other states, all the harassment happened elsewhere, and the only California connection was the employer's office. *Id.* at 1859. Persuasive federal decisions[6] have required a sufficient "nexus" between the employment and the claims and California. *See, e.g., Hill v. Workday, Inc.*, 773 F. Supp. 3d 779, 793 (N.D. Cal. 2025); *Doe v. Maxim, Inc.*, No. 2:22-CV-05289-MEMF(ASX), 2023 WL 11979557, *11 (C.D. Cal. May 19, 2023); *Russo v. APL Marine Servs., Ltd.*, 135 F. Supp. 3d 1089, 194 (C.D. Cal. 2015), *aff'd*, 694 Fed. App'x. 585 (9th Cir. 2017).

Defendants argue that Mr. Dixon cannot show a substantial connection between his employment and California because he filmed in Atlanta, and thus Georgia must be his "principal place of work." (Doc. 104-1, p. 15.) But this analysis overlooks the other ways to show a substantial connection with California, with the second being when it is the employee's "definite base of operations" and the third being when it is a "location where the employee's

---

[5] This is important because "the connections that suffice for purposes of one statute may not necessarily suffice for another." *Ward*, 9 Cal. 5th at 752.

[6] Federal decisions interpreting state law are not binding in California. *Johnson v. American Standard, Inc.*, 43 Cal. 4th 56, 69 (2008) (citation omitted).

19

work holds a substantial connection to." *Hill*, 773 F. Supp. 3d at 793-94. [7] Other than when Mr. Dixon was filming, he worked in California from January 2023 through October 1, 2024, which included reading and writing scripts and preparing performances. (Doc. 102, ¶ 54.) These facts are a world apart from *Campbell* or *Hill*, where the plaintiffs performed no work in California, and are more than sufficient to show a "substantial connection" at this stage. *See Rulenz v. Ford Motor Co.*, No. 10CV1791-GPC-MDD, 2014 WL 50807, *5 (S.D. Cal. Jan. 7, 2014) (denying dismissal where the plaintiff lived in California, earned income there, and "performed a significant amount of her work assignments" there); *Fusco v. Amer. Airlines*, No. C 00-1439 PJH, 2003 WL 25730512, *3 (N.D. Cal. Apr. 10, 2003) (denying a motion to dismiss the FEHA claims of California residents based on discrimination taking place in Texas), *aff'd in part, rev'd in part sub. nom. on other grounds, Leonel v. Am. Airlines, Inc.*, 400 F.3d 702 (9th Cir. 2005).

Defendants also argue there is no California "nexus" because the elements of Mr. Dixon's the claims did not occur there. (Doc. 104-1, p. 17.) But they did.

---

[7] As a result, the Central District of California's prior decision that Georgia is Mr. Dixon's "principal place of work" is irrelevant. (*See* Doc. 67, p. 6.) Not only does the law of the case doctrine not apply to previous rulings by a district court, *Robinson v. Parrish*, 720 F.2d 1548 (11th Cir. 1983), *and* this ruling concerned interpretation of a different statutory section regarding forum selection clauses (*see id.* (citing Cal. Labor Code § 925)), but Mr. Dixon argues California was his "base of operations" or a place where his work had a "substantial connection" under the FEHA—two issues never touched by the Central District of California.

Mr. Dixon lived in California from 2023 until his discharge (Doc. 102, ¶¶ 17-18, 173); Perry knew this and directed a substantial amount of *quid pro quo* and other sex harassment into the state during that time (*Id.* at ¶¶ 176-83); and this interfered with Mr. Dixon's employment there (*Id.* at ¶¶ 188-96). California law is clear that this harassment "occurred" in California. *Kearney*, 39 Cal. 4th at 119-20; *Malloy v. Superior Court*, 83 Cal. App. 5th 543, 554-55 (2022) (holding that a remote worker's FEHA claim was proper where she lived because that is where she suffered the harm of discriminatory interference with her rights).

The cases relied upon by Defendants are thus inapposite—the Maryland plaintiff in *Hill* alleged discrimination by a New York-based supervisor and only suffered discrimination in California during a one-week trip, 773 F. Supp. 3d at 794-95, and the plaintiff in *Gonsalvez* was a traveling salesman who did not live in California and did not allege who demoted and fired him, where they were, or where he was when he suffered discrimination, *Gonsalves v. Infosys Techns, Ltd.* , No. C 09-04112 MHP, 2010 1854146, *6-7 (N.D. Cal. May 6, 2010). Defendants' best case, *English v. Gen. Dynamics Missions Sys., Inc.*, was decided at summary judgment but even it is distinguishable because the plaintiff traveled for work and all the harassment took place in other states. No. EDCV 18-908 JGB, 2019 WL 2619658, *2-3, *6-8 (C.D. Cal. 2019). In this case, the harassing calls and text messages in 2023 and 2024, and the resulting discharge, were knowingly directed

21

by Perry into California and suffered by Dixon there, demonstrating the necessary "nexus" with California. *Kearney*, 39 Cal. 4th at 119-20; *Malloy*, 83 Cal. App. 5th at 554-55; *Rulenz*, 2014 WL 50807, at *5; *Fusco*, 2003 WL 25730512, at *3.

