# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

DEREK DIXON,

     *Plaintiff*,

    v.

TYLER PERRY;
TPS PRODUCTION SERVICES, LLC;
and AND ACTION, LLC,

     *Defendants*.

Case No. 1:25-CV-07102-SEG-CCB

# DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION
# TO DISMISS PLAINTIFF'S FIRST AMENDED AND
# <u>VERIFIED COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ............................................................................................................3

I.  COUNTS I AND II IMPERMISSIBLY SEEK TO EXPAND CALIFORNIA EMPLOYMENT LAWS BEYOND CALIFORNIA'S BORDERS ...........................................................................................3

    A.  Dixon's Opposition Arguments Are Largely Irrelevant ......................3

    B.  Dixon Cannot Invoke California Employment Laws ..........................4

II.  DIXON'S TITLE VII CLAIM IS UNTIMELY, AND DIXON DID NOT EXHAUST ADMINISTRATIVE REMEDIES ...................................9

    A.  Dixon Cannot Base A Title VII Claim On Untimely Alleged Conduct From 2020-2021 .......................................................9

    B.  The Only Timely Alleged Conduct Is Not Actionable ......................12

    C.  Dixon Also Has Not Exhausted Administrative Remedies ...............14

III.  DIXON'S EMOTIONAL DISTRESS CLAIM ARISES ONLY UNDER GEORGIA LAW AND IS ALSO UNTIMELY ............................15

    A.  Count IV Should Be Dismissed To The Extent Premised On California Law ...........................................................15

    B.  Count IV Is Time-Barred .................................................16

IV.  DIXON'S EFFORTS TO RE-PLEAD HIS TVPRA CLAIM FAIL ............18

V.  DIXON HAS NOT ALLEGED A GEORGIA RICO VIOLATION ............23

CONCLUSION .......................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Allen v. Ambu-Stat, LLC*,
  799 F. App'x 703 (11th Cir. 2020) ............................................................12, 13

*Ardolf v. Weber*,
  332 F.R.D. 467 (S.D.N.Y. 2019) ..................................................................21

*Bistline v. Parker*,
  918 F.3d 849 (10th Cir. 2019) .....................................................................20

*Bridges v. Poe*,
  487 F. Supp. 3d 1250 (N.D. Ala. 2020)........................................................19

*Buchanan v. Lossing*,
  2025 WL 2014324 (N.D. Ga. July 16, 2025) ................................................17

*Buckner v. Omnimed Med. Servs.*,
  2023 WL 12144750 (C.D. Cal. July 26, 2023)................................................7

*Burgess v. Religious Technology Center, Inc.*,
  600 F. App'x 657 (11th Cir. 2015) .....................................................18, 21, 23

*Cooper v. Meridian Yachts*,
  575 F.3d 1151 (11th Cir. 2009) ....................................................................15

*Croft v. Dolan*,
  2025 WL 3720844 (9th Cir. Dec. 23, 2025)..................................................21

*Diamond Multimedia Sys., Inc. v. Sup. Ct.*,
  19 Cal. 4th 1036 (Cal. 1999) ..........................................................................5

*Dorsey v. State*,
  279 Ga. 534 (2005) ......................................................................................25

*Eckhart v. Fox News Network, LLC*,
  2021 WL 4124616 (S.D.N.Y. Sept. 9, 2021) ................................................21

*English v. General Dynamics Missions Systems Inc.*,
  2019 WL 2619658 (C.D. Cal. May 8, 2019)................................................5, 7

*Fanning v. Bos. Mkt. Corp.*,
   2007 WL 9735676 (N.D. Ga. Feb. 26, 2007) ...................................................9, 11

*Five Star Athlete Management, Inc. v. Davis*,
   355 Ga. App. 774 (2020) ...................................................................23, 24, 25

*Gupta v. Fla. Bd. of Regents*,
   212 F.3d 571 (11th Cir. 2000) ................................................................12

*Hill v. Workday, Inc.*,
   2024 WL 3012802 (N.D. Cal. June 14, 2024).................................................6

*Kane v. Matson Navigation Co.*,
   2024 WL 1988838 (9th Cir. May 6, 2024).....................................................6

*Malloy v. Superior Court*,
   83 Cal. App. 5th 543 (2022) ...............................................................8, 9

*Nedlloyd Lines B.V. v. Super. Ct.*,
   3 Cal. 4th 459 (Cal. 1992)........................................................................4

*Noble v. Weinstein, et al.*,
   335 F. Supp. 3d 504 (S.D.N.Y. 2018) ...............................................21

*Ramsbottom v. Ashton*,
   2024 WL 4993391 (M.D. Tenn. Dec. 5, 2024) ...............................................19

*Richardson v. Nw. Univ.*,
   2023 WL 6197447 (N.D. Ill. Sept. 21, 2023).................................................20

*Roman v. Tyco Simplex Grinnell*,
   2017 WL 3394295 (M.D. Fla. Aug. 8, 2017)...............................................21

*Russo v. APL Marine Servs., Ltd.*,
   135 F. Supp. 3d 1089 (C.D. Cal. 2015) ........................................................3, 5

*Sexton v. Spirit Airlines, Inc.*,
   2023 WL 1823487 (E.D. Cal. Feb. 8, 2023) ...............................................5, 6

*Stevenson v. Superior Ct.*,
   16 Cal. 4th 880 (Cal. 1997)........................................................................3

*Sullivan v. Oracle Corp.*,
    51 Cal. 4th 1191 (Cal. 2011) ...................................................................5

*Surrell v. California Water Srvc. Co.*,
    518 F.3d 1097 (9th Cir. 2008) ................................................................14

*Terminio v. Crowley Maritime Corp.*,
    707 F. Supp. 3d 1234 (M.D. Fla. 2023).............................................19, 20

*United States v. Walker*,
    73 F.4th 915 (11th Cir. 2023) .................................................................20