### B. Mr. Dixon's Title VII Claim is Timely, Adequately Pled, and Properly Before the Court

Defendants seek dismissal of Mr. Dixon's Title VII claim arguing that he did not file a timely EEOC charge, has not pled a viable claim, and did not get a Notice of the Right to Sue ("NTRS") from the EEOC. (Doc. 104-1, pp. 20-25.) They are wrong about the first point because they entered into a tolling agreement which suspended the charge-filing periods; wrong about the second because the allegations are adequate under the applicable standards; and wrong about the third because he got an NTRS from the California CRD, and even if he had not, the proper remedy would be to allow him to obtain another from the EEOC.

#### 1. Mr. Dixon's Charges were Timely Filed Because the Tolling Agreement Extended the Limitations Periods

Attached to the FAC and specifically pled is the tolling agreement entered into on October 14, 2024 and extended through January 12, 2025—96 days. (Doc. 102, ¶¶ 6-10, Exs. 1-2.) Defendants correctly note that this allows Mr. Dixon's January 13, 2025 EEOC charge to reach back 180 plus 96 days, or to April 14, 2024. (Doc. 104-1, p. 21.) It also allows his June 13, 2025 CRD charge to reach back 300 plus 96 days, or to May 13, 2024, because California is a deferral state where

22

charges can be filed up to 300 days after the discriminatory acts, *E.E.O.C. v. Dinuba Med. Clinic*, 222 F.3d 580, 585 (9th Cir. 2000).

This timeline is critical because it is by now black letter law that "[a] charge alleging a hostile work environment claim … will not be barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002). Mr. Dixon clearly alleges that the last acts of sex harassment in the hostile work environment were a May 14, 2024 text message, a June 2024 telephone call, and his constructive discharge on October 1, 2024. (Doc. 102, ¶ 250). Because these occurred within the limitations periods for both the EEOC and the CRD as extended by the tolling agreement, Mr. Dixon's Title VII claim is properly before the Court, even though "many of the acts upon which his claim depends occurred outside the 300-day filing period." *Morgan*, 536 U.S. at 120-21; *see also Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1255, 1258 (11th Cir. 2003) (including harassment from a year before the charge was filed); *Short v. Immokalee Water & Sewer Dist.*, 165 F. Supp. 3d 1129, 1141-43 (M.D. Fla. 2016) (including 10 years of harassment before the charge).

Defendants know this, which is why they argue that the sexual assaults and earlier sex harassment of Mr. Dixon in 2020 and 2021 are a "separate course of conduct" from the sex harassment in 2023 and 2024. (Doc. 104-1, pp. 21-22.)

23

This argument is a longshot effort to avoid *Morgan*, but it must fail because it rests upon misrepresentations about Mr. Dixon's allegations and because there was no "intervening remedial action." Defendants argue that Mr. Dixon alleges no harassment in 2021 or 2022, but that is not accurate because he alleges ongoing sexual remarks, requests for sex, and offers of career opportunities, as well as harassment for refusing sexual advances, both on set and otherwise throughout 2021 and 2022. (Doc. 102, ¶¶ 152(e), 158-174.) Following this was the harassment once a week throughout 2023 and half of 2024 (*id.* ¶¶ 177-80), leading to his constructive discharge (*id.* ¶¶ 181-96). All that *Morgan* requires is that the "pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers" 536 U.S. at 120. The allegations here clearly meet this standard.

This is the paradigm case for a single hostile work environment under *Morgan*. The *same* harasser, Perry, directed the *same kind of harassment* at the *same victim*, Mr. Dixon, from 2019 to 2024 uninterrupted. (Doc. 102, ¶¶ 68-180.) There was never an investigation, no warning issued to Perry, no policy implemented, and no corrective action. The cases Defendants rely on all involved a clean break of exactly the sort that is absent here—in *Watson*, one of the harassers was transferred, 324 F.3d at 1259, and in *Fanning v. Boston Mrkt. Corp.*, there was no harassment for two years after the harasser was disciplined, No. 1:05-CV-1121-

24

TCB, 2007 WL 9735676, *13 (N.D. Ga. 2007). Here, Perry stayed exactly where he was—at the top of the companies Mr. Dixon worked for—and his conduct continued. This is a textbook continuing violation. *Morgan*, 536 U.S. at 120-22.