*United States v. Williams*,
    666 F. App'x 186 (3d Cir. 2016) ..............................................................22

*Ward v. United Airlines*,
    9 Cal. 5th 732 (Cal. 2020).......................................................................6

*Watson v. Blue Circle, Inc.*,
    324 F.3d 1252 (11th Cir. 2003) ............................................................9, 11

## Rules / Statutes

10 U.S.C. § 920(g)(4)................................................................................23

18 U.S.C. § 1591 ........................................................................18, 22, 24

California Constitution Article I ................................................................3

California Labor Code § 925(a) .................................................................6

California Fair Employment and Housing Act (FEHA)....................................*passim*

O.C.G.A. § 16-14-4...............................................................................23, 24

O.C.G.A. § 16-14-6.....................................................................................24

## PRELIMINARY STATEMENT

This motion turns on just a few key and undisputed facts that necessitate dismissal of the case.

Dixon cannot pursue claims under California employment statutes because it is undisputed that all alleged physical contact between Dixon and Perry occurred outside California; all of Perry's communications with Dixon emanated "from Defendant Perry's location in Georgia" (AC ¶ 55); every project Dixon contracted to work on was filmed in Georgia; and a California federal court previously ruled that Dixon's alleged employment was always based in Georgia.

Dixon's Title VII claim must be dismissed because Dixon alleges supposed verbal and physical harassment in 2020 and 2021, rendering his assertion of a claim in 2025 untimely by years. Dixon cannot revive his claim by alleging a handful of 2023 and 2024 messages or phone calls generally referencing the topic of sex. Those alleged communications are not a continuing course of conduct with the 2020-2021 allegations, nor are they actionable on their own. In addition, Dixon failed to exhaust administrative remedies, which independently requires dismissal.

Dixon's June 2025 assertion of an intentional infliction of emotional distress claim is likewise untimely. Dixon alleges he recognized in 2021 that his "mental health condition [had] worsened" and that he needed "intensive psychiatric therapy." *Id.* ¶ 185. And by January 2023, Dixon allegedly felt compelled to move thousands

of miles across the country to distance himself from Perry.  If any of that is true, the two-year clock on Dixon's emotional distress claim began running years ago.

Dixon fails to sufficiently plead his TVPRA "sex trafficking by coercion" (*id.* ¶ 277) claim, where the supposed "coercion" comprised gifts, benefits, or money flowing to Dixon or the "implied" (*id.* ¶¶ 201, 228) notion that Dixon might lose his job.  Because none of that comes close to the TVPRA's definition of "coercion," Dixon tries to replead his claim via opposition brief as sex trafficking by coercion … or by fraud … or by force … whichever theory might stick.  None do because none are alleged, and no facts exist to support them.

Dixon also fails to make out a Georgia RICO claim.  In addition to not adequately alleging racketeering acts, Dixon does not allege the essential element that Defendants acquired personal property from their purported sex trafficking or pandering.  Quite the opposite, the only person Dixon alleges received financial benefits as a result of any of Defendants' alleged misconduct is Dixon himself.

In sum, while Dixon accuses Defendants of "pitching an alternative version of the facts" (Opp. 1), his Amended Complaint is subject to dismissal for reasons that are apparent on the face of the complaint and not subject to competing inferences.

2

## ARGUMENT

### I. COUNTS I AND II IMPERMISSIBLY SEEK TO EXPAND CALIFORNIA EMPLOYMENT LAWS BEYOND CALIFORNIA'S BORDERS

Dixon's California law claims in Counts I and II must be dismissed because he was never employed in California and does not allege any misconduct there.

#### A. Dixon's Opposition Arguments Are Largely Irrelevant

At the outset, Dixon confuses the issues with irrelevant arguments. Neither Georgia courts' choice-of-law rules for common law torts nor the governing-law clauses in Dixon's employment agreements (Opp. 13-16) dictate the result here.

Georgia choice-of-law rules are not applicable because Dixon is not asserting claims that arise from the common law. In Count II, Dixon seeks relief under a California statute, the Fair Employment and Housing Act. And Dixon's Count I wrongful discharge in violation of public policy claim—while technically a common law claim—requires the violation of a policy "delineated in either [California] constitutional or statutory provisions." *Stevenson v. Superior Ct.*, 16 Cal. 4th 880, 894 (Cal. 1997). Indeed, Dixon asserts that Defendants' liability for Count I stems from violations of the FEHA and/or Article I of the California constitution (which also prohibits employment discrimination). Whether Dixon can pursue these claims turns on the same question: whether they are an impermissible, extraterritorial expansion of California laws. *See Russo v. APL Marine Servs., Ltd.*, 135 F. Supp. 3d 1089, 1094 (C.D. Cal. 2015), *aff'd*, 694 F. App'x 585 (9th Cir. 2017) (dismissing

3

FEHA and "public policy" claims based on same extraterritoriality concerns). As explained in Defendants' motion (Mot. 14-19) and further below, *infra* I.B, Dixon's claims indeed would stretch California laws well beyond their permissible reach.

Dixon's argument with respect to the choice-of-law clauses in his performer agreements (Opp. 14-16) also misses the point. Those provisions are inapplicable to Counts I and II, but not for the reason Dixon suggests—that the claims are not "arising out of or related to" Dixon's employment. Opp. 14-15. That argument is frivolous, but irrelevant. Rather, a choice-of-law clause is not enforceable when it would contravene a fundamental policy of the state whose laws would apply absent the clause. *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459, 465 & n.5 (Cal. 1992). FEHA and the California constitution reflect fundamental California policies, so where those laws would otherwise apply, they cannot be displaced by a contractual choice of law. Here, there is no basis to apply FEHA or the California constitution in the first place, which is why Counts I and II necessarily fail.[1] *See infra* I.B.