### 2.   Mr. Dixon Adequately Pleads his Title VII Claim

Because of *Morgan*, Defendants have no choice but to argue that Perry's sex harassment in 2023 does not count as "harassment" at all, either as part of the whole series or standing alone. (Doc. 104-1, pp. 23-24.) The law says otherwise. Mr. Dixon alleges that these messages Perry sent once a week in 2023 included Perry asking who he was having sex with, whether he was a "top" or "bottom," and whether he was taking medication to protect against the HIV/AIDS virus. (Doc. 102, ¶ 178.a.-c.) Defendants argue these remarks are just Perry being "friendly" with Mr. Dixon (Doc. 104-1, p. 23), but "courts in this circuit have not hesitated to consider a … harasser's vulgar inquiries into a[n] … employee's sex life to be sexually discriminatory conduct that may contribute to the creation of a hostile work environment." *Livingston v. Marion Bank and Trust Co.*, 30 F. Supp. 3d 1285, 1306-07 (N.D. Ala. 2014) (citations omitted). Similarly, in 2024, Perry sent texts and called three or four times a month, telling Mr. Dixon he is sexy, wasting his life by not having sex, asking if Perry should sell *Losing It* to Netflix, and suggesting Mr. Dixon could be a writer on one of his TV shows. (Doc. 102, ¶ 180.a.-e.) These are implied offers of benefits for sex, or *quid pro quo* harassment,

25

and the courts also recognize these to be part of a hostile work environment. *Fredette v. BVP Mgmt. Assocs.*, 112 F.3d 1503, 1510 (11th Cir. 1997); *Smith v. Pefanis*, 652 F. Supp. 1308, 1329-20, 1324-26 (N.D. Ga. 2009) (recognizing remarks about the plaintiff owing sex for job security to be sex harassment); *Austin v. Mac-Lean Fogg Co.*, 999 F. Supp. 2d 1254, 1258-60 (N.D. Ala. 2014). It is clearly plausible that Perry's conduct in 2023 and 2024 was "harassment."

Defendants also argue that Mr. Dixon does not adequately allege that the harassment was "severe or pervasive." (Doc. 104-1, p. 23.) But to decide this, courts must "examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct" meets that standard, *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). This cannot be done on the pleadings, which is why courts in this Circuit routinely find allegations which combine the frequency of the harassment with a few examples to be sufficient. *Usai v. Club Mgmt. Miami II, LLC*, 801 F. Supp. 3d 1295, 1322-23 (S.D. Fla. 2025) (three comments and a touching); *Comerinsky v. August Coating & Mfg., LLC*, 418 F. Supp. 3d 1252 (S.D. Ga. 2019) (harassment "on a daily basis" with 11 examples); *Poague v. Huntsville Wholesale Furniture*, 369 F. Supp. 3d 1180 (N.D. Ala. 2019); *Butts v. Georgia State Patrol Div.*, No. 4:11-CV-60 CDL, 2011 WL 5597258, at *4 (M.D. Ga. Nov. 17, 2011) (four examples with allegation that plaintiff was "constantly" harassed). Mr. Dixon alleges he received inappropriate

26

calls or text messages once a week in 2023 and provides three examples (Doc. 102, ¶ 178), and three or four times a month in 2024 and provides five examples (*id.* ¶ 179-80). This is adequate under the cases.

### 3.    Mr. Dixon's Second Charge with the California CRD Exhausted his Title VII Administrative Remedies

Defendants argue that Mr. Dixon's Title VII claim cannot travel under his second charge with the California CRD because it did not exhaust Title VII administrative remedies. (Doc. 104-1, p. 24.) This argument is foreclosed by *Surrell v. California Water Srvc. Co.*, 518 F.3d 1097 (9th Cir. 2008). The plaintiff there did exactly what Mr. Dixon did—she filed with the CRD and received an NTRS which advised that a federal NTRS could be obtained from the EEOC, but she filed her lawsuit without first doing so. *Id.* at 1103-04. [8] The Ninth Circuit held that because the worksharing agreement between the EEOC and the CRD provides that a charge filed with the latter is deemed to be filed with the EEOC, *id.* at 1104 (citations omitted), the plaintiff was entitled to receive an NTRS from the EEOC, and "a plaintiff may proceed absent such a letter, provided she has received a right-to-sue letter from the appropriate state agency[,]" *id.* at 1105. Thus, because Mr. Dixon received an NTRS from the CRD (Doc. 102-3, pp. 4-5),

---

[8] When *Surrell* was decided, the deferral agency in California was called the Department of Fair Employment and Housing. *See Wilson v. City of Fresno*, 763 F. Supp. 3d 1073, 1090 n.1 (E.D. Cal. 2025).