**B.    Dixon Cannot Invoke California Employment Laws**

A long line of California cases have dealt with plaintiffs like Dixon who try to invoke California employment laws despite the facts having little or no connection

---

[1] The Georgia choice-of-law clauses do, however, preclude Dixon from asserting a common law intentional infliction of emotional distress claim (Count IV) under California law. *See infra* III.A.

to California.  If courts in California would not permit Dixon to invoke California laws, this Court should not either.

Dixon halfheartedly concedes (Opp. 19)—at least with respect to his FEHA claim—that there must be a substantial connection between the state of California, on the one hand, and the plaintiff's employment and the material elements of the claim, on the other.  *Russo*, 135 F. Supp. 3d at 1094.  Again, the same is true with respect to Dixon's Count I "public policy" claim, whether based on violations of FEHA or the California constitution.  *Id.* at 1096; *see also Gonsalves v. Infosys Techs., LTD.*, 2010 WL 1854146, at *7 (N.D. Cal. May 6, 2010) (dismissing FEHA claim on extraterritoriality grounds and wrongful discharge claim "for the same reasons"); *English v. General Dynamics Missions Systems Inc.*, 2019 WL 2619658, at *8 n.21 (C.D. Cal. May 8, 2019) (similar).

A plaintiff's employment is not sufficiently connected to California under FEHA unless California is the employee's "principal place of work."  *Sexton v. Spirit Airlines, Inc.*, 2023 WL 1823487, at *3 (E.D. Cal. Feb. 8, 2023).  And whether the elements of a FEHA claim occurred in California turns "on the location of the violative conduct" by the defendant.  *English v. General Dynamics Missions Systems Inc.*, 2019 WL 2619658, at *7 (C.D. Cal. May 8, 2019) (citing California Supreme Court decisions in *Diamond Multimedia Sys., Inc. v. Sup. Ct.*, 19 Cal. 4th 1036, 1060 (Cal. 1999) and *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (Cal. 2011)).

5

A sufficient California connection is absent here.  No argument exists that California was Dixon's "principal place of work," because Dixon contracted to work only in Georgia.  The California federal court already determined as much, and Dixon's efforts to minimize that decision (Opp. 20 n.7) are not persuasive.  Like this Court, Judge Walter was required to decide whether Dixon could invoke a California statute that applies only to employees who "primarily" work in California.  Labor Code § 925(a); *Sexton*, 2023 WL 1823487, at *3 (FEHA applies where California is "principal place of work").  The court ruled he could not.  ECF No. 67 at 5-6.

Reading and writing scripts or "preparing performances" in California— "incidental" work according to the California court (*id.* at 6)—does not turn California into Dixon's "definite base of operations" or the "location where [his] work holds a substantial connection to."  (Opp. 19-20) (citing *Hill v. Workday, Inc.*, 2024 WL 3012802, at *9 (N.D. Cal. June 14, 2024).  That effectively is an argument that Dixon's temporary California residency (his unilateral decision) created enough connection to invoke California laws, and courts repeatedly have rejected such arguments.  *See Kane v. Matson Navigation Co.*, 2024 WL 1988838, at *1 (9th Cir. May 6, 2024) (unpublished) (holding in FEHA case that "California residency does not establish a substantial work connection to California."); *Ward v. United Airlines*, 9 Cal. 5th 732, 740, 755-56, 760-61 (Cal. 2020) (California employment law did not apply to California residents who were not "based for work purposes" in California).

6

Nor has Dixon alleged "violative conduct" in California. *English*, 2019 WL 2619658, at \*7 (dismissing FEHA claim by California resident who experienced discrimination elsewhere). He alleges all misconduct occurred outside California, including Perry's "inappropriate" calls and texts. *See* AC ¶ 55 (alleging Perry "contacted Mr. Dixon by telephone from … Georgia."). "When, as here, a defendant 'ma[kes] its FEHA-violating decisions and sent its FEHA-violating communications from' outside of the state, a plaintiff lacks a viable claim.'" *Buckner v. Omnimed Med. Servs.*, 2023 WL 12144750, at \*3 (C.D. Cal. July 26, 2023).

Dixon does not even allege **he** was in California when he received the communications in 2023 and 2024.[2] Dixon's claim (Opp. 17) that he was in California when constructively terminated cannot change the result. Like the plaintiff in *English*, Dixon "has cited no case in which the fact that a plaintiff was located in California at the time of termination was sufficient to establish that California law could permissibly be applied." 2019 WL 2619658, at \*7; *see also Buckner*, 2023 WL 12144750, at \*3 (dismissing FEHA claim where decision to terminate California resident was made in and communicated from Nevada).

---

[2] While Dixon alleges that, "[d]uring 2023, Defendant Perry called Mr. Dixon on the telephone and sent text messages to him approximately once a week," he does not allege he received **harassing** communications once a week. The same is true with respect to Dixon's allegations of a few purportedly harassing calls or texts in 2024. *Id.* ¶¶ 179-80.

7

Dixon's authorities do not support him. In *Lidow v. Superior Court* (Opp. 17-18), the plaintiff lived and worked in California for a California-headquartered company, and the case involved the unique question of whether the "internal affairs" doctrine required application of the laws of the company's state of incorporation. 206 Cal. App. 4th 351, 354, 358-64 (Cal. Ct. App. 2012). It is inapplicable here.

In *Rulenz v. Ford Motor Company* (Opp. 20), the plaintiff's FEHA claim survived where she alleged tortious conduct in California, that she "performed a significant amount of her work assignments in California," and that she paid California income taxes. 2014 WL 50807, at *5 (S.D. Cal. Jan. 7, 2014). Dixon alleges none of that.