27

his Title VII claims are properly before the Court. [9]

> ### 4. *The Proper Remedy if the California CRD did not Exhaust Title VII Administrative Remedies is Amendment of the Complaint*

Even if the Court were to conclude that the NTRS from the CRD did not exhaust administrative remedies as to Title VII, the proper remedy is not dismissal but to allow Mr. Dixon to obtain an NTRS from the EEOC. *Dague v. Riverdale Athletic Ass'n*, 99 F.R.D. 325, 328 (N.D. Ga. 1983); *see also White v. City of Sylvester*, No. 1:14-CV-00076 (LJA), 2016 WL 1270236, at *2 (M.D. Ga. Mar. 31, 2016) (permitting amendment after receipt of a NTRS on a first charge); *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1254, 1262 (M.D. Ala. 2001) (failure to receive the NTRS is "cured by the subsequent receipt of the letter"). [10]

> ### C. Mr. Dixon's Intentional Infliction of Emotional Distress Claim is Timely Because it Accrued when he Could not Return to Work

Defendants argue that Mr. Dixon cannot assert his IIED claim under California law because it did not arise there and cannot assert it under Georgia

---

[9] Defendants also argue that the CRD was not an appropriate state agency because Mr. Dixon was not employed there and did not live in California when he filed with the CRD. (Doc. 104-1, pp. 24-25.) The first point is untrue but neither matter because "the FEHA imposes no residency requirement on either the employer or the person aggrieved," *Russo*, 135 F. Supp. 3d at 1094, and even though as explained above a California court would apply the FEHA here, *see supra*, pp. 16-22, this is irrelevant to the application of Title VII, a federal statute.

[10] Even where the claim has been dismissed, it is without prejudice to allow the plaintiff to amend and "reinstitute" the Title VII claim after obtaining the NTRS. *James v. Comm'ns Workers of Amer.*, 534 F. Supp. 566, 570 (N.D. Ga. 1982).

law because it is time-barred. (Doc. 104-1, pp. ¶¶ 34-35.) Both are incorrect, but regardless of which law applies, Mr. Dixon states a timely claim.

Defendants invoke the lex loci delicti rule to argue that the IIED claim does not arise under California law because the physical touching occurred in Georgia and on Perry's private island (Doc. 104-1, p. 25). Again, they ignore all the allegations as to sex harassment and coercion by text message and telephone, and the resulting constructive discharge, which continued throughout 2023 and 2024 until October of that year (Doc. 102, ¶¶ 176-96). For the reasons explained above as to Counts I and II, these harms were the last acts necessary to create liability for intentional infliction of emotional distress; they were suffered in California, and the choice of law clause in the contracts does not apply, so California substantive law governs. *See supra*, pp. 13-16. [11]

Defendants do not move for dismissal on any substantive ground under California law, nor could they, because Mr. Dixon alleges that he suffered severe emotional distress in 2024 when he had an acute episode of depression and

---

[11] Defendants cite *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151 (2009), in support of their choice of law clause, but the clause there was more broadly worded than Mr. Dixon's because it covered "all disputes arising out of *or in connection with*" the agreement. 575 F.3d at 1162. His applies only to claims "arising out of or related to this Agreement or the interpretation, performance or … breach thereof[,]" which is narrower and controlled by cases like *Doe*, 657 F.3d at 1218-20, or *Gamble v. New England Auto Finance, Inc.*, 281 F. Supp. 3d 1354 (N.D. Ga. 2017), which interpreted similar language and found it inapplicable to tort claims not directly related to the performance in the agreements.

29

started suffering sleep disturbances, nightmares, flashbacks, decreased appetite, and difficulty concentrating on scripts. (Doc. 102, ¶¶ 188-92). It was only when this happened, at a time when his psychiatrist observed his depression was "chronic and worsening," that he could not return to work. (*Id.* ¶¶ 193-95.)

California courts recognize that the IIED claim accrues when the emotional distress becomes "severe," and that this is a question of fact for the jury. *See, e.g., Johnson v. Lucent Technologies Inc.*, 653 F.3d 1000, 1008 (9th Cir. 2011) (applying California law and holding that the employee's IIED claim was not time-barred because two events that may have caused emotional distress to become severe occurred within the two years preceding the filing of the lawsuit); *Wassman v. South Orange Cnty. Comm. Coll. Dist.*, 24 Cal. App. 5th 825, 852-53 (2018) (IIED claims accrue when emotional distress becomes severe). Because Mr. Dixon plausibly alleges that the emotional distress became severe in 2024 and he filed within two years on June 13, 2025 (Doc. 1-1), his IIED claim is timely.