In *Fusco v. American Airlines* (Opp. 20), FEHA applied where "each plaintiffs connection to [the employer defendant] arose from his connections as a California resident and [the defendant's] business operations in California." 2003 WL 25730512, at *3 (N.D. Cal. Apr. 10, 2003). Dixon's connection to and work for the Georgia defendants has nothing to do with California or any operations there.

And finally, Dixon's citation to *Malloy v. Superior Court* (Opp. 21) is highly misleading. Dixon cites it for the purported "holding that a remote worker's FEHA claim was proper where she lived because that is where she suffered the harm of discriminatory interference with her rights." But *Malloy* involved only the question of whether the **venue** for the case should be Los Angeles County or Orange County,

8

California—not whether there was a basis to apply California laws.[3] 83 Cal. App. 5th 543, 549-50, 553-59 (2022).

Counts I and II should be dismissed because California statutes and constitutional provisions do not extend to these Georgia-centered facts.

## II. DIXON'S TITLE VII CLAIM IS UNTIMELY, AND DIXON DID NOT EXHAUST ADMINISTRATIVE REMEDIES

### A. Dixon Cannot Base A Title VII Claim On Untimely Alleged Conduct From 2020-2021

Dixon's allegations of assaults and harassment in 2020-2021 are not "part of the same unlawful employment practice" as alleged texts and calls in 2024. And because that earlier alleged conduct is well outside the EEOC filing period, Dixon cannot rely on it for his Title VII claim for a "sexually hostile work environment." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003); *Fanning v. Bos. Mkt. Corp.*, 2007 WL 9735676, at *11 (N.D. Ga. Feb. 26, 2007), *report and rec. adopted*, 2007 WL 9735720, *aff'd*, 262 F. App'x 999 (11th Cir. 2008).

Dixon tries to dispute this with conclusory assertions that the alleged harassment "never stopped" and was "uninterrupted" (Opp. 11, 24), but his allegations put the lie to those arguments. A brief timeline proves the point:

---

[3] *Kearney v. Salomon Smith Barney, Inc.* (Opp. 21) is also inapt, first because it does not involve FEHA or other employment laws, but also because the "crucial element" of that plaintiff's claim occurred in California: the unauthorized recording of a phone conversation involving someone located in California. 39 Cal. 4th 95, 119-20 (2006).

*The 2020-June 2021 Pre-Filing-Period Alleged Assaults And Harassment.*

Dixon alleges that Perry "rubb[ed] his body" or "groped his buttocks" in January and October of 2020.  AC ¶¶ 91-103, 132-34.  He also alleges that Perry made overt sexual advances during this time, such as pretending to choke Dixon in a sexualized manner, texting Dixon photos of Dixon's buttocks; and telling Dixon that his body looked "thick," that Perry was "jealous" of Dixon being with other men, and that "everybody want[ed] to fuck [Dixon]."  *Id.* ¶¶ 116-24, 130, 136-37.  Dixon alleges that many purportedly harassing interactions during this period were in person in Georgia.  *See id.* ¶¶ 98-99, 122, 132-34, 138.  Dixon also alleges that, on June 4, 2021, Perry pulled down Dixon's underwear and groped him after a night of drinking at Perry's Georgia home.  *Id.* ¶¶ 138-150.

*The 2023 Pre-Filing Period Alleged Texts And Calls.*  Dixon alleges he voiced displeasure about the June 2021 incident, and Perry apologized.  *Id.* ¶¶ 148-49, 153-54.  Dixon does not allege any assaults, harassment, or sexual advances by Perry of any kind from that point until 2023, when Perry allegedly called or texted Dixon and discussed sex-related topics on three occasions in 2023.  *Id.* ¶ 178.  While Dixon claims he alleges harassment during the remainder of 2021 and 2022, the allegations he cites (Opp. 24 (citing *Id.* ¶¶ 152(e), 158-74)) are devoid of any such conduct.  In January 2023, Dixon decided to move to California.  *Id.* ¶ 175.

***The Only Timely Alleged Conduct: May and June 2024 Text and Phone Call.*** Dixon concedes that the only conduct he alleges within the statutory filing period is (a) a May 2024 text message where Perry joked that Dixon would end up alone in 30 years if he "let the alone time win" (Dixon laughed in response) (AC ¶ 180(c)); and (b) a June 2024 call where Perry similarly encouraged Dixon to generally have more sex because he is a "sexy man" (*id.* ¶ 180(d)).

That alleged conduct is not part of the same unlawful employment practice as the prior alleged conduct because (a) it is separated from the prior conduct by nearly three years; (b) it is separated from the prior conduct by an "intervening event"—namely, Dixon's alleged employer and harasser apologizing and ceasing the alleged sexual harassment, assaults, or other sexual advances; (c) it is separated from the prior conduct by the additional intervening events of Dixon moving to a new state and allegedly assuming new work responsibilities as a script writer; and (d) it is objectively less severe than the prior conduct, which allegedly included multiple assaults or other in-person harassment. These circumstances break the connective chain between separate periods of alleged misconduct and preclude Dixon from using the 2024 communications to revive his otherwise time-barred claims. *See Watson*, 324 F.3d at 1259 (intervening action by employer that stops harassment breaks the chain); *Fanning*, 2007 WL 9735676, at *11-13 ("roughly two year period" between alleged acts of harassment, remedial employer action, plaintiff's

11

transfer and promotion, and differing severity of conduct are all circumstances that preclude finding of single unlawful employment practice).

### B.    The Only Timely Alleged Conduct Is Not Actionable

Dixon's allegations of three 2024 communications referencing the topic of sex (AC ¶ 180) do not, on their face, amount to "severe or pervasive harassment" under Title VII.  *E.g.*, *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 584 (11th Cir. 2000).  That is especially true given Dixon's alleged friendship with Perry. AC ¶¶ 92, 130(a), 137(f); *Allen v. Ambu-Stat, LLC*, 799 F. App'x 703, 709 (11th Cir. 2020) (alleged harassing communications must be viewed in context when plaintiff and defendant are friends).  Nor is the result different if the three alleged 2023 communications referencing sex (AC ¶ 178) are considered part of the same course of conduct.  All of these communications reflect nothing more than Perry encouraging Dixon to embrace his sexuality.  As a result, Dixon does not have any viable Title VII claim.  *Gupta*, 212 F.3d at 584; *Allen*, 799 F. App'x at 709.