Georgia law is essentially the same, and that is why it does not matter which law applies to this claim. Georgia courts apply the discovery rule to IIED claims so that the claim accrues when the employee discovers through a psychiatric diagnosis that emotional distress is severe. *Tomczyk v. Jocks & Jills Rests., LLC.*, 198 Fed. App'x. 804, 814 (11th Cir. 2006) (holding that the claim accrued when the plaintiff was prescribed Prozac for the emotional injury arising

30

from the harassment and permitting trial on harassment within the two years before the lawsuit was filed); *Scott v. Dismas Charities, Inc.*, No. CIVA 105CV-3267-TWT, 2007 WL 2746697, \*3-5, \*28 (N.D. Ga. Sept. 17, 2007) (holding that the claim accrued when the plaintiff was diagnosed with anxiety, depression, and PTSD two years after the harassment began but the claim was timely because she filed within two years after the diagnosis); *Mears v. Gulfstream Aerospace Corp.*, 225 Ga. App. 636, 639 (1997) (holding that the claim accrued when emotional distress prevented the plaintiff from returning to work six months after she began short-term disability leave for the mental health condition). Thus, under Georgia law, as with California law, because Mr. Dixon plausibly alleges that it was not until 2024 that the emotional distress caused by Defendants resulted in severe emotional distress that left him unable to work, his IIED claim is timely.

### D.    Mr. Dixon Adequately Alleges a TVPA Claim

18 U.S.C. § 1591(a) imposes liability on anyone who (1) "knowingly … in or affecting interstate or foreign commerce" (2) "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person" while (3) "knowing, or … in reckless disregard of the fact, that means of force, threats of force, fraud, coercion … or any combination of such means will be used" (4) to cause the person to engage in a commercial sex act."

31

*See United States v. Smith*, 895 F.3d 410, 415 n.1 (5th Cir. 2018) (citation omitted);

*Noble v, Harvey Weinstein, at al.*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018).

Defendants do not appear to dispute—nor could they—that Mr. Dixon

adequately alleges the first, [12] second, [13] and fourth elements. [14] Instead, they

argue he has not pled the third—that Perry acted knowing force, threats of force,

fraud, or coercion would be used. (Doc. 104-1, pp. 29-31.) Specifically, they argue

he does not allege Perry ever threatened "serious harm" necessary for

"coercion." (*Id.*) Defendants misunderstand the TVPA and the case law.

---

[12] Mr. Dixon alleges Defendants' conduct was in or affecting interstate commerce (Doc. 102, ¶ 283), and supports this with numerous facts (*id.* at 49-56).

[13] Mr. Dixon alleges that Perry recruited him (Doc. 102, ¶¶ 69-80); enticed him by asking him to audition, offering career opportunities (*id.* ¶¶ 85-86, 115-17, 120-21, 125, 130, 151, 156-60, 163-64, 178-80), and otherwise arousing hope or desire in him, *Noble*, 335 F. Supp. 3d at 517; and solicited him (*id.* ¶¶ 74-76, 134-35).

[14] A "commercial sex act" is "*any* sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(a)(3) (emphasis added). As to the "commercial" nature of the act, while it is obvious that a new car (Doc. 104, ¶ 85), or a $6,000 raise (*id.* ¶¶ 159-60), are "anything of value," courts also recognize that promises of career opportunities (*id.* ¶¶ 81-83, 132-35, 151), meet the standard, *Noble*, 335 F. Supp. at 521. Continued employment *after* a nonconsensual sex act to buy silence also makes it "commercial." *Treminio v. Crowley Maritime Corp.*, 707 F. Supp. 3d 1234, 1248 (M.D. Fla. 2023).

Courts have also uniformly recognized that the use of the word "any" means that the definition of "sex act" is not restricted to sexual conduct involving penetration or genitalia. *United States v. Taylor*, 44 F. 4th 779, 788 (8th Cir. 2022) (citing cases). Rather, it includes an "act performed with another for sexual gratification." *Ardolf v. Weber*, 332 F.R.D. 467, 477-78 (S.D.N.Y. 2019) (holding that fondling a male model's genitals over the clothing and promising career advancement constituted a "commercial sex act"). Mr. Dixon alleges five "sex acts" under the statute. (Doc. 104, ¶¶ 93-103, 124, 134, 143-44, 282.c.)