Dixon's arguments in opposition (Opp. 25-27) mischaracterize his allegations.  Dixon claims that he "alleges he received inappropriate calls or text messages once a week in 2023 and provides three examples (Doc. 102, ¶ 178), and three or four times a month in 2024 and provides five examples."  Opp. 26-27.  But that simply is not true.  What Dixon actually alleges is that, in 2023, "Perry called Mr. Dixon on the telephone and sent text messages to him approximately once a

week ….." (AC ¶ 178)—not that every call or text was purportedly harassing or "inappropriate." Dixon alleges only three 2023 communications even touching on sexual topics. AC ¶ 178. The same is true with respect to 2024: what Dixon actually alleges is that Perry would call Dixon "three or four times per month to ask about his sex life and dangle work in front of him." *Id.* ¶ 179. Calls about work are not the same thing as calls about Dixon's sex life.[4] Again, Dixon alleges only three, innocuous sex-related communications from 2024, which is telling in a complaint otherwise replete with screenshots of text messages and other purported quotes from conversations dating back to 2019. *Id.* ¶ 180. *Allen*, 799 F. App'x at 708-09 (five comments "spread over four months, can hardly be described as frequent").

Dixon's own authorities illuminate why dismissal is appropriate. In *Usai v. Club Mgmt. Miami II, LLC*, for instance, the court held that "three comments, and one contact, directed at [plaintiff] over a five-to-six-month period" weighed against a finding of "pervasive" harassment. 801 F. Supp. 3d 1295, 1322-23 (S.D. Fla. 2025) The court only sustained the plaintiff's complaint because the alleged conduct was "severe" based on, among other things, the defendant allegedly "forcibly grabb[ing] [the plaintiff's] groin without her consent[.]" *Id.* at 1324 (some alterations in

---

[4]    And while Dixon characterizes Perry as "dangl[ing] work in front of him," (AC ¶ 179 Dixon does not allege that Perry ever offered him work and failed to follow through. That undermines Dixon's "*quid pro quo*" theory, as Dixon alleges he repeatedly rejected or failed to reciprocate Perry's purported sexual interest, yet his career undisputably still advanced.

13

original).  In *Comerinsky v. August Coating & Manufacturing*, the plaintiff expressly alleged harassment "on a daily basis," which escalated into three physical incidents that caused injuries.  418 F. Supp. 3d 1252, 1261 (S.D. Ga. 2019).  Dixon does not even allege weekly or monthly harassment in 2023 and 2024, and he alleges no physical interactions with Perry whatsoever after June 2021.

This is a case where a plaintiff sat for years on allegations that plausibly could be interpreted as harassment (if they were true).  Now, he is trying to resuscitate them with objectively inoffensive communications that, on their face, are nothing more than encouragement for someone admittedly seeking to overcome "guilt" about his sexuality.  *See* AC ¶ 137(b), (d), (f); 179-180.  There is no viable hostile work environment claim on those alleged facts.

### C.    Dixon Also Has Not Exhausted Administrative Remedies

Dixon's failure to exhaust administrative remedies is not cured by improperly filing a claim with the California Civil Rights Division in a further effort to manufacture a California connection.  In Dixon's cited case (Opp. 27), the California right-to-sue notice prevented dismissal only because the California CRD was "the appropriate state agency."  *Surrell v. California Water Srvc. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008).  Here, the CRD was not the appropriate agency because Dixon was never employed in California and has not alleged any harassment in California.  *See* ECF No. 67 at 6 ("the Court concludes that Plaintiff did not primarily work in

14

California, but rather primarily worked in Georgia ….”); *see supra* pp. 4-9.  Not surprisingly, Dixon filed his EEOC charge in the Atlanta, Georgia office of the EEOC in January 2025.  AC ¶ 6.  Months later, with no right-to-sue letter, and apparently realizing any Georgia law claims were time-barred, Dixon tried a new tactic.  He hired a new lawyer, filed a California CRD complaint, and on the same day filed this lawsuit in California state court falsely claiming to still be a California resident.  *Id.* ¶ 9.  Dixon's Title VII claim should be dismissed.

## III.  DIXON'S EMOTIONAL DISTRESS CLAIM ARISES ONLY UNDER GEORGIA LAW AND IS ALSO UNTIMELY

### A.  Count IV Should Be Dismissed To The Extent Premised On California Law

Dixon agreed to litigate disputes "arising out of or related to" his work agreements under Georgia law.  *See* Exs. 1-4.  His IIED claim for alleged workplace harassment fits that bill.  *See Cooper v. Meridian Yachts*, 575 F.3d 1151, 1162 (11th Cir. 2009).  The authorities Dixon cites to argue otherwise (Opp. 29 n.11) are readily distinguishable.  In *Doe v. Princess Cruise Lines*, an arbitration provision did not apply to claims that the defendants "could have engaged in … even in the absence of any contractual or employment relationship with Doe."  657 F.3d 1204, 1218-20 (11th Cir. 2011).  Here, by contrast, Dixon's claim is inseparable from his alleged employment because it is expressly premised on an alleged "pattern of unwanted sexual conduct *as a condition of his employment*."  AC ¶ 264 (emphasis added).

*Gamble v. New England Auto Finance*, another arbitration case, is even more inapt because the plaintiff brought a class-action claim under a federal anti-telemarketing statute, which the court determined did not arise out of or relate to a loan agreement containing an arbitration clause.  281 F. Supp. 3d 1354 (N.D. Ga. 2017).