32

To begin with, Mr. Dixon alleges Perry knew he would cause Mr. Dixon to suffer commercial sex acts with offers of career opportunities (Doc. 102, ¶ 280), which included, in 2019, asking Mr. Dixon to "audition" for him (*id.* ¶ 73), telling Mr. Dixon he would "change [his] life," (*id.* ¶ 79), and telling Mr. Dixon he would help him become fulfilled as an "artist" (*id.* ¶ 80). [15] He then sexually assaulted Mr. Dixon no less than four times in 2020 and 2021. (*Id.* ¶¶ 98-99, 134, 143-44, 282.c.) The cases confirm that these are plausible allegations of knowledge that fraudulent promises will be used to cause sex acts. *Eckhard v. Fox News Network, LLC*, No. 20-CV-5593 (RA), 2021 WL 4124616, *10-11 (S.D.N.Y. Sept. 9, 2021); *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 163-65, 168 (S.D.N.Y. 2019) (holding that women who were offered meetings to discuss their careers and suffered attempted assault each alleged TPVA violations through fraudulent promises of career advancement); *Noble*, 335 F. Supp.3d at 517-58; *Ardolf*, 332 F.R.D. at 475-76 (allegations that defendant said "just relax and you'll go far in this industry" before molesting plaintiffs were sufficient to allege the use of fraud); Perry need not have intended to use threats of "serious harm" because the use of fraudulent means alone establishes the requisite mental state. *See United States v. Mickey*, 897 F.3d 1173, 1182 (9th Cir. 2018); 18 U.S.C. § 1591(a).

---

[15] Mr. Dixon alleges Perry employed a *modus operandi* with him and others (*e.g.,* Doc. 102, ¶¶ 57-67), which also shows the requisite knowledge on the part of a trafficker, *Treminio*, 707 F. Supp. 3d at 1245 (citing and discussing cases).

Mr. Dixon also alleges Perry knew he would use "coercion" (Doc. 102, ¶ 279), which includes threats of "physical restraint" or a scheme designed to make him believe he would suffer it if he did not comply, 18 U.S.C. § 1591(a)(2)(A). Perry used physical restraint on June 6, 2021 when he held Mr. Dixon's wrists to keep him from pulling up his underwear while Perry groped his buttocks, causing him to think he would be raped. (Doc. 102, ¶¶ 144-45.) This is "physical restraint," *Bridges v. Poe*, 487 F. Supp. 3d 1250, 1261 (N.D. Ala. 2020), and use of "force," *Ardolf*, 332 F.R.D. at 476, [16] neither of which require "serious harm."

Finally, Perry knew he would use threats of "serious harm," or a scheme intended to make Mr. Dixon believe he would suffer "serious harm," which is:

> *any* harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

18 U.S.C. § 1591(e)(5). This hybrid objective-subjective standard makes dismissal

---

[16] While Mr. Dixon's Amended Complaint clearly alleges all the factual bases under 18 U.S.C. § 1591(a), the TVPA count itself admittedly lacks clear invocation of the use of "force" by Perry. Because Mr. Dixon cites the statute and provides the factual bases, the Amended Complaint is nevertheless sufficient under Fed. R. Civ. P. 8. *See Evans v. McClain*, 131 F.3d 957, 964 n.2 (11th Cir. 1997); *Morrow v. Green Tree Servicing, L.L.C.*, 360 F. Supp. 2d 1246, 1249 (M.D. Ala. 2005). However, if the Court does not agree and concludes that Mr. Dixon does not plausibly plead the other bases of his TVPA claim, he respectfully requests leave to amend to more clearly allege that Perry knew he would use "force."

difficult because the court considers the plaintiff's personal "background" and "circumstances." *See United States v. Walker*, 73 F.4th 915, 931 (11th Cir. 2023).

Courts find threats of serious financial consequences to be sufficient. *Treminio*, 707 F. Supp. 3d at 1250 (holding that plaintiff was coerced where she was told she would be fired and suffer career damage if she did not travel to attend a training event where she was assaulted). Defendants are correct that mere termination of employment is not enough (Doc. 104-1, pp. 29-30), but the necessary "something more" is only something "more serious" than the financial harm any employee encounters upon firing. *Roman v. Tyco Simplex Grinnell*, 732 Fed. App'x. 813, 817 (11th Cir. 2018); *Treminio*, 707 F. Supp. 3d at 1253 (a threat is "serious" if it includes "more than what an employee would ordinarily face"). Courts have found the "something more" where there is "loss of a place to live" in addition to lost employment, *see Bistline v. Parker*, 918 F.3d 849, 871-72 (10th Cir. 2019), [17] or loss of a scholarship and access to educational opportunities, *Richardson v. Nw. Univ.*, No. 1:21-CV-00522, 2023 WL 6197447, *1, *6-7 (N.D. Ill. Sept. 21, 2023) (holding that plaintiff was coerced where she was told she would lose $10,000 in scholarships and have to repay some if she did not attend alumni

---

[17] Some authorities interpret 18 U.S.C. § 1589, a related but distinct provision of the TVPA which prohibits forced labor, because it also employs the term "serious harm." *See Richardson*, 2023 WL 6197447, *7.

events where she was groped). Here, Mr. Dixon alleges Perry led him to quit his job (Doc. 102, ¶¶ 84, 115) and move into a TPS studio house (*id.* ¶ 125), which he would have lost along with at least five seasons of work on *The Oval* (*id.* ¶ 116) and future career opportunities like *Losing It* (*id.* ¶¶ 151, 164). These were all at risk for Mr. Dixon, who was not an actor and worked a catering job before this.[18]