Ordinary choice-of-law principles also dictate application of Georgia law. Dixon argues (Opp. 29) that 2023-2024 texts and calls after his California move "were the last acts necessary to create liability for intentional infliction of emotional distress," but that is belied by Dixon's own allegations.  Dixon alleges (a) that his distress was caused by "sexual acts, groping, and coercive sexual propositioning" (AC ¶ 265), which allegedly occurred in 2020-2021; (b) as a result, he sought mental health treatment for anxiety and depression as early as 2020; and (c) his counselor suggested "intensive psychiatric therapy" after his "mental health condition worsened" in 2021 following the June 2021 alleged incident.  AC ¶¶ 184-85.  Thus, Dixon claims he suffered severe emotional distress nearly two years before he moved to California, if not earlier.  A claim based on allegations that predate any California connection does not arise under California law.

## B.    Count IV Is Time-Barred

These same allegations establish that the two-year statute of limitations (the same under Georgia or California law) began to run in 2020 or 2021, at least four years before Dixon filed suit.  Dixon agrees his claim accrued when his alleged

16

emotional distress became "severe."  Opp. 30-31; *Buchanan v. Lossing*, 2025 WL 2014324, at *2 (N.D. Ga. July 16, 2025) (limitations period starts when "injury is sustained"); *See Tomczyk v. Jocks & Jills Rests.*, LLC., 198 Fed. App'x. 804, 814 (11th Cir. 2006) (claim accrues when conduct "culminated in damage").  Here, the limitations period on Dixon's claim extends back to March 9, 2023 (based on a June 13, 2025 filing date and the parties' agreed tolling for 96 days (AC ¶ 11)).  **Before** that date, Dixon alleges he sought treatment for anxiety and depression, realized that his condition was worsening, continued to seek treatment, and was advised he needed "intensive psychiatric treatment," which he only declined because of cost. *Id.* ¶ 185.  Dixon thus claims "severe" distress well before the limitations period.

Dixon elevates form over substance (Opp. 2, 28, 30-31) by suggesting his claim only accrued when he could not "return to work" in 2024.  Inability to return to work is not a hardline rule for when an IIED claim accrues; indeed, many IIED cases have nothing to do with an employment scenario.  The claim accrues, and the clock starts ticking, whenever the plaintiff discovers his injury.  *Buchanan*, 2025 WL 2014324, at *2.  Here, Dixon admits he discovered his injury long before he decided in October 2024 that he would not film another season of *The Oval*.  Further proving the point, Dixon's alleged January 2023 determination that he could not remain in Georgia (AC ¶ 175)—another purported realization of harm outside the limitations period—is no different than his alleged October 2024 determination that

17

he could not travel back to Georgia to film.  Thus, even if Dixon's allegations were true, he knowingly sat on them for years and is barred from bringing a claim now.

## IV.    DIXON'S EFFORTS TO RE-PLEAD HIS TVPRA CLAIM FAIL

Dixon appears to recognize that he has not adequately alleged "sex trafficking by coercion" (AC ¶ 278) because he is now advancing new theories of trafficking by "fraud" or "force" found nowhere in his complaint.  Dixon's attempts to replead and/or request leave to amend his complaint (Opp. 33-36 & fn.16) are both improper. *Burgess v. Religious Technology Center, Inc.*, 600 F. App'x 657, 665 (11th Cir. 2015) ("[P]laintiffs cannot amend their complaint through a response to a motion to dismiss.").

Regardless, Dixon fails to articulate any viable sex trafficking theory.

***Coercion.***    Beginning with the claim that is actually in Dixon's complaint, "sex trafficking by coercion" (AC ¶ 278), Dixon has not alleged the defining element of coercion, which requires "threats of serious harm to or physical restraint against any person."  18 U.S.C. § 1591(e)(2)(A).

Dixon claims he was threatened with "physical restraint" in June 2021 when Perry "held [his] wrists to keep him from pulling up his underwear while Perry groped his buttocks, causing him to think he would be raped."  Opp. 34.  Setting aside that Dixon's complaint tellingly does not identify this as "coercion" (*see* AC ¶¶ 281-82 (listing the supposed coercion)), the TVPRA contemplates more.

18

"Physical restraint" refers to conditions akin to actual "confinement," not the brief holding of a plaintiff's wrists. *See Bridges v. Poe*, 487 F. Supp. 3d 1250, 1261 (N.D. Ala. 2020) (noting some dictionaries define "physical restraint" as "confinement" and sustaining claim where plaintiff alleged she was threatened with confinement to jail cell for 23 hours a day if she did not engage in sex). Here, Dixon alleges that he could "get free" (despite Perry being "much larger") and that all he needed to do "to end the encounter" was tell Perry he was hungry. AC ¶¶ 145-47. More generally, Dixon never alleges that he was unable to leave Perry's presence. *See Ramsbottom v. Ashton*, 2024 WL 4993391, at *14 (M.D. Tenn. Dec. 5, 2024) (no threat of physical restraint where, despite plaintiff claiming "she felt like she was a 'hostage,'" she never "lacked the ability to simply walk out the door, and she always maintained access to her car keys, her telephone, and her wallet").

Next, Dixon wrongly argues (Opp. 35) that implied threats of termination amount to threats of "serious harm." Dixon concedes that a threat is "serious" under the TVPRA "if it includes '***more*** than what an employee would ordinarily face'" in losing a job. *Id.* (quoting *Terminio v. Crowley Maritime Corp.*, 707 F. Supp. 3d 1234, 1253 (M.D. Fla. 2023) (emphasis added)). In *Terminio*, for example, the defendant made threats against the plaintiff's and her family's safety and sought to exploit her precarious personal circumstances. *See id.* at 1247 (alleged trafficker grabbed plaintiff in an elevator with enough "strength to leave physical marks," and

19

"cautioned her to be mindful of her son …."); *id.* at 1254 (defendants "knew of Plaintiff's personal issues and circumstances, including her marital status and that she had a son, which they then used as a basis to threaten and coerce Plaintiff…").