Perry also enticed Mr. Dixon with gifts and invitations on trips (¶¶ 85, 87, 132-35, 155-56), exhibited demanding behavior (*id.* ¶¶ 131, 152.b) and tried to isolate him from others (*id.* ¶¶ 136-37), and treated him with hostility and suggested physical violence (¶ 152).[19] There is no doubt that Mr. Dixon also plausibly alleges also that Perry acted with knowledge he would use threats of "serious harm" or a scheme designed to make him think he would suffer it. *Treminio*, 707 F. Supp. 3d at 1253; *Richardson*, 2023 WL 6197447, *6-7.[20]

### E.    Mr. Dixon Adequately Alleges his Georgia RICO Claim

To state a Georgia RICO claim against Defendants, Mr. Dixon must allege

---

[18] That is why Mr. Dixon believed if he did not allow Perry's abuse, he would lose his career. (*Id.* ¶¶ 106, 110, 157.)

[19] The use of luxury to lure victims is a common pattern in TVPA cases, *Does 3 v. Indyke*, 801 F. Supp. 3d 200, 207 (S.D.N.Y. 2025), as is isolating victims, *United States v. Williams*, 714 Fed. App'x. 917 (11th Cir. 2017).

[20] Defendants do not address Mr. Dixon's TVPA beneficiary claim against Defendants TPS and AA under § 1591(a)(2) except to say that Mr. Dixon does not adequately allege it because it requires an underlying violation of § 1591(a)(1). (Doc. 104-1, p. 31-31.) Because he does as explained above at pages 31-36, the Defendants' Motion must be denied as to these claims as well.

that (1) they violated the Georgia RICO; (2) he suffered injury as a result of their violation, and (3) proximate cause. *Wylie v. Denton*, 323 Ga. App. 161, 165 (2013). Defendants argue he does not adequately allege predicate racketeering acts or acquisition of money (Doc. 104-1, pp. 32-35), but they are mistaken.

### 1.    *Defendants Violated the Georgia RICO*

Mr. Dixon pleads his Georgia RICO claim under O.C.G.A. § 16-14-4(a). (Doc. 102, ¶ 304), and all he must show under that subsection is "'proof that the defendant committed predicate offenses ... at least twice.'" *Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279, 1316 (N.D. Ga. 2021) (citations omitted). Violations of the TVPA and O.C.G.A. § 16-6-12 are both predicate acts of racketeering activity. *See* O.C.G.A. § 16-14-3(5)(A)(vii), (B) (incorporating 18 U.S.C. § 1961(1), which lists 18 U.S.C. § 1591)). Mr. Dixon specifically alleges dozens of violations of both.

First, as to the TVPA violations, Mr. Dixon pleads his own recruitment, as well as that of Mr. Rodriguez (Doc. 102, ¶¶ 61, 69-80); dozens of acts of enticement (*id.* ¶¶ 85-86, 115-17, 120-21, 125, 130, 151, 156-60, 163-64, 178-80)); and solicitation (*id.* ¶¶ 74-76, 134-35), each of which is an independent violation because Perry did with the requisite knowledge explained *supra* at pages 33-36, *see also United States v. Corley*, 679 Fed. App'x. 1, 7 (2d Cir. 2017).

Second, Mr. Dixon pleads several pandering violations. Pandering is soliciting another to perform an act of "prostitution," O.C.G.A. § 16-6-12, which

is when the other person "performs … or consents to perform a sexual act … for money or other items of value" O.C.G.A. § 16-6-9. Defendants argue there was no "solicitation" by Perry or Mr. Dixon rejected it. (Doc. 104-1, pp. 33-34.) But no actual sexual conduct is required for solicitation. *State v. Stillman*, 372 Ga. App. 330, 335 (2024). Even implied requests, such as suggesting one's "price" for a "date" can constitute solicitation under the circumstances, *Osborne v. State*, 92 Ga. App. 518, 518-19 (1955). And "[r]equiring sexual activities as a condition of employment constitutes pandering[.]" *Kea v. State*, 344 Ga. App. 251, 254 (2018). Mr. Dixon alleges several instances of Perry implying an exchange of sex for things of value or continued employment, such as when he told Mr. Dixon when they were in the Bahamas that he should make himself sexually available to Perry because he "likes nice things" (Doc. 102, ¶¶ 134-35). [21]

### 2.    *Defendants Acquired Money Through Their Violations*

Defendants also argue that Mr. Dixon fails to allege that they acquired money through the racketeering activity because all the money they made on the acting of Mr. Rodriguez or Mr. Dixon was from "legitimate licensing." (Doc.