Here, Dixon does not allege the necessary something "more." He argues (Opp. 35) that he faced the "loss of a place to live" because he was at one point during COVID living in a TPS studio apartment, but unlike his cases, he does not allege he had nowhere else to live or that he had given up his own apartment. *See Bistline v. Parker*, 918 F.3d 849, 871-72 (10th Cir. 2019) (cult leader threatened vulnerable plaintiffs with "loss of all shelter, food, medical care, cash, livelihood, and other essential support mechanisms necessary to an endurable daily existence"); *see also United States v. Walker*, 73 F.4th 915, 928 (11th Cir. 2023) (plaintiffs living in motel with pimp far from home threatened with loss of shelter). Nor does he allege that his termination came with a "mandatory financial burden" or life-altering penalty. *See Richardson v. Nw. Univ.*, 2023 WL 6197447, at *6 (N.D. Ill. Sept. 21, 2023) (victim had to repay prohibitively expensive college scholarship and would lose access to a college education unless she complied).

At bottom, Dixon's alleged circumstances are starkly different than those of a trafficking victim: he had his own Georgia apartment with a roommate, as well as his own car, money, and job; he moved to Santa Monica when he wanted; and when his beachside life became too expensive, he moved in with family in North Carolina

20

before moving to New York City.  The *only* harm Dixon alleges was the prospect of losing his job or no longer getting opportunities from Perry.  That is not enough for sex trafficking.  *See Roman v. Tyco Simplex Grinnell*, 2017 WL 3394295, at *5-6 (M.D. Fla. Aug. 8, 2017); *Croft v. Dolan*, 2025 WL 3720844, at *2 (9th Cir. Dec. 23, 2025) (unpublished) ("losing out on career opportunities" to work with a famous rock band not "serious harm"); *see also* Opp. 35 (Dixon admitting "Defendants are correct that mere termination of employment is not enough").  Lastly, it again bears noting that Dixon does not allege that Perry ever actually threatened to terminate his employment or ever conditioned any opportunity on supposed sexual advances.

*Fraud.*  Before even trying to defend his "coercion" theory, Dixon pivots to a new trafficking by "fraud" theory.  Opp. 33.  Again, Dixon cannot amend via opposition.  *Burgess*, 600 F. App'x at 665.  His fraud theory also holds no water. Unlike the cases on which he relies (Opp. 32-33), Dixon does not allege fraudulent promises.  *See, e.g.*, *Eckhart v. Fox News Network, LLC*, 2021 WL 4124616, *3, *10 (S.D.N.Y. Sept. 9, 2021) (Defendant enticed plaintiff by promising to "bring her on [his] show as a frequent on-air guest" but "failed to follow through").[5]  Instead,

---

[5]  *See also Noble v. Weinstein, et al.*, 335 F. Supp. 3d 504, 512-13, 519 (S.D.N.Y. 2018) (defendant assured plaintiff during violent assault that she would get a "role in the promised TWC project," but "no film role materialized"); *Ardolf v. Weber*, 332 F.R.D. 467, 477 (S.D.N.Y. 2019) (fraud existed because defendant claimed sexual exercises were necessary for models "to take better photographs").  Dixon does not allege Perry mentioned his career during any alleged harassment nor that Perry offered opportunities that never materialized.

Dixon alleges Perry made good on offers of an audition and to "change [Dixon's] life." Opp. 33.  Dixon was working in catering when he met Perry.  Soon after, Perry offered and Dixon accepted roles on multiple film and TV projects, culminating in a role as a series regular on multiple seasons of a tv show.  *Id.* ¶¶ 23, 81-84, 116, 159-60; *see also* Defs' Exs. 1-4 (Dixon performer agreements).  Defendants also bought the TV show that Dixon created and filmed a pilot episode starring Dixon. *Id.* ¶¶ 23, 164.  Dixon similarly alleges Perry made clear that Dixon secured his opportunities purely through merit.  *Id.* ¶ 130(a).  The ***only*** thing Dixon alleges never came to fruition was Perry's alleged claim that he could sell Dixon's show to a streaming network.  But Dixon admits that Defendants paid for the rights to his show, and Perry also informed Dixon of the obstacles to a streaming deal.  *Id.* ¶¶ 164, 174.  None of Dixon's allegations spell out a fraud.

**Force.**  Dixon's new "force" theory also is not in the complaint, and it also has no merit.  Dixon again tries to rely on allegations about Perry allegedly holding Dixon's wrists in June 2021.  Opp. 34.  But that does not establish sex trafficking by force under the TVPRA.  First, nowhere does Dixon allege the statutory requirement that Perry recruited or enticed Dixon knowing that force purportedly would be used to cause him to engage in commercial sex.  18 U.S.C. § 1591.  The fact that Dixon alleges he was "recruited" back in 2019, two years before the brief alleged instance of Perry holding Dixon's wrists, belies any such theory.  *See, e.g., United States v.*

22

*Williams*, 666 F. App'x 186, 199 (3d Cir. 2016) (Force linked to recruitment for commercial sex when the trafficker "hit [one victim] in front of [the other victim] the same night he convinced [second victim] to work as a prostitute for him.")

Moreover, Dixon does not allege actual "force," which is defined elsewhere in the federal code with respect to sex crimes. "Force" means "(A) the use of a weapon; (B) such physical strength or violence as to overcome, restrain, or injure a person; or (C) "inflicting physical harm sufficient to coerce or compel submission by the victim." 10 U.S.C. § 920(g)(4). That is not what Dixon alleges considering he "was able to get free of Defendant Perry's grasp" and "end the encounter" by proclaiming he was hungry. AC ¶ 146. Because Dixon has not adequately alleged sex trafficking by force, he asks for "leave to amend to more clearly allege" it. Opp. 34 n.16. That request should be rejected. *Burgess*, 600 F. App'x at 665.