---

[21] Defendants suggest that solicitation outside Georgia would be an extraterritorial application of the statute (Doc. 104-1, p. 34), but the reasonable inference is that the sex would have taken place in Douglasville, Georgia like the sexual assaults (*id.* ¶ 151.b.), and Georgia law provides that a person can be prosecuted for a crime that is committed "partly" within the state or committed elsewhere and constitutes an attempt to commit a crime here, O.C.G.A. § 17-2-1.

104-1, pp. 35.) This argument was rejected over 30 years ago in *Reaugh v. Inner Harbour Hosp., Ltd.*, 214 Ga. App. 259, 264 (1994), where the Court held that the Georgia RICO is "broader than its federal counterpart" and mere acquisition of any money as a result of the racketeering activity is enough. *Id.* Here, Mr. Dixon clearly alleges that through recruiting, enticing, and soliciting him and others, Defendants obtained revenue on their labor and performances. (Doc. 102, ¶¶ 81-83, 116-17, 159-60, 164-66, 167.) It is irrelevant that the underlying enterprises—media production and distribution companies—also engage in lawful business. *Reaugh*, 214 Ga. App. at 264; *see also Cobb Cnty. v. Jones Group P.L.C.*, 218 Ga. App. 149, 151-53 (1995) (denying motion to dismiss where defendant acquired profits from sales of lawful engineering services and equipment).

### 3. Mr. Dixon Suffered Injury

Defendants suggest that Mr. Dixon does not allege that he suffered injury through Defendants' pattern of racketeering activity (Doc. 104-1, pp. 33), but this is untrue. He specifically alleges that, as a result of the Georgia RICO violations, he suffered emotional distress which prevented him from continuing to work for Defendants, which forced him to walk away from a contract for continued employment and suffer lost employment opportunities, relocation expenses, and other actual damages (Doc. 102, ¶¶ 184-96, 312.) All of these are compensable under the Georgia RICO. O.C.G.A. § 16-14-6(c); *Reaugh*, 214 Ga. App. at 264.

39

### 4. Mr. Dixon Adequately Alleges Proximate Cause

Finally, Mr. Dixon adequately pleads that the pattern of racketeering activity by Defendants proximately caused his injuries. The question of proximate cause for purposes Georgia RICO claim is "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006). While the violation need not be the "sole cause" of the injury asserted, there must be "some direct relation" between the injury and the violation. *Id.* at 457 (citing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). Here, there is a direct relation between Mr. Dixon's psychological injuries and his emotional distress and economic damages. What is more, Mr. Dixon was the "primary and intended" victim of Defendants' racketeering activity. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 650 (2008). The Georgia RICO cases show that the full package of harms in wrongful termination cases are recoverable. *Wommack v. G. S. Construction, Inc.*, 377 Ga. App. 582, 590-91 (2025) (holding that plaintiffs adequately alleged emotional, reputational, and financial injuries proximately caused by wrongful termination); *O'Neal v. Garrison*, 263 F.3d 1317, 1323 (11th Cir. 2001). Mr. Dixon has adequately alleged proximate cause.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court DENY Defendants' Motion to Dismiss his First Amended Complaint.

40

Respectfully submitted this 22nd day of May, 2026.

**BEAL, SUTHERLAND,
BERLIN & BROWN, LLC**

*/s/ Brian J. Sutherland*
Brian J. Sutherland
Georgia Bar No. 105408
brian@beal.law
Andrew M. Beal
Georgia Bar No. 043842
drew@beal.law
945 East Paces Ferry Rd NE
Suite 2275
Atlanta, Georgia 30326
Tel: (678) 439-0330

**LAW OFFICES OF
JONATHAN J. DELSHAD**

Jonathan J. Delshad
California Bar No. 246176*
jdelshad@delshadlegal.com
Daniel Kohanbash
dk@delshadlegal.com
California Bar No. 358553*
1663 Sawtelle Blvd, Suite 220
Los Angeles, California 90025
Tel: (424) 255-8376
*admitted *pro hac vice*

*Counsel for Plaintiff*

41

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| DEREK DIXON, | ) | |
| | ) | |
| | ) | CIVIL ACTION |
| Plaintiff, | ) | FILE NO. 1:25-CV-07102-SEG-CCB |
| | ) | |
| v. | ) | |
| | ) | |
| TYLER PERRY; | ) | |
| TPS PRODUCTION SERVICES, LLC; | ) | |
| and AND ACTION, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTIFICATE OF LR 7.1(D), NDGA COMPLIANCE AND SERVICE

I hereby certify that the foregoing **Plaintiff's Response in Opposition to Defendants' Motion to Dismiss** was prepared with double spacing and Book Antiqua 13-point font in compliance with LR 5.1(C), NDGa, and was filed with the Court's CM/ECF system, automatically serving all counsel of record.

/s/ Brian J. Sutherland
Brian J. Sutherland
Georgia Bar No. 105408