Dixon alleges no TVPRA violation, under any cognizable theory.

## V.    DIXON HAS NOT ALLEGED A GEORGIA RICO VIOLATION

Dixon's GA RICO claim fails because he has not alleged racketeering acts and because, even if he had, he has not alleged Defendants acquired any property through racketeering. Both are essential elements under O.C.G.A. § 16-14-4(a). *Five Star Athlete Management, Inc. v. Davis*, 355 Ga. App. 774, 781 (2020).

As explained, Dixon's complaint is devoid of allegations of coercion, fraud, or force as a means to procure commercial sex. Thus, Dixon cannot possibly allege

23

that Perry recruited him or anyone else for commercial sex with knowledge that such unlawful acts would be used.  18 U.S.C. § 1591(a).  Dixon also does not allege pandering because he does not allege that Perry required of him—or anyone else— "sexual activities as a condition of employment." Opp. 38.  Indeed, Dixon continued to work on Perry's film and TV projects, in increasingly high-profile roles for which he earned increasing compensation—all despite rejecting Perry's purported sexual interest.  *See* AC ¶ 160, 162, 164.  Dixon offers no response to that.

Dixon also fails to allege that Defendants acquired "personal property" through racketeering activity.  Georgia RICO only creates a cause of action for a "person who is injured by reason of a violation of Code Section 16-14-4 …." O.C.G.A. § 16-14-6(c).  Dixon claims a violation of O.C.G.A. § 16-14-4(a), which criminalizes the acquisition of personal property through racketeering activity.  AC ¶ 307; *Five Star Athlete Management, Inc. v. Davis*, 355 Ga. App. 774, 781 (2020). Dixon fails to allege that essential element because he fails to identify any personal property that any Defendant acquired from him through the alleged racketeering activity of sex trafficking or pandering.  Instead, he identifies only personal property acquired *by* him in the form of payments for his services to Defendants.

Nor does Dixon identify any personal property acquired from anyone else as a result of racketeering activity.  Dixon tries to hang his hat on the tenuous notion that he acted in *The Oval*, Defendants licensed *The Oval* to a TV network in

24

exchange for money, so therefore Defendants acquired money through racketeering. Opp. 38-39. But the law requires that defendants must have obtained the property through the racketeering acts themselves—not through an undisputably legitimate business transaction. *Dorsey v. State*, 279 Ga. 534, 540 (2005) ("[O]ne or more of the [racketeering] acts … [must] result in the defendant acquiring or maintaining the prohibited control.") (emphasis omitted). Again, Dixon does not allege Defendants acquired control of any property from their purported sex trafficking or pandering. The only thing allegedly flowing to Defendants were paid actors' services, and services are not "personal property." *Five Star*, 355 Ga. App. at 775, 781.

In *Reaugh v. Inner Harbour Hospital*, Dixon's own case, the RICO claim survived because the defendant "acquired an interest in or control of money" through "mail fraud," the alleged racketeering activity. 214 Ga. App. 259, 264 (Ga. Ct. App. 1994). In *Cobb County v. Jones Group* (Opp. 39), the defendants acquired property by "illegally manipulat[ing] the procurement process for [water treatment] equipment" through bribery. 218 Ga. App. 149, 151-54 (Ga. Ct. App. 1995). Assuming Dixon had alleged sex trafficking and pandering, he does not allege Defendants received any property "as a result of" those acts.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's First Amended and Verified Complaint in its entirety, with prejudice.

Dated:  June 22, 2026

**TUCKER ELLIS LLP**

By:  */s/ Matthew A. Boyd*
Matthew A. Boyd
Georgia Bar No. 027645
matthew.boyd@tuckerellis.com
3344 Peachtree St. NE – Suite 1050
Atlanta, GA 30326
Telephone:  (404) 678-6365

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Alex Spiro (*admitted pro hac vice*)
alexspiro@quinnemanuel.com
295 5th Avenue
New York, New York 10016
Telephone:  (212) 849-7000

Michael T. Lifrak (*admitted pro hac vice*)
michaellifrak@quinnemanuel.com
Mari F. Henderson (*admitted pro hac vice*)
marihenderson@quinnemanuel.com
Alex Bergjans (*admitted pro hac vice*)
alexbergjans@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000

*Attorneys for Defendants Tyler Perry, TPS Production Services, LLC and And Action, LLC*

26

## LOCAL RULE 5.1 CERTIFICATION

Counsel certifies that this memorandum of law has been prepared with Times New Roman size 14-point font, which are font and point selections approved by the Court in Local Rule 5.1. This memorandum does not contain more than 10 characters per inch of type.

TUCKER ELLIS LLP

By: */s/ Matthew A. Boyd*
Matthew A. Boyd
Georgia Bar No. 027645
Matthew.boyd@tuckerellis.com
3344 Peachtree St. NE – Suite 1050
Atlanta, GA 30326
Telephone: (404) 678-6365

*Attorneys for Defendants Tyler Perry, TPS Production Services, LLC and And Action, LLC*

27

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| DEREK DIXON, *Plaintiff*, v. TYLER PERRY; TPS PRODUCTION SERVICES, LLC; and AND ACTION, LLC, *Defendants*. | Case No. 1:25-cv-07102-SEG-CCB |

## CERTIFICATE OF SERVICE

This is to certify that, on this 22nd day of June, 2026, I have electronically filed **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED AND VERIFIED COMPLAINT** with the Clerk of Court using CM/ECF and thereby served the Plaintiff through his counsel of record.

*/s/ Matthew A. Boyd*
Matthew A. Boyd
Georgia Bar No. 027645

28